IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| STATE OF LOUISIANA, By and through its Attorney General, LIZ MURRILL; | Hon. __ |
| AMERICAN PETROLEUM INSTITUTE; and, | CIVIL ACTION NO. __ |
| CHEVRON U.S.A. INC, | |
| Plaintiffs, | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE; and | |
| HOWARD LUTNIK, in his official capacity as the Secretary of Commerce, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs State of Louisiana, the American Petroleum Institute ("API"), and Chevron

U.S.A. Inc. ("Chevron") bring this civil action for declaratory and injunctive relief, and allege as

follows:

## PRELIMINARY STATEMENT

1.     Acting on an artificially compressed timeline committed to by the prior

administration, the National Marine Fisheries Service ("the Service") issued the "Biological and

Conference Opinion on Bureau of Ocean Energy Management and the Bureau of Safety and

Environmental Enforcement's Oil and Gas Program Activities in the Gulf of America" on May

20, 2025 (the "2025 BiOp"), pursuant to Section 7 of the Endangered Species Act ("ESA"). The 2025 BiOp addresses all activities regulated by the United States ("U.S.") Bureau of Ocean Energy Management ("BOEM") and the U.S. Bureau of Safety and Environmental Enforcement ("BSEE" and jointly the "Bureaus") under the Outer Continental Shelf Oil and Gas Program (hereafter referred to as the "Oil and Gas Program").[1] The 2025 BiOp evaluates the effects of those activities on threatened and endangered species in the Gulf of America (the "Gulf").

2.      The Service was under a hard deadline to issue the 2025 BiOp by May 21, 2025 because a federal district court in Maryland—based on scheduling promises made by the prior administration that had been working on the 2025 BiOp for years—ordered the prior biological opinion vacated on that day. The Service and Bureaus had informed the court that vacating the prior biological opinion without a replacement in place would lead to safety risks, regulatory chaos, and declining Gulf production.

3.      The compressed timeline left only four months remaining after President Trump's inauguration to complete the 2025 BiOp. The prior administration, at the behest of special interest groups, consistently took a "precautionary approach"—making pessimistic and worst-case assumptions—when analyzing potential effects on listed species, particularly the Rice's whale. That approach serves as the foundation for critical analyses in the 2025 BiOp, and it violates the ESA.

4.      Congress passed the ESA to protect threatened and endangered species from extinction. The ESA's biological opinion process is set forth in Section 7. It requires federal agencies taking an action (like the Bureaus here) to consult with the agency with jurisdiction

---

[1] Plaintiffs intend to send notice letters to the Bureaus and may amend this Complaint to add the Bureaus upon completion of the notice period.

over the species (here, the Service) and the applicant for the federal approval (here, API on behalf of its members, and Chevron) to ensure that the authorized action is not likely to jeopardize the continued existence of threatened and endangered species. If, after consultation, the Service concludes that jeopardy is likely, the Service must propose a reasonable and prudent alternative to avoid that jeopardy. These determinations must be documented in a written biological opinion. The biological opinion "has a powerful coercive effect on the action agency" and the applicants. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Compliance with the biological opinion generally shields the agency and applicant from ESA liability for unauthorized take of a listed species. *Id*.

5.    Despite no evidence that an Oil and Gas Program vessel has ever struck a Rice's whale, the 2025 BiOp projects that Oil and Gas Program vessels will lethally strike numerous Rice's whales over the term of the 2025 BiOp. On that basis alone, the Service found that the Oil and Gas Program will jeopardize the continued existence of the Rice's whale, and developed a multi-step reasonable and prudent alternative which it asserts will reduce projected vessel strikes to zero.

6.    The ESA also imposes important limitations on a biological opinion's coercive power. As particularly relevant here, the Service must "use the best scientific and commercial data available" in making decisions under the ESA. 16 U.S.C. § 1536(a)(2). This empirical mandate ensures the law is not "implemented haphazardly, on the basis of speculation or surmise," and thus "avoid[s] needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Spear*, 520 U.S. at 176-77. The Service may not speculate about the potential effects of a proposed action, but rather must evaluate the "reasonably certain" effects of the action on ESA-listed species. 50 C.F.R. §

402.02. When evaluating those reasonably certain effects, the Service may not make "pessimistic assumptions," employ "worst-case scenarios," or otherwise give the "benefit of the doubt" to the species. *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 586 (D.C. Cir. 2023).

7.     The 2025 BiOp's jeopardy finding and analysis of effects do not adhere to these important statutory limitations. The 2025 BiOp repeatedly relies on overly conservative or pessimistic assumptions, ignores the best available data, and engages in speculation and surmise to overstate the effects of the Oil and Gas Program on ESA-listed species and to impose burdensome and unnecessary measures to offset those exaggerated, hypothetical impacts. This violates the ESA.

8.     Nowhere are these errors more glaring than the 2025 BiOp's analysis of the effects of Oil and Gas Program vessels on the Rice's whale. The Rice's whale is a rarely found animal that the Service first identified as a new species (separate from the non-endangered Bryde's whale) in 2021. 86 Fed. Reg. 47,022 (Aug. 23, 2021). There is no evidence that an Oil and Gas Program vessel has ever struck a Rice's whale (or a Bryde's whale) despite continued operation in the Gulf over many decades. This is unsurprising given that there are no active oil and gas activities in the previously identified "biologically important area" for Rice's whales—a portion of the De Soto Canyon in the eastern Gulf where the whales are predominately found. The biologically important area is not a normal transit route for Program vessels. Based on these facts, and taking into account transit routes and normal vessel speeds, the Bureaus logically concluded in the biological assessment that preceded the Service's 2025 BiOp that Oil and Gas Program vessels were unlikely to strike a Rice's whale.

9.      The 2025 BiOp disregards the Bureaus' logical, fact-based conclusion. Instead, the Service's 2025 BiOp engages in speculation and guess-work to surmise that Oil and Gas Program vessels could be striking and killing Rice's whales on a regular basis. The Service ignores the best available data (*i.e.*, showing no recorded observations of an oil and gas vessel striking a Rice's whale) and instead presumes that forceable and lethal collisions between oil and gas service vessels and 60,000-pound whales are regularly occurring but somehow going unnoticed by the vessels and their crews and that the carcasses silently disappear into the water, never to be seen again. Based on these hypothesized Rice's whale strikes, for which there is zero evidence in support, the Service declares that "jeopardy" is "likely" and imposes a reasonable and prudent alternative to avoid those phantom vessel strikes. This is precisely what the ESA prohibits: haphazard implementation "on the basis of speculation or surmise." *Spear*, 520 U.S. at 176-77.

10.     The 2025 BiOp then uses the reasonable and prudent alternative to turn the ESA's consultation process upside down and backwards. Having found "jeopardy" based on the speculative vessel strikes, the reasonable and prudent alternative requires the Bureaus to conduct a study to assess vessel strike risk in the Gulf to determine whether the assumptions the Service made in reaching the jeopardy conclusion were actually correct. This is nonsensical. The ESA jeopardy determination is supposed to be based on the "best scientific and commercial data available." It is not an invitation for the Service to declare jeopardy based on speculation and then force the action agency and the regulated community to prove (or disprove) that speculation through after-the-fact studies. That is exactly what occurred here and the process followed by the Service "looks more like a weaponization of the Endangered Species Act than the collaborative, reasoned approach prescribed by the applicable laws and regulations." *Louisiana v. Haaland*,

No. 2:23-CV-01157, 2023 WL 6450134, at *9 (W.D. La. Sept. 21, 2023), *order modified, appeal dismissed in part*, 86 F.4th 663 (5th Cir. 2023).

11.     For all these reasons, and those discussed more fully below, Plaintiffs respectfully request that the Court declare the Service's actions in preparing the 2025 BiOp violated the ESA and remand the matter back to the Service to timely correct these errors and issue a revised, lawful biological opinion. Plaintiffs seek reform, not vacatur, of the 2025 BiOp because the regulatory protections afforded by the 2025 BiOp are essential to continued operation of oil and gas activities in the Gulf during any court-ordered remand, and the protective measures that were included as part of the Bureaus' Program have successfully avoided and minimized impacts to ESA-listed species.

## THE PARTIES

12.     Plaintiff State of Louisiana is a sovereign state of the U.S. Louisiana has 32 active public ports, including five of the largest 15 ports in the U.S.[2] Louisiana ports carry 25% of U.S. waterborne commerce and account for about 525,000 jobs in the state (about one out of every five jobs).

13.     Underlying Louisiana, and in the waters of the adjoining Gulf, lie vast stores of oil and natural gas. Louisiana is the nation's number two producer of oil, producing almost 1.6 million barrels a day in October 2017 when including production from the federal Outer Continental Shelf ("OCS"). This represents 16% of the nation's crude oil production, behind Texas, with North Dakota in a close third place. Louisiana is also one of the nation's top five

---

[2] *See* Louisiana's Public Ports System, *Comparison to Other Southern Coastal States and Recommendations for Improvement* (Jan. 31, 2024), https://app.lla.la.gov/publicreports.nsf/0/493fe89c1d5f184086258ab5006778b2/$file/00003bbba.pdf.

producers of natural gas, which supplies the nation's electricity plants, among other critical infrastructure. Oil and gas development in the Gulf and on public lands is an essential part of Louisiana's economy—generating substantial tax revenue and jobs. The oil and gas industry in Louisiana accounts for approximately 249,800 jobs in the state. All of the direct and indirect revenue from the OCS depends on a lawful biological opinion to facilitate timely permitting for exploration and production.

14.    Louisiana and its parishes and municipalities receive hundreds of millions of dollars every year from Gulf lease sales and royalties under the Outer Continental Shelf Lands Act ("OCSLA") and the Gulf of Mexico Energy Security Act ("GOMESA"). Under the relevant statutes, coastal States are entitled to significant portions of the proceeds from OCS leasing and production. GOMESA provides for the sharing of 37.5% of "qualified Outer Continental Shelf revenues" among Louisiana, Alabama, Mississippi, and Texas to aid in coastal-restoration efforts. P.L. 109-432, 120 Stat. 3000 §105(a)(2), 43 U.S.C. §1331 note. Since 2017, the geographic area of "qualified" revenues encompasses the entire Gulf OCS available for leasing. P.L. 109-432, 120 Stat. 3000 § 105(b)(2). In addition, 12.5% of "qualified" revenues is shared with the Land and Water Conservation Fund, which provides matching grants to assist States with outdoor recreation programs. *Id*. § 105(a)(2).

15.    These revenue-sharing programs provide States with substantial funds; for example, in 2022 alone, Louisiana received $112 million in direct revenue sharing, and the Land and Water Conservation Fund received $84 million for state assistance programs. *See* Cong. Research Serv., Gulf of Mexico Energy Security Act (GOMESA): Background and Current Issues, at 6 (Dec. 21, 2022), bit.ly/45e7hS9. Louisiana annually deposits the funds it receives from the revenue-sharing program in the State Coastal Protection and Restoration Fund, a

constitutionally dedicated fund in the State Treasury that provides a recurring source of revenue for the development and implementation of a program to protect and restore Louisiana's coastal areas. La. Const. art. VII, §10.2(E)(1). Under Louisiana's Coastal Master Plan, those funds are used for various projects throughout the State, including within this judicial district. The 2023 Coastal Master Plan selected at least 16 projects located within this judicial district, including several specifically within the Lake Charles Division. *See* 2023 Louisiana's Comprehensive Master Plan for a Sustainable Coast 104-08 (May 25, 2023), https://coastal.la.gov/wp-content/uploads/2023/06/230531_CPRA_MP_Final-for-web_spreads.pdf. These funds depend on the orderly operation of the Oil and Gas Program, which itself depends on a lawful biological opinion to satisfy ESA requirements for the thousands of federal authorizations and approvals needed in this highly regulated industry.

16.    Louisiana has "broad trustee and police powers over wild animals within [its] jurisdiction, *Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976), including species analyzed in the 2025 BiOp. Of the species analyzed in the 2025 BiOp, the Gulf sturgeon and loggerhead sea turtle are also protected under Louisiana law.[3] As the trustee for these species when they are in Louisiana territory, Louisiana has a sovereign interest in actions taken that affect these species. For example, Louisiana has a state permitting program for seismic exploration to regulate the impacts of such exploration on protected species.[4] To reduce unnecessary burdens on Louisiana's regulatory program, particularly where exploration programs may include both states

---

[3] Louisiana Wildlife & Fisheries, Rare Species and Natural Communities by Parish, https://www.wlf.louisiana.gov/page/rare-species-and-natural-communities-by-parish.

[4] Louisiana Wildlife & Fisheries, Seismic Exploration Permits, https://www.wlf.louisiana.gov/page/seismic-exploration-permits.

and federal areas, Louisiana has an interest in ensuring that any conditions on seismic exploration imposed by the 2025 BiOp are consistent with state law.

17.     Liz Murrill is the Attorney General of the State of Louisiana and is authorized by Louisiana law to sue on the State's behalf. Her offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

18.     Plaintiff API is a national trade association representing nearly 600 member companies involved in all aspects of the oil and natural gas industry. API's members include leaseholders, operators, and service companies that operate in the Gulf and are subject to the BiOp. The Bureaus determined that API is an "applicant" under Section 7 of the ESA regarding its members' activities in the Gulf. The ESA provides applicants the right to participate in the Section 7 consultation process.

19.     Plaintiff Chevron is a leader in the oil-and-gas industry with interests in hundreds of leases in the Gulf. Chevron engages in exploration, development, and production on these leases. Chevron's operations in the Gulf are subject to the BiOp. The Bureaus determined that Chevron is an "applicant" under Section 7 of the ESA regarding its activities in the Gulf. The ESA provides applicants the right to participate in the Section 7 process.

20.     Defendant the Service is part of the federal National Oceanic and Atmospheric Administration within the U.S. Department of Commerce. The Service is generally responsible for the administration of the ESA with respect to marine species and their habitats, including the Rice's whale. The Service issued the 2025 BiOp, which is the subject of this litigation.

21.     Defendant Howard Lutnik is sued in his official capacity as the Secretary of Commerce. The Secretary is the chief officer of the U.S. Department of Commerce and is

charged by the ESA with responsibilities to consult with federal action agencies regarding the impacts of proposed federal agency action on threatened and endangered marine species.

## JURISDICTION AND VENUE

22.    This action is brought under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. This Court has jurisdiction over this action under 28 U.S.C. § 1346(a)(2), because an agency of the U.S. government is a named defendant, and 28 U.S.C. § 1331, because this action arises under the laws of the U.S.

23.    The BiOp is a final agency action for which Plaintiffs have a right of judicial review under the APA, 5 U.S.C. §§ 701-706. *Spear*, 520 U.S. at 154-55.

24.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because Defendants are federal agencies of the U.S. or officers sued in their official capacities, the State of Louisiana resides in this judicial district, and no real property is involved in this action.

## STATUTORY FRAMEWORK

A.    The Administrative Procedure Act

25.    The APA confers a right of judicial review on any person who is adversely affected by an agency action. 5 U.S.C. § 702. Suits against the government for maladministration of the ESA are properly brought under the APA. *See Conservation Force v. Salazar*, 753 F. Supp. 2d 29 (D.D.C. 2010).

26.    The APA authorizes courts to review final agency action, including a biological opinion. 5 U.S.C. § 702. The court is empowered to "hold unlawful" all or part of an agency action if the court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." *Id.* § 706(2)(A), (D).

B.      The Endangered Species Act

27.     The ESA provides the implementing agencies with authority to list qualifying species as "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

28.     Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any" listed species or result in the "destruction or adverse modification" of designated critical habitat. *Id*. § 1536(a)(2). To comply with this mandate, federal agencies must consult with the Service when their actions "may affect" a listed marine species. 50 C.F.R. § 402.14(a). At the conclusion of the consultation, the Service must provide a "written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). This is known as the "biological opinion."

29.     The goal of the biological opinion is to evaluate and avoid actions that are "likely" to jeopardize the continued existence of threatened or endangered species. *Id*. § 1536(a)(2); *Me. Lobstermen's Ass'n*, 70 F.4th at 595 ("Section 7, therefore, requires the action agency to avoid acts that will *more likely than not* jeopardize a species. No more, and no less." (emphasis added)). To determine whether the action is likely to jeopardize a listed species, the Service must evaluate the "reasonably certain" effects of the proposed action. 50 C.F.R. § 402.02. In determining what effects are "reasonably certain," the agency must rely on "solid

information" and not "speculation sprinkled with dabs of evidence." *Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 989 (9th Cir. 2023).

30.     The agencies must use the "best scientific and commercial data available" during the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(f), (g)(8). This empirical mandate ensures the law is not "implemented haphazardly, on the basis of speculation or surmise," and thus "avoid[s] needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Spear*, 520 U.S. at 176-77.

31.     If the Service concludes that the agency action is likely to jeopardize the species, the biological opinion may specify a "reasonable and prudent alternative[]" that will avoid jeopardy. 16 U.S.C. § 1536(b)(3). The reasonable and prudent alternative consists of "actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02.

A biological opinion that concludes the agency action is not likely to jeopardize the continued existence of a listed species but will result in "take" incidental to the agency action must include an incidental take statement. 16 U.S.C. § 1536(b)(4). Among other requirements, an incidental take statement must specify any "reasonable and prudent measures" that the Service considers necessary or appropriate to minimize the impact of any incidental take as well as "terms and conditions" to implement those measures. *Id.*; 50 C.F.R. § 402.14(i).

**FACTUAL ALLEGATIONS**

A.    The Gulf of America Oil and Gas Program

32.    OCSLA governs the OCS and instructs that the OCS "is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). OCSLA empowers the Secretary of the Interior to grant leases to the highest qualified responsible bidder on the basis of sealed competitive bids and to formulate regulations as necessary to carry out the provisions of OCSLA.

33.    OCSLA governs exploration, development, and production of oil and gas resources from the OCS. Leases grant the exclusive right to explore for and produce oil and gas and leases expire if the lessee fails to achieve certain milestones within the lease term. Lessees pay annual rentals for each lease and royalties on production.

34.    In accordance with OCSLA, BOEM manages approximately 156 million acres in the Gulf. BOEM conducts lease sales and reviews plans for exploration (including seismic and exploration drilling), development, and production.

35.    BSEE is charged with safety and enforcement on the OCS. BSEE's mandate includes reviewing and acting on thousands of permit applications related to well design and safety.

36.    As of January 1, 2024, there are 2,190 active oil and gas leases on approximately seven million acres in the Gulf, managed under the OCSLA. The Gulf is the primary source of offshore oil and gas, accounting for 99% of all U.S. offshore oil and gas, including 15% of all domestic oil production and 2% of natural gas production.

37.    In fiscal year 2023, operations on the OCS in the Gulf produced 674 million barrels of oil and 795 billion cubic feet of natural gas. In 2023 alone, the Gulf's oil and gas industry is estimated to have supported over 412,000 jobs, contributed over $34.3 billion to the U.S. gross domestic product, and generated $6.1 billion in federal government revenue.

38.    These resources are produced by an extensive network of 1,432 active platforms, 7,170 wells, and 3,956 pipelines.

39.    These offshore operations are supported by hundreds of vessels making tens of thousands of annual vessel trips. These vessels bring crews, food, and supplies to offshore platforms, support drilling activities, conduct geological surveys, and perform maintenance and decommissioning activities.

40.    Most of the current and historic Gulf OCS oil and gas activities occur in areas offshore of Texas and Louisiana, with most of the associated vessel traffic to those areas originating from the Port of Galveston, Texas, and the Port of Fourchon, Port of Morgan City, and Port of Iberia, Louisiana. The majority of these oil and gas activities are conducted by API members.

41.    Oil and gas activities on the Gulf OCS are an important part of Louisiana's economy. Louisiana and its coastal parishes received more than $156 million in FY 2024 through revenue sharing under the GOMESA. Gulf oil and gas support services are an important part of Louisiana's economy—including the processing of natural gas, which occurs in the Calcasieu and Cameron Parishes within the Lake Charles Division of this judicial district.

42.    Each year, BSEE approves more than 5,000 permits for wells, pipelines, and facilities, and BOEM approves hundreds of plans and permits.

B.    ESA-Listed Species in the Gulf

43.    The Gulf is home to several ESA listed species, including Rice's whales (*Balaenoptera ricei*; previously Gulf of Mexico Bryde's whale, *Balaenoptera edeni*), sperm whales (*Physeter macrocephalus*), Kemp's ridley sea turtles (*Lepidochelys kempii*), loggerhead sea turtles (Northwest Atlantic Distinct Population Segment ("DPS"), *Caretta caretta*), green sea turtles (North Atlantic DPS, *Chelonia mydas*), hawksbill sea turtles (*Eretmochelys imbricata*), leatherback sea turtles (*Dermochelys coriacea*), Gulf sturgeon (*Acipenser oxyrinchus desotoi*), oceanic whitetip shark (*Carcharhinus longimanus*), and giant manta ray (*Manta birostris*).

44.    Rice's whales are  baleen whales found in the Gulf. The government has conceded multiple times that "[r]elatively little is known about the Rice's whale." Gov't Resp. Br. 84, *Healthy Gulf v. U.S. Dep't of Interior*, No. 24-01024 (D.C. Cir. Oct. 10, 2024); *see also* 89 Fed. Reg. 31,488, 31,502 (Apr. 24, 2024) ("there is currently uncertainty about Rice's whale density, abundance, habitat usage patterns and other factors in the central and western" Gulf).

45.    The Service first listed the Rice's whale—then known as the Gulf of Mexico Bryde's whale—as an endangered species in April 2019. 84 Fed. Reg. 15,446 (Apr. 15, 2019). The Bryde's whale is not a threatened or endangered species. Rather, the Service decided that the group of Bryde's whales thought to be living only in the Gulf was a "subspecies" of the Bryde's whale based on a petition presented by the Natural Resource Defense Council. *Id*. The Service estimated this subspecies at 33 animals and determined that these low numbers warranted protection under the ESA. *Id*. Less than two years later, the Service changed its mind and concluded that this population of whales—visually indistinguishable from the Bryde's whale— was a separate species and renamed that new species the "Rice's whale." 86 Fed. Reg. 47,022.

46.     In the 2019 listing decision, the Service determined that the distribution of the Rice's whale was "limited to the Biological Important Area (BIA)" that is "located in the De Soto Canyon area of the northeastern Gulf of Mexico." 84 Fed. Reg. at 15,454-455. All confirmed sightings of the Rice's whale at the time of the listing decision were in the biologically important area. The biologically important area is depicted in the figure below (with confirmed Rice's whale sightings in pink and unknown whale sightings in yellow):



47.     The biologically important area includes De Soto Canyon and is defined as the area between the 100- and 400-m isobaths, from 87.5° W to 27.5° N, with a 10 kilometer (km) buffer.

C.      The 2020 Biological Opinion and Lease Sale 261

48.     On March 13, 2020, the Service issued a comprehensive biological opinion (the "2020 BiOp") that governed all oil and gas activities on the OCS. *See* Nat'l Marine Fisheries

Serv., *Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico* 166 (Mar. 13, 2020), https://perma.cc/S5Z4-E5XS. The 2020 BiOp covered a wide range of Oil and Gas Program activities and associated impacts over a 50-year period and was the product of an extensive consultation process between the Service and other agencies that spanned nearly a full decade. The Bureaus and the Service refused to recognize API's applicant status in the development of the 2020 BiOp. The 2020 BiOp was issued without input from or participation by API or any other industry stakeholder.

49.    The 2020 BiOp modeled the Rice's whale population at 44 individuals.

50.    The 2020 BiOp recognized that there was no evidence that a Rice's whale had ever been struck by an oil and gas vessel. The 2020 BiOp nonetheless proceeded to make a series of conservative assumptions regarding the risk of vessel strikes and modeled those assumptions over a 50-year period, concluding (based on modeling) that oil and gas vessels would strike 23 Rice's whales, with 17 of those strikes being lethal. 2020 BiOp at 363.

51.    To avoid jeopardy, the Service included a reasonable and prudent alternative in the 2020 BiOp to limit the risk of Oil and Gas Program vessel strikes. The reasonable and prudent alternative prohibits nighttime and low-visibility travel in the biologically important area and imposes a 10-km speed limit in that same area. With that reasonable and prudent alternative, the Service concluded in the 2020 BiOp that the Oil and Gas Program was not likely to jeopardize the continued existence of the Rice's whale.

52.    The measures in the 2020 reasonable and prudent alternative have been fully carried out since 2020 and included as conditions of approval in BOEM and BSEE permits and other authorizations for Oil and Gas Program activities.

53.    In August 2023, BOEM attempted a last-minute change to Lease Sale 261 (required by Congress to be held in September 2023) that would have excluded all areas between 100-400 meters in depth along the central and western Gulf from the area available for sale, ostensibly to protect the Rice's whale. It also would have included severe restrictions on vessel traffic throughout the same area as lease stipulations, far beyond what the 2020 BiOp required.

54.    Plaintiffs Louisiana, API, and others brought suit challenging the procedural irregularities and lack of scientific support for BOEM's last-minute change. This Court granted plaintiffs' motion for preliminary injunction requiring BOEM to hold the sale as originally noticed, with the disputed acreage available for lease and without the unjustified stipulations. *Louisiana v. Haaland*, No. 2:23-CV-01157, 2023 WL 6450134, at *9 (W.D. La. Sept. 21, 2023), *order modified, appeal dismissed in part*, 86 F.4th 663 (5th Cir. 2023).

55.    As a result of further litigation in the District of Maryland after this Court's preliminary injunction, the 2020 Biological Opinion is vacated by judicial order effective May 21, 2025.

D.    The 2025 Biological Opinion

56.    On October 25, 2022, the Bureaus submitted a letter to the Service, asking the Service to formally reinitiate consultation under Section 7 of the ESA.

57.    As part of the reinitiated consultation, the Bureaus developed a biological assessment ("BA") on December 22, 2023. The BA is required by Section 7 of the ESA. 16 U.S.C. § 1536(c). In the BA, the Bureaus considered the vessel mitigation requirements from the 2020 reasonable and prudent alternative part of the proposed action for the reinitiated consultation.

58.    Section 5.9 of the Bureaus' BA evaluates the potential for accidental vessel strikes with ESA-listed species, considering the strike avoidance measures that the Bureaus currently impose on Oil and Gas Program vessel traffic. The BA also surveys program vessels for size, vessel travel routes, and speeds.

59.    The BA concludes that it is unlikely that an Oil and Gas Program vessel will strike a Rice's whale: "Due to the relatively low abundance of vessel routes originating from the eastern [Gulf]; relatively low percentage of vessel traffic attributed to the Bureaus' oil and gas program activities within the [Gulf]; lack of previous vessel strikes attributed to oil- and gas-related activities; and that all of the larger vessel types ([average length overall] >80 meters) BOEM identified as conducting oil and gas activities on the OCS are expected to be typically operating either below or at the lower range of speeds noted to result in the majority of large whale ship strikes, as well as the proven effectiveness of existing protocols, we find the potential for vessel strikes to whales is unlikely to occur and, therefore, discountable." BA at 180.

60.    In response to an August 2024 order from the District of Maryland originally vacating the 2020 BiOp effective December 20, 2024, the Service informed the court that its reinitiated consultation was already underway but would not be complete until May 21, 2025. The Service provided declarations to the court explaining that this date was possible, in part, because BOEM and BSEE had agreed to a review period for the draft biological opinion of only five business days. The Maryland court amended the August order to defer the vacatur until May 21, 2025.

61.    On March 10, 2025, the Bureaus issued a letter recognizing the ESA Section 7 "applicant" status of API, API member company Chevron U.S.A. Inc., and three other trade associations representing companies operating in the Gulf. The Bureaus' letter followed requests

from these applicants that had been pending for years. On March 31, 2025, the Bureaus provided the applicants a draft copy of a new biological opinion, as required by the ESA.  The applicants were given seven days (five business days) to review the draft biological opinion and provide comments.

62.    On May 20, 2025, the Service issued the 2025 BiOp.

63.    The 2025 BiOp estimates the Rice's whale population at 51 individual whales.

64.    The 2025 BiOp disregards the BA's conclusion that an Oil and Gas Program vessel strike on a Rice's whale is unlikely to occur.

65.    The 2025 BiOp concedes that there is no evidence that an Oil and Gas Program vessel has ever struck a Rice's whale. But the 2025 BiOp discards the observed record and instead engages in a hypothetical exercise to speculate about vessel strike risk. This exercise relies on the assumptions that (1) based on an assumed carcass recovery rate for the Rice's whale of 5%, vessels in the Gulf have been silently striking and killing Rice's whales (unbeknownst to the vessel captains and crew) at an average rate of 0.87 whales per year for the last two decades and that same rate will continue for the next 45 years; and (2) 27% of those phantom strikes were by Oil and Gas Program vessels in the last two decades and will continue at that rate for the next 45 years. Based on these assumptions, the Service concludes that Oil and Gas Program vessels will strike and kill 11n Rice's whales in the next 45 years. Based on these speculative assumptions and calculations, the Service concludes that the Oil and Gas Program is likely to jeopardize the continued existence of the Rice's whale.

66.    The 5% carcass recovery rate for the Rice's whale means that the Service assumes for every five carcasses found, 95 carcasses are not found. To predict lethal strikes from Oil and Gas Program vessels using the assumed 5% carcass recovery rate, the Service applied that rate to

a single data point: a 2009 vessel strike by a cargo ship (not an Oil and Gas Program vessel), which is the only observed lethal Rice's whale vessel strike in at least the last 23 years with a recovered carcass. Specifically, the Service divided that single data point by the 5% recovery rate to conclude that 20 whales were struck and killed by vessels during that 23-year period—*i.e.*, 0.87 Rice's whales per year.

67.    But the Service's assumed 5% carcass recovery rate for the Rice's whale lacks any scientific basis. No study has determined a carcass recovery rate for the Rice's whale. It is undisputed that the Rice's whale carcass recovery rate is unknown. The authors of the only paper that attempted to determine carcass recovery rates for species in the Gulf (Williams et al. 2011[5]) were unable to calculate a carcass recovery rate for the Rice's whale (then known as the Gulf of Mexico Bryde's whale) due to substantial uncertainty.

68.    Without species specific information, the Service layers on speculation by picking the 5% carcass recovery rate discussed in Rockwood et al. (2017) as if it were an established carcass recovery rate.[6] But the 5% recovery rate in Rockwood et al. was not the result of scientific study; it was just a rough benchmark created to evaluate another of Rockwood's "novel" whale encounter models for blue, humpback, and fin whales off California, and created by averaging the recovery rates for three other species (killer whales, grey whales and sperm whales) in different locations.

---

[5] Williams, R., and coauthors. 2011. Underestimating the damage: Interpreting cetacean carcass recoveries in the context of the *Deepwater Horizon*/BP incident. Conservation Letters 4(3):228-233.

[6] Rockwood R.C., et al. 2017. High mortality of blue, humpback and fin whales from modeling of vessel collisions on the U.S. West Coast suggests population impacts and insufficient protection. PLoS ONE 12(8):e0183052.

69.    The Service's assumed 5% carcass recovery rate for the Rice's whale is also demonstrably inconsistent with the best available scientific and commercial data. During the last two decades, a total of seven Rice's whale carcasses have been recovered (Rosel et al. 2021, Table 4[7]). Applying the 5% recovery rate to the seven Rice's whale carcasses found from 2002 to 2024 yields a total mortality from all causes (including vessel strikes) of 140 whales (7/0.05 = 140) during that time period. Since the 2025 BiOp estimates the entire population of Rice's whales from 1992 to 2009 at 44 whales, and estimates the current population at 51 whales, it is not statistically plausible that 140 whales died between 2002 and 2024. The Service's assumed 5% carcass recovery rate for the Rice's whales is therefore erroneous and not plausible.

70.    The 2025 BiOp's assessment of vessel strikes is also faulty because it overestimates the contribution of oil and gas vessels. The 2025 BiOp assigns 27% of the assumed 20 lethal strikes to Oil and Gas Program vessels by making another series of overly conservative assumptions regarding the risk posed by program vessels. To calculate strike risk, the Service predicted the abundance of Rice's whales within 10-km cells based on "density modeling." This "density modeling" is not based on the probability of the actual presence of a Rice's whale, but instead on habitat suitability features. This leads to illogical results. As shown on Figure 71, the 2025 BiOp contemplates very high relative strike risk (100%) near the Port of New Orleans in locations where no Rice's whale has ever been seen or acoustically detected. Indeed, Soldevilla et al. (2022)[8] used passive acoustic monitoring for Rice's whale calls at the Grand Isle site (off the Port of New Orleans) and had *no acoustic detections* despite over 9,000

---

[7] Rosel, Patricia, et al. 2021. A new species of baleen whale (*Balaenptera*) from the Gulf of Mexico, with a review of its geographic distribution. Mar Mam Sci. 2021; 37:577-610.

[8] Soldevilla, Melissa, et al. 2022. Rice's whale in the northwestern Gulf of Mexico: call variation and occurrence beyond the known core habitat. Endangered Species Res. 2022; 48:155-174.

hours of monitoring. Yet *most of* the highest strike risk locations identified by Table Figure 71 are centered around the Grand Isle site.

71.     As for the biologically important area in the eastern Gulf, where most Rice's whales live, Figure 71 correctly shows zero strike risk from program vessels (because program vessels either do not travel through that area or are subject to speed and visibility restrictions). There is no factual basis for assigning 27% of the Service's hypothesized strike risk to oil and gas vessels when they are the *only* vessels that must either avoid the biologically important area where most Rice's whales are found or travel through that area under speed and visibility restrictions. Other non-program vessels, such as cargo ships, regularly travel through the biologically important area with no speed or visibility restrictions because multiple shipping lanes transect that area. The proportionate risk for Oil and Gas Program vessels should be negligible, not 27%.

72.     Compounding these problems, the 2025 BiOp further overestimates the program-related vessel strike risk relative to non-program vessels by relying predominantly on vessel speed while failing to account for critical differences related to vessel size. The size of a vessel (including its mass) informs the force imparted on impact (and thus the lethality of the impact), vessel maneuverability (and thus the ability to avoid a strike) and the hydrodynamic draw of the vessel (which can increase strike risk). A container vessel of over 230,000 gross tons traveling at 12 knots in a shipping lane through the middle of the Rice's whale habitat area presents a substantially different strike risk than a 500 gross ton (or much smaller) service vessel traveling at 12 knots across Grand Isle where no Rice's whale has ever been seen or acoustically detected. The Service's attribution of a 27% strike risk to program-related vessels does not account for these significant differences and is thus arbitrary, unsupported speculation.

73.    The 2025 BiOp makes similar unsupported and overly "conservative" assumptions about vessel strike risks and carcass recoveries when estimating take of other ESA-listed species, including sperm whales and sea turtles.

74.    API and Chevron identified the key problems with the Service's use of the 5% recovery rate and attribution of vessel strike risk in written comments on the draft BiOp. Instead of addressing the problems identified by the regulated community, the Service in the final 2025 BiOp claimed to supplement its flawed "vessel strike risk analysis for Rice's whales with a preliminary analysis" using "encounter rate theory." *See* 2025 BiOp at 357. The Service's "encounter rate theory" model mounds speculation on top of speculation.

75.    The encounter rate theory model attempts to incorporate "behavioral characteristics and whale avoidance." *Id*. But the Service had no data to run its model. The Service admits that it has "no data on reaction distance for Rice's whale" so it assumed, with no factual basis, that Rice's whales react with the same speed as the North Atlantic right whale. *See* 2025 BiOp at 357. And since "little is known about active avoidance of oncoming vessels by Rice's whales" the Service just "assumes that Rice's whales do not actively avoid an oncoming vessel." *Id*. at 357-58. The Service's new model produces a range of strike risk between 2% and 11%, numbers which do not represent "actual mortality estimates" and for which the Service has "no way to validate." *Id*.

76.    The Service then substitutes the previously used 27% strike risk with the new strike risk percentages (2% and 11%) . The Service once again uses the same 5% carcass recovery rate, and the same flawed conclusion that 0.87 phantom Rice's whales are being lethally struck by all vessels in the Gulf each year. The Service then does simple math to calculate that in the next 45 years either 1 Rice's whale (0.87 times 2% times 45 years = 0.783,

which rounds up to 1) or 5 Rice's whales (0.87 times 11% times 45 years = 4.3, which rounds up to 5) will be struck by oil and gas service vessels.. Then, for reasons that are unexplained, NMFS concluded that the likely result is 6 lethal vessel strikes by taking the average of the three model outputs (11 + 1 + 5 divided by 3 = 5.66, which rounds up to 6). Averaging speculative models does not make the result any less speculative. The 2025 BiOp also substantially overestimates incidental take by "harassment" by incorrectly treating Marine Mammal Protection Act ("MMPA") Level B harassment as ESA "harassment." The MMPA defines Level B harassment as an "act of pursuit, torment, or annoyance" that "has the *potential to disturb* a marine mammal . . . by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." 16 U.S.C. § 1362(18)(A)(ii) (emphasis added). The MMPA defines Level A harassment as an "act of pursuit, torment, or annoyance" that "has the *potential to injure* a marine mammal or marine mammal stock in the wild." *Id*. § 1362(18)(A)(i) (emphasis added). Accordingly, Congress specifically defined MMPA Level B harassment to *not* include any act that has the "potential to injure" (because any such act constitutes MMPA Level A harassment).

77.     The Service has not promulgated a regulatory definition for ESA "harassment." But, as recognized in the 2025 BiOp, the Service issued guidance defining "harass," under the ESA, as to "create the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding, or sheltering." Under this definition, ESA "harassment," which requires a "likelihood of injury," can *never* include MMPA Level B harassment, which does *not* include any act that creates the "potential to injure." An act that creates the "*likelihood* of injury" plainly falls completely within the broader scope of acts that create the "*potential* to injure."

78.     Despite these clear distinctions, the 2025 BiOp incorrectly uses the Service's estimated MMPA Level B harassment to both evaluate the effects of the action and specify the level of "incidental taking" that will occur as a result of the Oil and Gas Program. *See* 16 U.S.C. § 1536(b)(4). By incorrectly treating MMPA Level B harassment, as well as other acts that do not have a "likelihood of injury" (*i.e.*, disturbance of turtles), as ESA "harassment," the 2025 BiOp's incidental take statement improperly ascribes scores of incidents of supposed ESA "harassment" of marine mammals and turtles to the proposed action that are not actually ESA harassment. This is a serious and consequential mistake because it causes an enormous overestimate of ESA "take" by the proposed action, which falsely informs the jeopardy analyses and reasonable and prudent measures, and falsely implicates the need to comply with § 1536(b)(4).

79.     API and the other applicants identified these errors, and many others, in comments submitted on the draft of the 2025 BiOp.

80.     The errors in the 2025 BiOp's effects analysis and jeopardy determination cause direct harm to API and its members, including Chevron, who hold leases, work, and operate facilities in the Gulf. The 2025 BiOp improperly inflates the assumed effects and incidental take estimates based on speculation and surmise, and then imposes regulatory burdens on API's members operating in the Gulf through the reasonable and prudent alternative and reasonable and prudent measures to offset the impacts of the inflated effects and take estimates. The inflation of take estimates also causes reputational injury to API and its members by representing speculative harms as actual harms caused by the Oil and Gas Program. At best, this is the Service causing "needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Spear*, 520 U.S. at 176-77. At worst, it

is "a weaponization of the Endangered Species Act." *Louisiana*, 2023 WL 6450134, at *9. Remand to the Service, without vacatur, to correct these errors would redress these harms.

81.    The State of Louisiana is likewise harmed by the unsupported and speculative analyses and conclusions of the 2025 BiOp. As described above, the Oil and Gas Program is a critical component of the state's economy. Measures that unnecessarily burden the Oil and Gas Program with delay and expense in turn impair the State's direct and indirect financial interests, harm businesses and residents of the state who work and operate in the Gulf, and impair the State's regulatory interests in the Gulf and its adjoining waters. Increased expenses to the Program and decreased income leads to a direct decline in the State's statutory income, harming vital restoration projects and the State's overall economic health. Further, the improper inflation of take estimates in the 2025 BiOp, and the erroneous claim of hypothetical takes by vessel strikes by both Oil and Gas Program vessels and other vessel traffic, have a meaningful and chilling impact on cargo vessels, cruise lines, commercial fisheries, barge and equipment vessels, ships carrying commercial goods, medicines, automobiles, and all ports in the Gulf—damaging a wide array of businesses that Louisiana relies on to bolster its economy. Furthermore, this kind of speculation masquerading as science builds a faulty foundation for additional regulatory decisions in the Gulf related to the Rice's whale, including the imposition of unnecessary additional restrictions through the process set forth in the reasonable and prudent alternative. Such restrictions, like the other issues rampant in the BiOp, increase financial burdens on those businesses and projects that Louisiana and its citizens rely on for income, employment, and much more. Remand to the Service without vacatur to correct these errors would redress these harms.

## CLAIMS FOR RELIEF

**CLAIM ONE: The 2025 BiOp Unlawfully, Arbitrarily, and Capriciously Overestimates the Impacts of Oil and Gas Program Vessels on ESA-Listed Species**

82.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

83.     The ESA requires the Service to "use the best scientific and commercial data available" in making decisions under the ESA, including when evaluating whether the effects of proposed actions are likely to jeopardize the continued existence of ESA-listed species. 16 U.S.C. § 1536(a)(2).

84.     The effects of the action "are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action but that are not part of the action." 50 C.F.R. § 402.02. "A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." *Id.*

85.     The 2025 BiOp's estimate and analysis of the effects of the action and its jeopardy conclusion are arbitrary, capricious, and contrary to law for at least the following reasons:

> a.  The jeopardy finding is not supported by the best scientific and commercial data available;
>
> b.  The jeopardy finding relies on pessimistic and precautionary assumptions, speculation, and surmise;
>
> c.  The jeopardy finding is premised on effects of the action that are not reasonably certain to occur;

d.   The 2025 BiOp concludes that hypothesized effects, not the actual effects of the action, are likely to cause jeopardy;

e.   The vessel strike analysis is based on pessimistic assumptions that are not supported by the best scientific and commercial data available, are not reasonably certain to occur, and reflect speculation and surmise; and

f.   The vessel strike analysis fails to fully disclose the uncertainty and assumptions relied upon and erroneously presents speculative outcomes as reasonably certain to occur.

86.   The Service's 2025 BiOp is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

**CLAIM TWO: The 2025 BiOp Unlawfully, Arbitrarily, and Capriciously Imposes a Reasonable and Prudent Alternative**

87.   Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

88.   The 2025 BiOp compounds the errors in overestimating the effects of Oil and Gas Program vessels by imposing a reasonable and prudent alternative intended to avoid hypothesized vessel strikes that are not reasonably certain to occur. The reasonable and prudent alternative  includes a comprehensive process to evaluate and assess vessel strike risk, and then to develop and implement plans and mitigation measures to reduce vessel strike risk.

89.   A reasonable and prudent alternative is only allowed where the proposed action is likely to jeopardize the continued existence of the species. 16 U.S.C. § 1536(b)(3)(A).

90.   Because the 2025 BiOp's jeopardy finding is fundamentally flawed and unlawful, the Service's imposition of a reasonable and prudent alternative is also arbitrary, capricious, and contrary to law.

91.     Because the best available scientific and commercial data show zero historical Rice's whale strikes from Oil and Gas Program vessels, the reasonable and prudent alternative is unnecessary and, therefore, neither reasonable nor prudent.

92.     In addition, a reasonable and prudent alternative must be "economically and technologically feasible." 50 C.F.R. § 402.02. The reasonable and prudent alternative in the 2025 BiOp does not disclose the full scope of mitigation measures that will be required as a result of the required planning process. Accordingly, it is impossible to determine whether the measures to be imposed as a result of the reasonable and prudent alternative process are economically and technologically feasible. The Service's finding that the reasonable and prudent alternative is economically and technologically feasible is therefore unsupported and arbitrary.

93.     The 2025 BiOp's reasonable and prudent alternative is therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

**CLAIM THREE: The 2025 BiOp and Incidental Take Statement Unlawfully, Arbitrarily, and Capriciously Use the Wrong Take Standards**

94.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

95.     Agency action is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law when the agency uses the wrong legal standard.

96.     ESA harassment is limited to actions where there is a likelihood of injury. Likely means "more likely than not." *Me. Lobstermen's Ass'n*, 70 F.4th at 595 (internal quotation marks and citation omitted). MMPA Level B harassment is limited to actions with a "potential to disturb" and excludes those activities (defined as Level A harassment) that have a "potential to injure." 16 U.S.C. § 1362(18)(A). The 2025 BiOp uses MMPA Level B harassment and other

estimates of disturbance without a likelihood of injury to estimate ESA "harassment" of marine mammals and sea turtles. By applying the wrong legal standards, the 2025 BiOp enormously overestimates the ESA "take" by the proposed action.

97.    In addition, the Service, when calculating "take" in the 2025 BiOp, failed to correctly apply the best statutory meaning of the text. *See* 90 Fed. Reg. 16,102, 16,103 (Apr. 17, 2025). The 2025 BiOp's and incidental take statement's take estimates are erroneous and arbitrary for this reason as well.

98.    The 2025 BiOp's use and application of the wrong legal standards for ESA "take" are therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

### CLAIM FOUR: The 2025 BiOp's Incidental Take Statement Unlawfully, Arbitrarily, and Capriciously Imposes Reasonable and Prudent Measures

99.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set forth herein.

100.    The BiOp also includes reasonable and prudent measures ("RPMs") that are unnecessary and exceed the scope of measures authorized by statute and regulation.

101.    RPMs are "actions" the Service "considers necessary or appropriate to minimize the impact of the incidental take on the species" 50 C.F.R. § 402.02. An RPM may not "alter the basic design, location, scope, duration, or timing of the action" and cannot include more than "minor changes." 50 C.F.R. § 402.14(i)(2).

102.    RPM #1 requires seismic surveys to use the "quietest configuration" to avoid harassment of ESA listed species. This RPM is not necessary or appropriate because it is premised on misreading the ESA "harassment" standards, as discussed above. Moreover, RPM #1 could require the applicant to make material changes in planned surveys, including the

frequency range, shot duration, shot point intervals, tow depth, and other key variables. This would "alter the basic design, location, scope, duration, or timing of the action," as well as involve more than "minor changes," in violation of 50 C.F.R. § 402.14(i)(2).

103.    RPM #4 addresses "unauthorized releases of trash, debris, or oil associated with the Oil and Gas Program activities." As NMFS correctly concludes in the 2025 BiOp, the unauthorized release of marine debris or oil does not constitute "incidental take" under the ESA. Because RPMs "minimize [the] impact of incidental taking on the species," the incidental take statement cannot include RPMs that address unauthorized releases of marine debris or oil, as such releases are not "incidental take." 50 C.F.R. § 402.02.

104.    RPMs #1 and #4 are therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A), (C), (D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief from the Court:

1.    A declaration, pursuant to 28 U.S.C. § 2201, that the Service's actions preparing the 2025 BiOp are unlawful, arbitrary, and capricious for the reasons set forth in this Complaint;

2.    An order remanding the 2025 BiOp to the Service, without vacatur, to correct and revise the 2025 BiOp;

3.    An order setting a reasonable date for completion of the court-ordered remand;

4.    An order enjoining the Service from implementing or otherwise enforcing the reasonable and prudent alternative during completion of the court-ordered remand;

5.    An order awarding Plaintiffs their costs, reasonable attorneys' fees, and other expenses, pursuant to 28 U.S.C. § 2412; and

6.    Any additional equitable or other relief as the Court deems just and proper.

DATED: May 20th, 2025

Respectfully submitted,

/s/ James A. Holmes
**JAMES A. HOLMES – BAR #20571**
**CHRISTOVICH & KEARNEY, LLP**
601 Poydras Street, Suite 2300
New Orleans, LA 70130-6078
Tel: (504) 561-5700
jaholmes@christovich.com

and

**STOEL RIVES LLP**
Ryan P. Steen (*pro hac vice pending*)
ryan.steen@stoel.com
Jason T. Morgan (*pro hac vice pending*)
jason.morgan@stoel.com
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

*Attorneys for American Petroleum Institute*

/s/ Claire Juneau
Michael R. Phillips (#21020)
Claire E. Juneau (#33209)
Jeffrey J. Gelpi (#37130)
**KEAN MILLER LLP**
BankPlus Tower
909 Poydras St., Suite 3600
New Orleans, LA 70112
(504) 585-3050
mike.phillips@keanmiller.com
claire.juneau@keanmiller.com
jeff.gelpi@keanmiller.com

Sarah C. Bordelon (pro hac vice pending)
**HOLLAND & HART LLP**
5470 Kietzke Lane, Suite 100
Reno, NV 89511
(775) 327-3011
scbordelon@hollandhart.com
*Counsel for Plaintiff Chevron U.S.A. Inc.*

/s/ Caitlin Huettemann
**CAITLIN A. HUETTEMANN – BAR #40402**
Assistant Solicitor General
**ELIZABETH B. MURRILL**
Attorney General of Louisiana
**OFFICE OF THE ATTORNEY GENERAL**
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 888-7903
HuettemannC@ag.louisiana.gov
*Attorneys for the State of Louisiana*