IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| STATE OF LOUISIANA,<br>By and through its Attorney General, LIZ MURRILL;<br><br>AMERICAN PETROLEUM INSTITUTE; and,<br><br>CHEVRON U.S.A. INC.,<br><br>       Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE; and<br><br>HOWARD LUTNICK, in his official capacity as the Secretary of Commerce,<br><br>       Defendants. | CIVIL ACTION NO. 2:25-cv-00691-JDC-TPL<br><br>Hon. James D. Cain, Jr.<br><br>Magistrate Judge Thomas P. LeBlanc |

## MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

I. INTRODUCTION ............................................................................................................... 1

II. LEGAL AND FACTUAL BACKGROUND .................................................................... 3

    A.    The Endangered Species Act ............................................................................... 3

    B.    The Gulf of America Oil and Gas Program ......................................................... 5

    C.    ESA-Listed Species in the Gulf ........................................................................... 6

    D.    The 2020 Biological Opinion and Lease Sale 261 ............................................... 8

    E.    The 2025 Biological Opinion ............................................................................. 10

III. STANDARD OF REVIEW ............................................................................................ 17

IV. STANDING .................................................................................................................... 17

V. ARGUMENT ................................................................................................................... 18

    A.    NMFS's Jeopardy Determination for the Rice's Whale Violates the ESA. ........ 18

        1.    NMFS's Projection of Vessel Strikes Does Not Use — and Is Contrary To — the Best Available Data. ................................................. 19

        2.    NMFS Failed to Consider and Address the Bureaus' Contrary Findings and Opinion. ................................................................................ 20

        3.    NMFS Failed to Consider and Address Applicant Expert Opinion. ........ 21

        4.    The 5% Carcass Recovery Rate NMFS Used is an Unlawfully Pessimistic Assumption. .......................................................................... 22

        5.    The Vessel "Strike Risk" Percentages NMFS Used are Unsupported by Real-World Data. ......................................................... 23

        6.    NMFS's Methodology to Predict Vessel Strikes Is Not Designed to Demonstrate that Any Strikes are Reasonably Certain to Occur. ........... 26

    B.    NMFS's "Reasonable and Prudent Alternative" Violates the ESA. .................... 29

    C.    NMFS Intentionally Used the Wrong Standard for Take by Harassment. .......... 30

    D.    NMFS's "Reasonable and Prudent Measures" Violate the ESA. ....................... 32

VI. THE APPROPRIATE REMEDY IS REMAND WITHOUT VACATUR .......................... 34

VII. CONCLUSION ............................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Bankers Ass'n v. NCUA,*
   934 F.3d 649 (D.C. Cir. 2019) ........................................................................36

*Bennett v. Spear,*
   520 U.S. 154 (1997) ...........................................................................4, 22, 24

*Caring Hearts Pers. Home Servs., Inc. v. Burwell,*
   824 F.3d 968 (10th Cir. 2016) .....................................................................31

*Cent. & S. W. Servs., Inc. v. EPA,*
   220 F.3d 683 (5th Cir. 2000) ......................................................................36

*Cobell v. Norton,*
   240 F.3d 1081 (D.C. Cir. 2001) ..................................................................36

*Ctr. for Biological Diversity v. EPA,*
   937 F.3d 533 (5th Cir. 2019) .......................................................................2

*Ctr. for Biological Diversity v. Haaland,*
   87 F.4th 980 (9th Cir. 2023) .......................................................4, 22, 28

*Diamond Alternative Energy, LLC v. EPA,*
   145 S. Ct. 2121 (2025) .................................................................................17

*Fla. Power & Light Co. v. Costle,*
   650 F.2d 579 (5th Cir. 1981) ......................................................................35

*Gen. Chem. Corp. v. United States,*
   817 F.2d 844 (D.C. Cir. 1987) ....................................................................27

*Gen. Land Off. v. U.S. Dep't of the Interior,*
   947 F.3d 309 (5th Cir. 2020) .................................................................32, 33

*Gulf Restoration Network v. Haaland,*
   47 F.4th 795 (D.C. Cir. 2022) .....................................................................21

*Healthy Gulf v. U.S. Dep't of Interior,*
   No. 24-01024 (D.C. Cir. Oct. 10, 2024) ......................................................6

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) ....................................................................................34

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Louisiana v. Haaland,*
   86 F.4th 663 (5th Cir. 2023) ...........................................................................2, 9, 10

*Louisiana v. Haaland,*
   No. 2:23-cv-01157, 2023 WL 6450134 (W.D. La. Sept. 21, 2023) ................................1, 9, 18

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.,*
   70 F.4th 582 (D.C. Cir. 2023) .......................................................................... passim

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
   463 U.S. 29 (1983) ...........................................................................................17

*Nat'l Wildlife Fed'n v. NMFS,*
   524 F.3d 917 (9th Cir. 2008) ..............................................................................35

*Oceana, Inc. v. Ross,*
   No. 08-1881, 2020 WL 6701072 (D.D.C. Nov. 13, 2020) .....................................35

*Ohio v. EPA,*
   603 U.S. 279 (2024)..........................................................................................22

*Panhandle E. Pipe Line Co. v. FERC,*
   613 F.2d 1120 (D.C. Cir. 1979) ..........................................................................34

*PPL Wallingform Energy LLC v. FERC,*
   419 F.3d 1194 (D.C. Cir. 2005) ..........................................................................21

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC,*
   992 F.3d 1071 (D.C. Cir. 2021) ..........................................................................35

*Sierra Club v. NMFS,*
   No. 8:20-cv-03060, 2024 WL 3860211 (D. Md. Aug. 19, 2024)......................10, 37

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.,*
   701 F. Supp. 3d 862 (D. Alaska 2023) ...................................................................32

*Tex. Corn Producers v. EPA,*
   141 F.4th 687 (5th Cir. 2025) .................................................................22, 25, 27

*Texas v. EPA,*
   137 F.4th 353 (5th Cir. 2025) .......................................................................... passim

*Trump v. CASA, Inc.,*
   145 S. Ct. 2540 (2025)........................................................................................35

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.*,
985 F.3d 472 (5th Cir. 2021) ............................................................................17

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................17

16 U.S.C. § 1362 ..............................................................................................32

16 U.S.C. § 1532(19) ....................................................................................5, 31

16 U.S.C. § 1533 ................................................................................................3

16 U.S.C. § 1536(a)(2) ............................................................................. passim

16 U.S.C. § 1536(b)(3) ...........................................................................4, 29, 30

16 U.S.C. § 1536(b)(4) .......................................................................5, 31, 33

16 U.S.C. § 1536(c) ..........................................................................................10

**Regulations**

50 C.F.R. § 17.3 ...........................................................................................31, 32

50 C.F.R. § 402.02 .................................................................................... passim

50 C.F.R. § 402.14 .................................................................................... passim

**Other Authorities**

84 Fed. Reg. 15,446 (Apr. 15, 2019) ...............................................................6, 7

86 Fed. Reg. 47,022 (Aug. 23, 2021) .................................................................7

89 Fed. Reg. 31,488 (Apr. 24, 2024) ..................................................................6

President Trump Executive Order No. 14303, 90 Fed. Reg. 22601, 22603 (May 23, 2025) ....................................................................................................19, 36

Presidential Determination on the Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition (Sept. 25, 2020) ............................8

## I.  INTRODUCTION

The National Marine Fisheries Service ("NMFS"), relying on nothing more than surmise and speculation about hypothetical impacts to the Rice's whale, has weaponized the Endangered Species Act ("ESA") to improperly regulate the Gulf of America Oil and Gas Program (the "Oil and Gas Program" or "Program"). The ESA requires federal agencies to ensure that any proposed action "is not likely to jeopardize" an endangered species. 16 U.S.C. § 1536(a)(2). The statute requires realistic assessments "us[ing] the best scientific and commercial data available." *Id*. Those assessments cannot include "pessimistic assumptions," "worst-case scenarios," or speculation intended to give the "benefit of the doubt" to the species. *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 586 (D.C. Cir. 2023). In a rushed process completed largely under the Biden Administration, NMFS ignored that instruction here, using baseless assumptions and speculation to conclude that Oil and Gas Program vessels *could* accidentally, but repeatedly, collide with endangered Rice's whales, and, therefore, that the Program is *likely* jeopardizing the existence of that species.

This case presents many of the same questions this Court addressed in granting injunctive relief against the Biden Administration's last-minute changes to a Gulf oil-and-gas lease sale in 2023, which also adopted unsupportable restrictions to supposedly benefit the Rice's whale without any evidence of necessity and despite industry's warnings of severe economic, logistical, and safety repercussions. This Court correctly observed that the government's actions "look[ed] more like a weaponization of the Endangered Species Act than the collaborative, reasoned approach prescribed by the applicable laws and regulations." *Louisiana v. Haaland*, No. 2:23-cv-01157, 2023 WL 6450134, at *9 (W.D. La. Sept. 21, 2023), *order modified, appeal dismissed*, 86 F.4th 663 (5th Cir. 2023). Apparently undeterred, NMFS doubled down in the document challenged here, its programmatic biological opinion ("2025 BiOp") for the Oil and Gas

Program, and insisted—without evidence—that Rice's whales face jeopardy from routine Gulf oil and gas activities. The result is that oil and gas activities are burdened by gratuitous regulation, even though the vast majority of vessel transit through the Gulf—including cargo shipping, cruise ships, and private boating—may continue unencumbered.

NMFS's "jeopardy" finding is based on fiction, not the best available data. Every year, for many decades, hundreds of vessels supporting the Oil and Gas Program have transited the Gulf of America. Not a single Rice's whale strike by a Program vessel has *ever* occurred, and even visual sightings of Rice's whales by trained protected species observers onboard Program vessels are extremely rare. That is not surprising. "The Gulf is huge. It covers about 600,000 square miles, and it contains more than 640 quadrillion gallons of water." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 539 (5th Cir. 2019). Within that massive area, NMFS estimates that there are fewer than 100 Rice's whales, and most of those whales reside in a small portion of the De Soto Canyon where there are *no active oil and gas activities*. Under these circumstances, the chance of a Program vessel accidentally encountering a Rice's whale is "extremely unlikely." *Louisiana v. Haaland*, 86 F.4th 663, 667 (5th Cir. 2023).

Yet, in preparing the 2025 BiOp, NMFS brushed aside the available data and the analyses and findings presented by the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE") (jointly, the "Bureaus") that concluded that the risk of a Program vessel striking a Rice's whale was so unlikely as to be discountable. Instead, NMFS surmised that lethal collisions between Program vessels and 40-foot-long, 50,000-pound whales are regularly occurring but mysteriously going unnoticed by vessel crews, with the carcasses silently disappearing into the water, never to be seen again. Based on these phantom vessel strikes, NMFS concluded that the Program is "likely" jeopardizing the continued

existence of the Rice's whale. NMFS_000572.[1] That conclusion is entirely unsupported and manifestly wrong.

To rectify this and other fundamental errors, the State of Louisiana, the American Petroleum Institute ("API"), and Chevron U.S.A. Inc. ("Chevron") (collectively, "Plaintiffs") filed this case under the Administrative Procedure Act ("APA") challenging NMFS's unlawful 2025 BiOp. NMFS's 2025 BiOp repeatedly disregards the ESA's best available data requirement, exaggerates Oil and Gas Program effects with erroneous assumptions and misreadings of the statute, and imposes restrictions that cannot be justified by the facts or the law. For these reasons, as discussed more fully below, Plaintiffs respectfully request that the Court declare that NMFS's actions in preparing the 2025 BiOp violated the ESA and remand the matter to NMFS to timely correct these errors and issue a revised, lawful biological opinion.

## II. LEGAL AND FACTUAL BACKGROUND

### A.    The Endangered Species Act

The ESA authorizes NMFS to list qualifying species as "endangered" or "threatened" based on statutory listing criteria. 16 U.S.C. § 1533. Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any" listed species or result in the "destruction or adverse modification" of designated critical habitat. *Id*. § 1536(a)(2). To comply with this mandate, federal agencies must consult with NMFS when their actions "may affect" a listed marine species. 50 C.F.R. § 402.14(a). At the conclusion of the consultation, NMFS must provide a "written statement setting forth the Secretary's opinion, and a summary of the

---

[1] Citations to "NMFS_" refer to Bates stamped pages in NMFS's administrative record.  The court decides cases under the APA through summary judgment based on whether an agency's action is supported by the administrative record.

information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). This is known as the "biological opinion."

The goal of the consultation process is to avoid actions that are "likely" to jeopardize the continued existence of threatened or endangered species. *Id*. § 1536(a)(2); *Maine Lobstermen's Ass'n*, 70 F.4th at 595 ("Section 7, therefore, requires the action agency to avoid acts that will *more likely than not* jeopardize a species. No more, and no less.") (emphasis added). To determine whether a proposed action is likely to jeopardize a listed species, NMFS must evaluate the action's "reasonably certain" effects. 50 C.F.R. § 402.02. In determining what effects are "reasonably certain," the agency must rely on "solid information" and not "speculation sprinkled with dabs of evidence." *Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 989 (9th Cir. 2023) (citation omitted).

The agencies must use the "best scientific and commercial data available" during the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(f), (g)(8). "The ESA and the implementing regulations call for an empirical judgment about what is 'likely.'" *Maine Lobstermen's Ass'n*, 70 F.4th at 586. This empirical mandate ensures the law is not "implemented haphazardly, on the basis of speculation or surmise." *Bennett v. Spear*, 520 U.S. 154, 176 (1997).

If NMFS concludes that the agency action is likely to jeopardize the species, the biological opinion may specify a "reasonable and prudent alternative[]" that will avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A). The reasonable and prudent alternative consists of "actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that [are] economically and technologically feasible, and that the

Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02.

A biological opinion that concludes the agency action is not likely to jeopardize the continued existence of a listed species but will result in "take" incidental to the agency action must include an incidental take statement. 16 U.S.C. § 1536(b)(4). Under the ESA, "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Among other requirements, an incidental take statement must specify any "reasonable and prudent measures" NMFS considers necessary or appropriate to minimize the impact of any incidental take as well as "terms and conditions" to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

## B.    The Gulf of America Oil and Gas Program

BOEM manages approximately 159 million acres in the Gulf of America under the Outer Continental Shelf Lands Act ("OCSLA"). NMFS_000042. BOEM conducts lease sales and reviews plans for exploration (including seismic and exploration drilling), development, and production. NMFS_000026. BSEE is charged with safety and enforcement on the Outer Continental Shelf ("OCS"). *Id*. BSEE's mandate includes reviewing and acting on thousands of permit applications related to well design and safety. *Id*.

As of February 3, 2025, there were 2,200 active oil and gas leases on approximately seven million acres in the Gulf, managed under the OCSLA. NMFS_000042. The Gulf is the primary domestic source of offshore oil and gas, accounting for 99% of all U.S. offshore oil and gas, including 14% of all domestic oil production and 5% of natural gas production. NMFS_008294.

In 2023 alone, operations on the OCS in the Gulf produced 674 million barrels of oil and 795 billion cubic feet of natural gas, supported over 412,000 jobs, contributed over $34.3 billion to the U.S. gross domestic product, and generated $6.1 billion in federal government revenue. *See* Declaration of Holly Hopkins ("Hopkins Decl.") ¶ 8. These resources are produced by an extensive network of 1,432 active platforms, 7,170 wells, and 3,956 pipelines. *Id.*

These offshore operations are supported by hundreds of vessels making tens of thousands of annual vessel trips. NMFS_000078-80. These vessels bring crews, food, supplies and equipment to offshore platforms, conduct and support drilling activities, conduct geological surveys, and perform maintenance and decommissioning activities. NMFS_000078-80.

## C.    ESA-Listed Species in the Gulf

The Gulf is home to several ESA-listed species, including Rice's whales. NMFS_000027. The government has conceded multiple times that "[r]elatively little is known about the Rice's whale." Gov't Resp. Br. 84, *Healthy Gulf v. U.S. Dep't of Interior*, No. 24-01024 (D.C. Cir. Oct. 10, 2024); *see also* 89 Fed. Reg. 31,488, 31,502 (Apr. 24, 2024) ("there is currently uncertainty about Rice's whale density, abundance, habitat usage patterns and other factors in the central and western" Gulf). NMFS first listed the Rice's whale—then known as the Gulf of Mexico Bryde's whale—as an endangered species in April 2019. 84 Fed. Reg. 15,446 (Apr. 15, 2019). The Bryde's whale is not a threatened or endangered species. Rather, NMFS decided that the particular group of Bryde's whales living in the Gulf was a "subspecies" of the Bryde's whale based on a petition presented by the Natural Resources Defense Council. *Id.* NMFS estimated this subspecies to consist of 33 animals and determined that this small population warranted protection under the ESA. *Id.* Less than two years later, NMFS revised its views and concluded that this whale "subspecies"—visually indistinguishable from the Bryde's whale—was a new,

separate species. 86 Fed. Reg. 47,022 (Aug. 23, 2021). NMFS renamed that newly declared species the "Rice's whale." *Id.*

In the 2019 ESA listing decision, NMFS determined that Rice's whales are "limited to the Biological Important Area (BIA)" that is "located in the De Soto Canyon area of the northeastern Gulf of Mexico." 84 Fed. Reg. at 15,454-55. All confirmed sightings of Rice's whales at the time of the listing decision were in the biologically important area. The biologically important area is depicted in the figure below, with confirmed Rice's whale sightings as of 2020 in pink and unknown whale sightings in yellow.



NMFS_073051. The biologically important area includes De Soto Canyon and is defined as the area between the 100- and 400-m isobaths, from 87.5° W to 27.5° N, with a 10 kilometer (km) buffer. NMFS_073177. No oil-and-gas leasing occurs in this region, as it falls within the portion of the eastern Gulf that was subject to congressional moratorium and is now under Presidential

withdrawal. *See* Presidential Determination on the Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition (Sept. 25, 2020), available at https://trumpwhitehouse.archives.gov/presidential-actions/presidential-determination-withdrawal-certain-areas-united-states-outer-continental-shelf-leasing-disposition/.

**D.     The 2020 Biological Opinion and Lease Sale 261**

On March 13, 2020, NMFS issued a programmatic biological opinion (the "2020 BiOp") governing all oil and gas activities on the Gulf of America OCS. NMFS_072860. The 2020 BiOp covered a 50-year period and was the product of an extensive consultation process between NMFS and other agencies that spanned nearly a full decade. NMFS_072887. The 2020 BiOp modeled the Rice's whale population at 44 individuals. NMFS_073053.

The 2020 BiOp identified no report or other evidence that a Rice's whale had ever been struck by an Oil and Gas Program vessel. NMFS_073229-32. The 2020 BiOp nonetheless proceeded to make a series of "conservative" assumptions regarding the risk of vessel strikes and modeled those assumptions over a 50-year period, concluding that oil and gas vessels would strike 23 Rice's whales, with 17 of those strikes being lethal. NMFS_073243-48.[2] These assumptions resulted in a jeopardy finding. NMFS_073439.

To avoid jeopardy, the 2020 BiOp included a "reasonable and prudent alternative" to avoid the risk of the hypothetical Oil and Gas Program vessel strikes. NMFS_073482-85. The 2020 "reasonable and prudent alternative" prohibited nighttime and low-visibility travel in the Rice's whale's biologically important area and imposed a 10-knot speed limit in that same area.

---

[2] After issuance of the 2020 BiOp, the D.C. Circuit Court of Appeals held that the ESA does not permit NMFS to make these types of conservative assumptions in a biological opinion. *Maine Lobstermen's Ass'n*, 70 F.4th at 586 ("The Service's role as an expert is undermined, not furthered, when it distorts that scientific judgment by indulging in worst-case scenarios and pessimistic assumptions to benefit a favored side.").

NMFS_072482-83. "BOEM disagreed with NMFS's analysis and maintained that vessel traffic from [oil and gas] leases was unlikely to cross the identified habitat"; "[n]evertheless, BOEM and BSEE formally accepted NMFS's [reasonable and prudent alternative] for Rice's whale," and included the measures as conditions of approval in BOEM and BSEE permits and other authorizations for Oil and Gas Program activities. *Louisiana*, 2023 WL 6450134, at *4; *see* NMFS_002563. BOEM repeatedly rejected environmental groups' efforts to use the Rice's whale to curtail oil and gas activities, explaining that vessel strikes are "extremely unlikely to occur." *Louisiana*, 2023 WL 6450134, at *5.

Meanwhile, environmental groups sued NMFS in the District of Maryland, complaining that the 2020 BiOp was insufficiently protective of Rice's whales. NMFS and the environmental groups agreed to stay that case if BOEM enacted last-minute changes to Lease Sale 261 (required by Congress to be held in September 2023) that would have excluded all areas between 100-400 meters in depth along the central and western Gulf from the sale area and imposed severe restrictions on vessel traffic throughout the same area, ostensibly to protect the Rice's whale. *Louisiana,* 2023 WL 6450134, at *1, *6. BOEM capitulated, deviating from its longstanding position that additional measures were unnecessary. *See id.* at *6.

The State of Louisiana, API, Chevron, and another company brought suit challenging the procedural irregularities and lack of scientific support for BOEM's last-minute change. *Id*. at *1. This Court admonished the government's baseless attempt to justify its "political reassessment of offshore drilling" and required BOEM to hold the sale as originally noticed, with the disputed acreage available for lease and without the unjustified stipulations. *Id*. at *9.

BOEM did not challenge this Court's injunction, requesting only additional time to comply with it. *Louisiana*, 86 F.4th at 666. But the environmental groups that had sued in the

District of Maryland and subsequently intervened in this Court appealed, with the Fifth Circuit dismissing their appeal for lack of standing. *Id*. The Fifth Circuit explained that the groups' theory of injury—"diminished recreational or aesthetic interests resulting from the death of at least one Rice's whale"—was "so attenuated that the alleged harm is not 'certainly impending,'" particularly given BOEM's longstanding position that "additional protections for the Rice's whales are unnecessary." *Id.* at 666-67.

Thwarted, the environmental groups ran back to the District of Maryland, first convincing that court to lift a stay on their challenge to the 2020 BiOp and then to vacate the 2020 BiOp entirely. *See Sierra Club v. NMFS*, No. 8:20-cv-03060, 2024 WL 3860211 (D. Md. Aug. 19, 2024). The District of Maryland eventually agreed to delay vacatur until May 21, 2025, after NMFS and industry participants—including API and Chevron—filed emergency motions explaining the devastating consequences of vacating the programmatic biological opinion, which would have effectively shut down oil and gas operations across the entire Gulf. *See* Dkts. 211, 212, 218, 219, 220, *Sierra Club v. NMFS*, No. 8:20-cv-03060 (D. Md.). NMFS—which had begun work on a replacement biological opinion in 2022—was required to complete the 2025 BiOp to meet the vacatur deadline, and did so with mere hours to spare.

**E.    The 2025 Biological Opinion**

On October 25, 2022, the Bureaus asked NMFS to reinitiate consultation under ESA Section 7. NMFS_001609-611. As part of the reinitiated consultation, as required by ESA Section 7(c), 16 U.S.C. § 1536(c), the Bureaus completed a biological assessment on December 22, 2023. NMFS_001886-2261.

In the biological assessment, the Bureaus treated the vessel mitigation requirements from the reasonable and prudent alternative in the 2020 BiOp as part of the proposed action for the reinitiated consultation. NMFS_001950. In other words, the Bureaus committed to maintain the

package of mitigation measures adopted in the 2020 BiOp and evaluated the effects of the Oil and Gas Program with those measures in place. *Id.*

Section 5.9 of the Bureaus' biological assessment evaluates the potential for accidental vessel strikes with ESA-listed species, considering the strike avoidance measures that the Bureaus currently impose on Oil and Gas Program vessel traffic. NMFS_002060-66. The biological assessment also surveys program vessels for size, travel routes, and speeds. *Id.*

Based on the available data, the biological assessment concludes that it is unlikely that an Oil and Gas Program vessel will strike a Rice's whale:

> Due to the relatively low abundance of vessel routes originating from the eastern [Gulf]; relatively low percentage of vessel traffic attributed to the Bureaus' oil and gas program activities within the [Gulf]; lack of previous vessel strikes attributed to oil- and gas-related activities; and that all of the larger vessel types ([average length overall] >80 meters) BOEM identified as conducting oil and gas activities on the OCS are expected to be typically operating either below or at the lower range of speeds noted to result in the majority of large whale ship strikes, as well as the proven effectiveness of existing protocols, **we find the potential for vessel strikes to whales is unlikely to occur and, therefore, discountable.**

NMFS_002065 (emphasis added). This conclusion was further supported by the "low level of program-related activities" in the biologically important area and the "existing mitigation" in that area. *Id.*

On March 10, 2025, the Bureaus issued a letter recognizing the ESA Section 7 "applicant" status of API, API member company Chevron, and three other trade associations representing companies operating in the Gulf. NMFS_002358-65. The Bureaus' letter followed multiple requests from these applicants that had been pending for years. The Bureaus received a draft copy of a new biological opinion from NMFS, and, on March 31, 2025, the Bureaus provided the copy to the applicants, as required by the ESA. NMFS_000030. The applicants

were given seven days (five business days) to review the draft biological opinion and provide comments. *Id.*

The draft biological opinion (the "draft BiOp") estimated the current Rice's whale population to be 51 whales. NMFS_001416. The draft BiOp identified no evidence that an Oil and Gas Program vessel has ever struck a Rice's whale. NMFS_001197-1200; 002061-62. In fact, there is only one known incident of a vessel of any kind striking and killing a Rice's whale, and that whale was found on the front of a cargo ship in Florida. NMFS_001198; NMFS_002061 (cargo vessel strike not attributed to Oil and Gas Program).[3]

The draft BiOp concluded that the Oil and Gas Program is "likely" to jeopardize the continued existence of the Rice's whale, based solely on NMFS's supposition that Oil and Gas Program vessels will strike 12 Rice's whales in the next 45 years, with nine of those strikes being lethal. NMFS_001418-19. That supposition is based on a so-called "quantitative analysis" of future vessel strikes. *Id*.

The draft BiOp's "quantitative analysis" is really just unsupported guesswork, composed of arithmetic applied to assumptions. NMFS_001208-1216. NMFS first assumed that of all Rice's whales that die in the Gulf of America (from all causes), only 5% of the resulting carcasses are seen floating or washed up on a beach, and the other 95% are not found. NMFS_001214. In the last 23 years, seven Rice's whale carcasses have been found, with only *one* of those deaths being caused by a vessel strike (the cargo ship incident referenced above). *Id.*; NMFS_084913-16. NMFS applied its 5% carcass recovery rate to that single vessel strike to calculate that, during the same 23-year period, 19 more Rice's whales were struck and killed by

---

[3] Although it is well known based upon photographic evidence that the vessel responsible for the solitary documented lethal strike was a cargo vessel (*see* NMFS_073230), in its quantitative analysis NMFS inexplicably claims the type of vessel involved is "unknown." NMFS_000380.

vessels, but none of those estimated 19 whale carcasses were ever found. From this, NMFS calculated that an average of 0.87 Rice's whales per year are struck and killed by vessels (because 1 observed plus 19 assumed carcasses divided by 23 years equals 0.87), and then it applied that strike rate to the draft BiOp's remaining 45-year period. NMFS_001214. NMFS then assumed that 21% of those strikes over the 45-year period would be caused by Oil and Gas Program vessels. *Id.* NMFS used these numbers to calculate its estimate of nine Rice's whales killed by Program vessels over the next 45 years, *i.e.*, 0.87 x 21% x 45 years = 8.22 (which NMFS "rounded up" to 9). *Id.* NMFS stated that this number of lethal strikes was "likely" to occur (NMFS_001216) and, thus, that the Oil and Gas Program was "likely" to jeopardize the species (NMFS_001419).

On April 7, 2025, the applicants submitted written comments on the draft BiOp. NMFS_002435-2463; NMFS_002466-2476. API provided a supplemental comment on May 12, 2025. NMFS_002506-2517. Included with API's supplemental comment was a report by Heidi King, an expert in regulatory and risk analysis (the "King Report"). NMFS_002508. Among other concerns, the applicants' comments and the King Report identified numerous material flaws in the draft BiOp's "quantitative analysis." NMFS_002508-2516.

Principally, the applicants explained that NMFS's assumed 5% carcass recovery rate for the Rice's whale lacks any scientific basis. NMFS_002513-15. There has never been an established carcass recovery rate for Rice's whales, and it is undisputed that the Rice's whale carcass recovery rate is unknown. NMFS_002514. The authors of the only paper that attempted to estimate carcass recovery rates for species in the Gulf (Williams et al. 2011) were unable to calculate a carcass recovery rate for the Rice's whale (then known as the Gulf of Mexico Bryde's whale) due to substantial "uncertainty." *Id.*; NMFS_103368.

Without species-specific information, NMFS chose the 5% carcass recovery rate

discussed in Rockwood et al. (2017). NMFS_002514. But that rate was not based on Rice's

whale data. In fact, the Rockwood 5% recovery rate was not intended for *any* particular species.

NMFS_002513. It was just a benchmark that Rockwood created by averaging together older data

from killer whales, grey whales, and sperm whales to evaluate his "novel" whale encounter

model for whales in the Pacific Ocean. *Id.*; NMFS_008473.

The applicants also explained that NMFS's assumed 5% carcass recovery rate for the

Rice's whale is inconsistent with the best available scientific and commercial data.

NMFS_002438; NMFS_002509. As discussed above, over the last 23 years, a total of seven

Rice's whale carcasses have been recovered. NMFS_002513. Applying the 5% recovery rate to

those seven recovered carcasses yields a total mortality from all causes (including vessel strikes)

of 140 Rice's whales (7/0.05 = 140) during that time period. *Id.* Since the 2025 BiOp estimates

the *entire population* of Rice's whales during that time period at 44 to 51 whales, it "seems

impossible" that 140 Rice's whales died between 2002 and 2024. *Id.* The King Report concluded

that NMFS's assumed 5% carcass recovery rate for the Rice's whale is "therefore not plausible."

*Id.*[4]

On May 20, 2025, NMFS issued the final 2025 BiOp. NMFS_000001-701. Despite the

applicants' comments and the King Report's analysis, the 2025 BiOp's jeopardy analysis

remained the same, stating that "[b]ased on the quantitative analysis, 9 instances of lethal or

serious injury, and 3 instances of sublethal physical injury or impairment from oil and gas

---

[4] The applicants also explained that it was improper to assign 21% of the total vessel strike risk
in the Gulf of America to the Oil and Gas Program. NMFS_002439; NMFS_002513. This so-
called risk assessment just "combines a series of uncertain assumptions into a framework that
contributes to further uncertainty" and then presents the results "with false precision."
NMFS_002512.

vessels are reasonably certain to occur over the course of the duration of the action (45 years)." NMFS_000571.

NMFS did make some changes in the "quantitative analysis" that purports to support the jeopardy determination, but these changes did not address the problems identified by the applicants. Instead, the 2025 BiOp used the same basis from the draft, and merely changed one of the assumptions. Specifically, the quantitative analysis *increases* the assumed percentage of Program vessel strike risk from 21% to 27%. NMFS_000380. NMFS then applied the same math to the new assumption to increase the estimate from nine to 11 lethal Rice's whale strikes: 0.87 x 27% x 45 years = 10.57 (rounds up to 11). NMFS_000380.[5]

NMFS also calculated new estimates of Rice's whale vessel strikes based on new assumptions (but no new data). NMFS_000381-83. These estimates were based on a "Blondin" method that attempts to account for "behavioral characteristics and whale avoidance." NMFS_000381. But NMFS had no Rice's whale data, so it applied the method to data for a different species—the North Atlantic right whale. In applying the method, NMFS also assumed that "Rice's whales do not actively avoid an oncoming vessel." NMFS_000381-82. This method produced a strike risk between 2% and 11%, which, as NMFS conceded, does not represent "actual mortality estimates" and could not be validated. *Id*. (NMFS has "no way to validate" calculated strike risk). NMFS then plugged the 2% and 11% (unvalidated) estimates into its previous formula—*i.e.*, 0.87 x 2% x 45 years = 0.783 (rounds up to 1) and 0.87 x 11% x 45 years = 4.3 (rounds up to 5). NMFS_000382.

---

[5] The 2025 BiOp does not explain why one set of figures was used for the jeopardy analysis, when different sets of figures were generated by the "quantitative analysis."

15

NMFS then inexplicably added together its three estimates of lethal Rice's whale strikes by Oil and Gas Program vessels—11, 1, and 5—and divided that total by three, resulting in six estimated lethal strikes (rounded up from 5.66). *Id.*[6] The 2025 BiOp concludes those six estimated lethal strikes are the "likely" result of the proposed action. NMFS_000383. The 2025 BiOp does not explain why its jeopardy analysis continues to use the estimate of nine Rice's whale lethal strikes that was carried over from the draft BiOp instead of the estimate of six Rice's whale lethal strikes produced by the new "quantitative analysis."

The 2025 BiOp presents a new, multi-phase "reasonable and prudent alternative" to eliminate the hypothesized Rice's whale vessel strikes and thereby avoid "jeopardy." NMFS_000598-605. Phase 1 requires immediate reporting by vessel operators who observe a whale that might be a Rice's whale. NMFS_000601. Phase 2 requires, within one year, "an advanced assessment of vessel strike risk in the Gulf of America." NMFS_000602. Phase 3 requires the development of a "vessel strike avoidance technology plan" that will "harness existing, ongoing, and future technology." NMFS_000602-03. Phase 4 requires implementing that plan within 24 months after the issuance of the 2025 BiOp, and then continuously monitoring every single vessel for 45 years to determine if the plan is effective. NMFS_000604.

The 2025 BiOp also includes an incidental take statement. NMFS_000608-623. The incidental take statement purports to estimate the amount of "take" of all ESA-listed species, identifies reasonable and prudent measures intended to reduce take, and includes terms and conditions intended to implement those measures. *Id.*

---

[6] The 2025 BiOp does not explain the rationale for calculating the arithmetic mean of these three different methodologies; nor does the 2025 BiOp explain why the only prediction supported by data – zero strikes – was not included when calculating the mean.

## III.  STANDARD OF REVIEW

The APA authorizes a court to declare unlawful agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)). A court must scrutinize the record to determine whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). A court "may not supply a reasoned basis for the agency's decision that the agency itself has not given." *Id.* Agency action is arbitrary and capricious if it fails to "consider an important aspect of the problem," or "fails to account for 'relevant factors' or evinces 'a clear error of judgment." *Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021).

## IV.  STANDING

Plaintiffs' standing is self-evident, as they are the object of the challenged action. *See Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2135 (2025); *Maine Lobstermen's Ass'n*, 70 F.4th at 592-593 (parties regulated by a biological opinion have standing to challenge it). The 2025 BiOp explicitly regulates the Gulf oil and gas activities of API's members, including Chevron. *See* Hopkins Decl. ¶¶ 5, 8; Declaration of Joe Gordon ¶¶ 8-10, 12-13, 15. The errors in the 2025 BiOp's effects analysis and jeopardy determination, as addressed in the arguments below, cause direct harm to API and its members, including Chevron, which hold leases, work, and operate facilities in the Gulf, and injure the State of Louisiana's direct and material interest in the Oil and Gas Program as a critical component of the state's economy. *See* Hopkins Decl.¶¶ 7-12; Gordon Decl. ¶¶ 8-10; Declaration of Edward O'Brien ¶¶ 5-15.

## V.  ARGUMENT

A.    **NMFS's Jeopardy Determination for the Rice's Whale Violates the ESA.**

The 2025 BiOp's jeopardy determination only makes sense as an unlawful results-motivated exercise—*i.e.*, the Biden Administration's final "attempt to provide scientific justification to a political reassessment of offshore drilling." *Louisiana*, 2023 WL 6450134, at *9. It is otherwise impossible to follow NMFS's reasoning from the unsupported assumptions about the Rice's whale and the Program vessel activity, through the multiple, unreconciled methodologies to assess the risk of a fatal strike, to the ultimate strike projections presented with false precision that purport to support the conclusion that that jeopardy is likely. While an agency's reasoning need not be a model of clarity, the jeopardy determination and the supporting "quantitative analysis" are undecipherable.

The primary function of the Section 7(a)(2) consultation is to ensure that a proposed action is "not likely to jeopardize the continued existence of" an ESA-listed species. 16 U.S.C. § 1536(a)(2). "A key term limiting this duty is 'likely.'" *Maine Lobstermen's Ass'n*, 70 F.4th at 595. The plain and ordinary meaning of "likely" is "probable" or "in all probability" or "more likely than not." *Id*. (internal quotation marks, brackets, and citations omitted). NMFS must make its jeopardy determination based on the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), and evaluate the effects that are "reasonably certain to occur." 50 C.F.R. § 402.02 (defining "effects of the action"). This requires a neutral evaluation focused on "'likely' outcomes, not worst-case scenarios." *Maine Lobstermen's Ass'n*, 70 F.4th at 599. "Nothing in § 7 requires 'distorting the decisionmaking process by overemphasizing highly speculative harms' whenever the available data is wanting." *Id*. at 596.

NMFS concludes that the Oil and Gas Program is "likely to jeopardize the continued existence of the Rice's whale." NMFS_000572. This conclusion is based on NMFS's supposition

that Program vessels will collide with Rice's whales, resulting in "9 instances of lethal injury, and 3 instances of sublethal injury" over the next 45 years. NMFS_000571. But that projection, as baseless as it is, differs from the results of the so-called "quantitative analysis" on which it purportedly relies, and the "quantitative analysis" itself is nothing more than adding math to speculative assumptions that are either wrong or unsupported, or both. The results of that analysis cannot possibly be considered "the best scientific or commercial data available." 16 U.S.C. § 1536(a)(2).[7] "While courts routinely defer to agency modeling of complex phenomena, model assumptions must have a 'rational relationship' to the real world." *Texas v. EPA,* 137 F.4th 353, 369 (5th Cir. 2025) (citation omitted). A court "cannot excuse" an agency's "reliance upon a methodology that generates apparently arbitrary results." *Id*. (citation modified). NMFS's jeopardy analysis and determinations are arbitrary, capricious, and contrary to law in at least six different ways.

### 1.    NMFS's Projection of Vessel Strikes Does Not Use — and Is Contrary To — the Best Available Data.

NMFS's prognostication of whale strikes runs contrary to the available data. There are no known instances where a Program vessel has ever collided with a Rice's whale. NMFS_002061. The Bureaus appropriately documented in their biological assessment why strikes are unlikely to occur, based on the best available data on vessel size, speeds, and routes, and based on *zero*

---

[7] As detailed in the King Report, NMFS's analysis "does not employ analytical best practices to assess, test, and explain" how uncertainties influence model results, fails to provide any statistical rationale or validation, fails to conduct a sensitivity test, and fails to account for or disclose uncertainties and avoid the introduction of bias. NMFS_002508-2516. Use of the quantitative analysis is inconsistent with the recent standards for "scientific information" set forth by President Trump in Executive Order No. 14303, 90 Fed. Reg. 22601, 22603 (May 23, 2025) ("When using scientific information in agency decision-making, employees shall transparently acknowledge and document uncertainties, including how uncertainty propagates throughout any models used in the analysis.").

reported Program vessel collisions with a Rice's whale. NMFS_002065. Program vessels have

had a longstanding mandatory duty to report any marine mammal collisions and any sightings of

dead or injured marine mammals "regardless of whether the injury or death is caused by your

vessel." NMFS_107576 (Notice to Lessees, 2016-G01).

The 2025 BiOp does not use or even address this real-world available data. NMFS's

head-in-the-sand approach violates the ESA. *Maine Lobstermen's Ass'n*, 70 F.4th at 599 ("The

statute is focused upon 'likely' outcomes, not worst-case scenarios. It requires NMFS to use the

best available scientific data, not the most pessimistic."). Moreover, the 2025 BiOp fails to

explain why its projections of 1, 5, or 11 strikes from Program vessels are reasonably certain to

occur when the only available data is that no such strikes from Program vessels have ever

occurred.

### 2.    NMFS Failed to Consider and Address the Bureaus' Contrary Findings and Opinion.

The 2025 BiOp nowhere explains why the Bureaus' biological assessment is wrong. The

Bureaus estimated zero collisions with Program vessels based on the best available data, but the

2025 BiOp jeopardy determination projects that there will be 12 Rice's whale collisions (nine

lethal and three non-lethal). NMFS_000571. A "failure to address or reconcile" conflicting data

or predictions creates an "unexplained inconsistenc[y] in the rulemaking record." *Texas,* 137

F.4th at 369 (internal quotations omitted). This unexplained inconsistency renders the 2025 BiOp

arbitrary and capricious under the APA. *Id.*

It is axiomatic that, to engage in reasoned decisionmaking, "an agency must respond to

'objections that on their face seem legitimate.'" *Gulf Restoration Network v. Haaland*, 47 F.4th

795, 803 (D.C. Cir. 2022) (quoting *PPL Wallingform Energy LLC v. FERC*, 419 F.3d 1194, 1198

(D.C. Cir. 2005) (cleaned up)). When an agency receives comments from a sister agency that are

at odds with its own conclusions, at a minimum, the agency must acknowledge and explain the difference of opinion, or its "decision can hardly be classified as reasoned." *See PPL Wallingform Energy*, 419 F.3d at 1198 (internal quotations omitted). Vessel strikes of Rice's whales, if they occur, result from the intersection of the Oil and Gas Program (subject to the Bureaus' expertise and regulation), and the whales (subject to NMFS's expertise). Yet NMFS disregarded – without explanation – the expert opinion of the agencies charged with one half of the equation. This is textbook arbitrary and capricious decisionmaking.

### 3.    NMFS Failed to Consider and Address Applicant Expert Opinion.

NMFS repeated its unexplained rejection of differing opinion in its treatment of the Plaintiff-applicants' comments. ESA regulations expressly require agencies to give applicants the opportunity to review and comment on a draft biological opinion. 50 C.F.R. § 402.14(g)(5). Such an opportunity is meaningless if the agency ignores the applicants' comments, as NMFS did here. The Plaintiffs identified these precise errors in comments on the draft BiOp, but NMFS arbitrarily ignored them. As the King Report explained, "the quantitative analysis does not support a conclusion that nine Rice's whale strikes by oil and gas program vessels are 'reasonably certain to occur.'" NMFS_002509. Rather, "uncertainty in both the input parameters and the model itself are so large that it overwhelms the ability to draw accurate or meaningful conclusions that are more likely – or more probable – than what is known from existing data showing zero vessel strikes from oil and gas vessels." *Id.* The flaws identified by the King Report are fatal to the jeopardy finding because the statute requires a jeopardy determination to be based on impacts of the proposed action that are "more likely than not" to occur. *Maine Lobstermen's Ass'n*, 70 F.4th at 595; *Ctr. for Biological Diversity*, 87 F.4th at 989 ("speculation sprinkled with dabs of evidence" does not show effects are "reasonably certain to occur"); *Bennett*, 520 U.S. at 176 ("the requirement that each agency 'use the best scientific and

commercial data available' is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise").

Yet, in the final opinion, NMFS fails to address or respond to these criticisms. It is well settled that "[a]n agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted). An action is not "reasonably explained" where "commenters posed [a] concern" to the agency, and the agency "offered no reasoned response." *Id.* at 292-93 (citation omitted). NMFS's failure to address the criticisms in the King Report render the 2025 BiOp arbitrary and capricious. *Tex. Corn Producers v. EPA*, 141 F.4th 687, 704-05 (5th Cir. 2025) (agency failure "to respond to extensive comments raising potential significant flaws in the Rule" violated APA).

### 4. The 5% Carcass Recovery Rate NMFS Used is an Unlawfully Pessimistic Assumption.

NMFS's assumed 5% recovery rate bears no "rational relationship" to the real world and is just an improper pessimistic assumption. *Texas*, 137 F.4th at 369 (citation omitted). There is no study, paper, or other scientific research that purports to calculate (or even roughly estimate) a carcass recovery rate for the Rice's whale. As explained in the King Report, NMFS's use of the 5% recovery rate is the product of a "highly speculative chain of uncertainties" that ultimately trace to a paper that professed that it *could not* estimate a carcass recovery rate for the Rice's whale "'due to uncertainties in their abundance and/or population structure.'" NMFS_002514. Another species, for which there is an extensive data set, has a much *higher* carcass recovery rate. NMFS_007286 (2025 study discussing 37% carcass recovery rate for North Atlantic right whale). Using an ultra-low 5% recovery rate based on no actual data is precisely the kind of "pessimistic assumption" that is *prohibited* by the ESA's best scientific data mandate. *Maine Lobstermen's Ass'n*, 70 F.4th at 586.

Moreover, as explained in the King Report, use of the pessimistic 5% carcass recovery rate leads to the seemingly "impossible" result that 140 Rice's whales died—from a total population size of about 50 Rice's whales—over the last 20 years. NMFS_002513. The 2025 BiOp makes no effort to explain this result, further rendering the decision arbitrary and capricious. *Texas*, 137 F.4th at 369.

### 5. The "Vessel Strike Risk Percentages" NMFS Used are Unsupported by Real-World Data.

A critical piece of NMFS's "quantitative analysis" was an attempt to convert the likelihood that a Program vessel might strike a Rice's whale into a numerical percentage of vessel traffic strike risk. NMFS used two different methodologies to develop three different "vessel strike risk percentages" (2%, 11% and 27%), and none of them is based on anything more than speculation.

Two of those risk percentages (2% and 11% risk) come from NMFS's use of the "Blondin" method—unveiled between the draft and final 2025 BiOp. The method relies on data about the "behavioral characteristics" of particular whale species relative to vessel avoidance, including "whale reaction distances." NMFS_000381. But the 2025 BiOp states that "there are no data on reaction distances for Rice's whale," so NMFS just plugged in data from an entirely different species (the North Atlantic right whale) for that input with *no explanation* as to why a Rice's whale would have similar reactions. *Id.* The ESA may not be implemented based on "speculation or surmise." *Bennett*, 520 U.S. at 176. Similarly, NMFS concedes that "little is known about active avoidance of oncoming vessels by Rice's whale," so NMFS just "assume[d] that Rice's whales do not actively avoid an oncoming vessel." NMFS_000382. This is precisely the kind of "worst-case scenario[]" or speculation intended to give the "benefit of the doubt" to the species that is prohibited by the ESA. *Maine Lobstermen's Ass'n*, 70 F.4th at 586 (D.C. Cir.

2023).

The final risk figure (27%) is likewise an assumption that does not match real world observation. NMFS_000379. The Bureaus reasoned in their biological assessment that the greatest risk of a collision is presented by large vessels traveling at high speed through the biologically important area around De Soto Canyon. NMFS_002065.  Because there is virtually no Program vessel traffic passing through that area, and any Program vessel seeking to pass through that area is subject to significant speed, visibility, and monitoring requirements that reduce the risk to zero, the Bureaus estimated the strike risk to be so low it is discountable.  *Id.* The proportional share of Program vessel strike risk should therefore be near zero, not 27%. NMFS's assumption that Program vessels account for 27% of the vessel strike risk therefore has no "'rational relationship' to the real world." *Texas*, 137 F.4th at 369 (citation omitted). Nor does it account for the contrary findings in the Bureaus' biological assessment (NMFS_002065) or address comments pointing out these same flaws (NMFS_002439).

Far from addressing these concerns in response to comments on the draft BiOp, NMFS instead inexplicably *raised* the strike risk in the final BiOp from 21% to 27%. NMFS_002439; *Tex. Corn Producers*, 141 F.4th at 704-05 (agency failure "to respond to extensive comments raising potential significant flaws in the Rule" violated APA). NMFS then arbitrarily assigned 27% of all vessel strike risk to Program vessels based on Program traffic in areas where Rice's whales have rarely (or never) been seen. This is reflected in Figure 71 from the 2025 BiOp below:



NMFS_000379. This figure shows zero Program vessel strike risk in the areas where Rice's whales are usually found (the biologically important area around De Soto Canyon) appropriately recognizing the absence of Program vessel traffic. Yet the 2025 BiOp assigns a 100% relative strike risk (red) in areas outside of the Rice's whale habitat where Rice's whales have seldom (if ever) been seen. This includes higher strike risk off the Port of New Orleans (at the Grande Isle site) where 9,000 hours of continuous acoustic monitoring revealed *zero* Rice's whale detections. NMFS_000188 (map showing no detections at Grande Isle); NMFS_002439. For this reason, too, NMFS's assumption that Program vessels account for 27% of the Gulf strike risk has no "'rational relationship' to the real world." *Texas*, 137 F.4th at 369 (citation omitted). There is simply no way to reconcile NMFS's decision to assign its made-up 27% vessel strike risk estimate to Program vessels when those vessels and Rice's whales are rarely, if ever, in the same place at the same time.

6.      **NMFS's Methodology to Predict Vessel Strikes Is Not Designed to Demonstrate that Any Strikes are Reasonably Certain to Occur.**

The ultimate purpose of NMFS's quantitative analysis is (or should be) to assess whether it is reasonably certain that Program vessels will strike Rice's whales, and, if so, how many. NMFS's jeopardy determination, which is based solely on the risk posed by vessel strikes, can only be supported if NMFS determined that vessel strikes are reasonably certain to occur. But the methodologies NMFS chose are not up to the task.

NMFS fails to explain how plugging in seemingly random numbers to unsupported assumptions can yield a result that is "reasonably certain to occur" as required by the ESA. 50 C.F.R. § 402.02. The observed record shows zero lethal vessel strikes attributed to Program vessels. NMFS would need a "clear and substantial basis" to come to a different result. *Maine Lobstermen's Ass'n*, 70 F.4th at 600. Instead, the 2025 BiOp arbitrarily selects the 5% carcass recovery rate and then plugs in three different (but also arbitrary) vessel risk percentages (2%, 11%, and 27%). Those assumed percentages, multiplied by 45 years (and divided by the 5% carcass recovery rate) yield 1, 5, or 11 lethal vessel strikes.

But the 2025 BiOp does *not* conclude that any of these specific results are "reasonably certain to occur." Instead, it says the "likely" result is 6 lethal vessel strikes, because 6 is the average of 1, 5, and 11 (rounded up). NMFS_000382-83. Nowhere does NMFS explain why averaging these numbers somehow makes the end result "reasonably certain to occur."

Making matters worse, NMFS then discarded its convoluted mathematics in favor of the even higher strike numbers that appear only in the draft BiOp—again without any explanation. NMFS's "quantitative analysis" concluded that "the proposed action is likely to result in 11 vessel strikes of Rice's whales, with **six** strikes being likely to result in serious injury or mortality and **five** strikes likely to result in minor or no injuries." NMFS_000383 (emphases

added). Yet NMFS's jeopardy analysis inexplicably substitutes different numbers, stating that "[b]ased on the quantitative analysis, **9** instances of lethal or serious injury, and **3** instances of sublethal physical injury" are expected to occur. NMFS_000571 (emphases added). The 2025 BiOp does not analyze whether the strikes projected by the revised quantitative analysis will result in jeopardy or otherwise explain this contradiction. *See Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (agency action arbitrary because analysis was "internally inconsistent and inadequately explained").

None of this complies with the ESA. NMFS may only consider effects of the action that are "reasonably certain to occur" based on the "best scientific and commercial data available." 50 C.F.R. § 402.02 (defining the effects of the action); 16 U.S.C. § 1536(a)(2). The 2025 BiOp does not explain how *averaging* three faulty and assumption-laden calculations could possibly produce a "reasonably certain" result. *See Tex. Corn Producers*, 141 F.4th at 702 (agency "flunked the APA because it did not demonstrate that its decision was 'the product of reasoned decisionmaking'" (citation omitted)). Indeed, NMFS provides no explanation at all for why 6 Program vessel strikes are reasonably certain to occur, nor does it reconcile its number with the *zero* Program vessel strikes in the observed data. NMFS also fails to explain why *any* of its individually calculated strike numbers (1, 5, or 11), standing alone, are reasonably certain to occur. *Ctr. for Biological Diversity,* 87 F.4th at 989 (reasonable certainty requires "solid information" and not "speculation sprinkled with dabs of evidence" (citation omitted)). Rather, the most likely outcome is that which is based on the *best available data*, and those data show *zero* vessel strikes from the Oil and Gas Program. Accordingly, the only reasonable conclusion based on the best available data is that Oil and Gas Program vessel strikes of Rice's whales are *not* "reasonably certain to occur"—just as the Bureaus originally concluded (and as NMFS

ignored). *Maine Lobstermen's Ass'n*, 70 F.4th at 600 ("The Service lacks a clear and substantial basis for predicting an effect is reasonably certain to occur, and so, the effect must be disregarded in evaluating the agency action.").

In sum, the ESA requires that the jeopardy analysis be based on "likely" outcomes, effects that are "reasonably certain to occur," and the best available data—not speculation or surmise. *Maine Lobstermen's Ass'n*, 70 F.4th at 599. NMFS's jeopardy finding here was instead premised on phantom vessel strikes created from baseless assumptions. The best available scientific and commercial data shows that there has never been a lethal strike of a Rice's whale by a Program vessel. It also shows that future strikes are highly unlikely—as the Bureaus reasonably found—because Program vessels rarely travel in the biologically important area (and do so only under strict protective measures), and because Rice's whales have rarely (or never) been seen or detected in the primary areas where Program vessels travel. NMFS_002065; NMFS_002455. NMFS's contrary conclusion in the 2025 BiOp is the speculative product of applying basic arithmetic to erroneous, improbable, and unsubstantiated assumptions. This violates the ESA's empirical mandate to make the jeopardy determination based on the best available data, *Maine Lobstermen's Ass'n*, 70 F.4th at 586, and is arbitrary and capricious under the APA. *Texas*, 137 F.4th at 374 (agency "seems to have forced a result on sparse and suspect evidence. That violates the APA.").[8]

---

[8] NMFS multiplies its errors in the 2025 BiOp by using the same arithmetic-applied-to-assumptions methodology to other ESA species to substantially overestimate the impacts of the Oil and Gas Program based on speculation and surmise. *See* NMFS_000377-78 (applying similar assumptions to sperm whale takes); NMFS_000384 (for turtles "we took the same general approach as described for Rice's and sperm whales above"). Plaintiffs here focus on the Rice's whale because the erroneous assumptions lead to an erroneous jeopardy finding and the improper imposition of a "reasonable and prudent alternative."

**B.    NMFS's "Reasonable and Prudent Alternative" Violates the ESA.**

The errors in NMFS's jeopardy opinion are also fatal to NMFS's "reasonable and prudent alternative." "If the Service finds the action will likely 'jeopardize' a protected species by appreciably reducing its chance of surviving, then the Service proposes 'reasonable and prudent alternatives,' if there are any, that reduce the increased risk of extinction." *Maine Lobstermen's Ass'n*, 70 F.4th at 588 (quoting 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2)). NMFS, however, can only offer a "reasonable and prudent alternative" if it is needed to avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A).

Here, the 2025 BiOp includes a "reasonable and prudent alternative" intended to avoid jeopardy caused by phantom vessel strikes of Rice's whales. Because, that jeopardy finding is arbitrary, capricious, and contrary to law, the "reasonable and prudent alternative" is neither reasonable nor prudent. *See* 50 C.F.R. § 402.02 (purpose of reasonable and prudent alternative is to "avoid the likelihood of jeopardizing the continued existence of listed species"). Without a valid jeopardy finding, NMFS has no statutory authority to propose a reasonable and prudent alternative. For this reason alone, the Court should declare that NMFS violated the APA in issuing the 2025 reasonable and prudent alternative.

Indeed, the requirements of NMFS's reasonable and prudent alternative underscore the fundamental errors in the 2025 BiOp by requiring (after the fact) the Bureaus and the regulated community to gather the data related to vessel strike risk. Specifically, the reasonable and prudent alternative requires "an advanced assessment of vessel strike risk in the Gulf of America." NMFS_000602. The assessment is to "further our understanding of the uncertainties associated with estimating injurious and lethal vessel strikes" and must "rely on the best available science and commercial information and methodology." *Id.* This is entirely backwards and only confirms that the jeopardy analysis was faulty in the first place.

"In the biological opinion, the Service's first task was to describe the 'reasonably certain' effects of the" Oil and Gas Program on the Rice's whale, based on the best scientific and commercial data available. *Maine Lobstermen's Ass'n*, 70 F.4th at 588 (citation omitted). If, and only if, those data demonstrate that jeopardy is "likely," NMFS may propose a reasonable and prudent alternative. 16 U.S.C § 1536(a)(2), (b)(3). NMFS made no such demonstration here. It speculated about future vessel strikes, ignored the best available data (zero observed strikes), and failed to explain why the six strikes (or nine strikes) it calculated were "likely" to occur. NMFS apparently presumes that its after-the-fact "advanced assessment of vessel strike risk" will backfill the data needed to support its otherwise unfounded jeopardy determination. But this manipulation of the Section 7 process is precisely what the ESA's best available data requirement is supposed to prevent: "[t]he word 'available' rings hollow if the Service may hold up an action agency by merely presuming that unavailable data, if only they could be produced, would weigh against the agency action." *Maine Lobstermen's Ass'n*, 70 F.4th at 599. For these reasons, the reasonable and prudent alternative is arbitrary, capricious, and contrary to law.

**C.    NMFS Intentionally Used the Wrong Standard for Take by Harassment.**

The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Along with its biological opinion, NMFS must produce an incidental take statement that "specifies the impact of [the] incidental taking" and imposes "those reasonable and prudent measures that [NMFS] considers necessary or appropriate to minimize such impact." *Id.* § 1536(b)(4). NMFS typically "specifies the impact" by numerically estimating the amount of incidental take from the proposed action, and that is what it did here.

However, NMFS's incidental take estimates are flawed because it intentionally used the wrong definition of "harass." This renders the incidental take statement arbitrary, capricious, and

contrary to law. *See Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 977 (10th Cir. 2016) ("an agency decision that loses track of its own controlling regulations and applies the wrong rules in order to penalize private citizens can never stand").

In its ESA implementing regulations, the U.S. Fish and Wildlife Service ("FWS") defines "harass" as an act "which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. NMFS's regulations do not define "harass," but NMFS has adopted, via agency guidance, FWS's regulatory definition of the term. NMFS_000038. Thus, both FWS and NMFS agree that "harass" requires an act that creates a *likelihood of injury* to an animal. NMFS_000038-39.

NMFS expressly recognizes this ESA definition of harass in the 2025 BiOp, and uses it for turtles, sharks and fish, but intentionally decides not to use it for marine mammals. *See* NMFS_000039 ("For this consultation . . . we do not rely on the NMFS ESA definition of harass when assessing effects to marine mammals."). Instead, NMFS imports the Marine Mammal Protection Act's ("MMPA") definition of "Level B harassment," which is an act that has "the potential to disturb a marine mammal." *Id*. Critically, as NMFS admits, MMPA Level B harassment "does *not* include an act that has the *potential to injure* a marine mammal." *Id*. (emphasis added).[9] NMFS then populates the incidental take statement with *tens of thousands* of MMPA Level B harassments that do not even have the "potential to injure a marine mammal."

_____

[9] *See* 16 U.S.C. § 1362(18)(A)(ii) (MMPA Level B harassment is an "act of pursuit, torment, or annoyance" that "has the *potential to disturb* a marine mammal . . . by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering") (emphasis added). To reinforce the point that Level B harassment *cannot* have the "potential to injure," Congress established a different form of harassment—"Level A harassment"—which does have the "potential to injure." *Id*. § 1362(18)(A)(i).

*Id.*; NMFS_000614 (listing sperm whale and Rice's whale "harassment" from seismic surveys). The 2025 BiOp then imposes conditions under the ESA to mitigate that MMPA Level B harassment. *See* NMFS_000618-19 (imposing sound restrictions on seismic surveys).

An agency action is arbitrary and capricious when it applies the wrong legal standard. *Gen. Land Off. v. U.S. Dep't of the Interior*, 947 F.3d 309, 318 (5th Cir. 2020) (agency action under ESA "was arbitrary and capricious because the Service applied the incorrect legal standard"). MMPA Level B harassment is obviously the wrong legal standard under the ESA. ESA "harassment" requires an act that creates a "likelihood of injury." 50 C.F.R. § 17.3. Logically, an act that does not even have the "potential to injure" cannot create a "likelihood of injury." NMFS_000039. "Accordingly, MMPA Level B harassment is generally not ESA take." *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 701 F. Supp. 3d 862, 908 (D. Alaska 2023), *aff'd in part on other grounds, rev'd in part on other grounds and remanded sub nom. Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 992 n.4 (9th Cir. 2025).

NMFS's error has consequences. The incidental take statement projects that seismic surveys in the first year alone will result in 13,198 instances of "incidental take by harassment" of the endangered sperm whale. NMFS_000614. *All* those estimated instances of "incidental take by harassment" are MMPA Level B harassment that do not have the "potential" to injure sperm whales, much less a "likelihood" of injuring sperm whales. The Court should therefore declare that NMFS acted arbitrarily, capriciously, and contrary to law by using the wrong definition of "harass" when estimating take for the incidental take statement. *Gen. Land Off.,* 947 F.3d at 318.

**D.     NMFS's "Reasonable and Prudent Measures" Violate the ESA.**

The ESA requires the incidental take statement to specify both "the impact of such incidental taking on the species" and "those reasonable and prudent measures that the Secretary

considers necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4). Such measures may not "alter the basic design, location, scope, duration, or timing of the action" and cannot include more than "minor changes." 50 C.F.R. § 402.14(i)(2). At least two of the reasonable and prudent measures included in the incidental take statement violate these requirements.

*First*, Reasonable and Prudent Measure #1 requires seismic surveys to use the "quietest configuration of equipment necessary to conduct geophysical surveys." NMFS_000618-19. The problem with this measure is that it is intended to offset MMPA Level B harassment not ESA harassment, as explained above. Accordingly, this measure can be neither "necessary" nor "appropriate" because it does not "minimize" ESA harassment in the first place, and is therefore unlawful.

Even if the measure were directed at ESA harassment, it is still unlawful because it effectively directs the applicant for a geophysical permit to "alter the basic design, location, scope, duration, or timing of" planned surveys, in violation of 50 C.F.R. § 402.14(i)(2). As the applicants explained in their comments on the draft BiOp, much more goes into a survey than the loudest or quietest configuration, including the frequency range, shot duration, shot point intervals, tow depth, and a host of other key factors that can affect the viability of the study and sound propagation in the water. NMFS_002444. The very purpose of such a survey is to direct sound into the ocean floor to gather information about sub-surface geology. Requiring the "quietest configuration" necessarily means altering the entire framework of the survey, including duration, timing, and scope, and is more than a "minor change," in violation of the ESA. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent

judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.").

    **Second**, Reasonable and Prudent Measure #4 addresses "unauthorized releases of trash, debris, or oil associated with the Oil and Gas Program activities." NMFS_000619. This, too, exceeds the scope of NMFS's authority. Even assuming that illegal release of marine debris can constitute "take" under the ESA, it is not "incidental take" under NMFS's regulations because it is not part of "carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02. Indeed, in the 2025 BiOp, NMFS explains it is *not* including the illegal release of marine debris in the incidental take statement for this very reason. NMFS_000587. Having concluded that illegal marine debris releases are not incidental take, NMFS cannot impose a reasonable and prudent measure to address marine debris because such measures must "minimize the impact *of the incidental take* on the species." 50 C.F.R. § 402.02 (emphasis added). The incidental take statement is arbitrary, capricious, and contrary to law for this reason as well. *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979) (agency does not "have authority to play fast and loose with its own regulations").

## VI. THE APPROPRIATE REMEDY IS REMAND WITHOUT VACATUR

    Under the APA, the court "may exercise equitable powers in its choice of a remedy, as long as the court remains within the bounds of statute and does not intrude into the administrative province." *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 590 (5th Cir. 1981) (citation omitted). And it is axiomatic that courts should not grant relief that is "broader than necessary to provide complete relief to each plaintiff." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562-63 (2025). Plaintiffs seek a declaration that NMFS violated the APA and ESA and a

remand of the 2025 BiOp to NMFS to correct those errors, without vacating the 2025 BiOp.[10] To ensure that those errors are corrected in a timely manner, Plaintiffs further request that the Court impose a deadline of 12 months to complete the remand and retain jurisdiction to ensure the deadline is met.

Courts commonly order precisely this relief in cases involving biological opinions in order to avoid disruptive consequences to regulated parties during remand. *See, e.g.*, *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021) (remanding faulty biological opinion without vacatur); *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 925 (9th Cir. 2008) ("The court remanded to the agencies for a new BiOp and revisions to the proposed operations, leaving the 2000 BiOp in effect in the meantime."). Courts also commonly place deadlines on the remand of biological opinions to ensure timely compliance. *See, e.g., Oceana, Inc. v. Ross*, No. 08-1881, 2020 WL 6701072, at *2 (D.D.C. Nov. 13, 2020) (giving NMFS eight months to fix errors in biological opinion). In addition, "federal courts regularly retain jurisdiction until a federal agency has complied with its legal obligations, and have the authority to compel regular progress reports in the meantime." *Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001).

Plaintiffs do not request (and would strongly oppose) vacatur of the 2025 BiOp. *See* Hopkins Decl. ¶¶ 13-16; Gordon Decl. ¶¶ 11-18. The APA "does not require vacatur," and remand without vacatur is generally appropriate when there is "at least a serious possibility" the agency can correct its errors and when vacating would be "disruptive," especially to "the regulated community." *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)

---

[10] Plaintiffs reserve the right to seek injunctive relief, including to prevent enforcement of the "reasonable and prudent alternative" and "reasonable and prudent measures." *See* Compl. Prayer For Relief.

(internal quotation marks omitted). Both factors, independently and together, point to remand without vacatur. *See American Bankers Ass'n v. NCUA*, 934 F.3d 649, 674 (D.C. Cir. 2019) ("A strong showing of one factor may obviate the need to find a similar showing of the other."). The government can correct its errors on Rice's whales; indeed, the government should receive the opportunity under a new administration to chart a science-based approach to environmental regulation. *See* Executive Order No. 14303, Restoring Gold Standard Science (90 Fed. Reg. at 22601) (calling out NMFS for historically employing a "worst-case scenario" view that "skewed its approach to the evidence," and directing agencies to use only the most rigorous evidence).

Vacatur would also have disastrous consequences. The 2025 BiOp serves a programmatic function: virtually all oil and gas activities in the Gulf depend on permits and approvals from BOEM and BSEE, and the Bureaus' ability to issue those permits depends on the existence of a programmatic biological opinion. Vacatur of the 2025 BiOp would grind to a halt authorizations for Gulf of America oil and gas operations, causing serious safety concerns and massive economic dislocation. Indeed, NMFS, BOEM, BSEE, and industry participants detailed the disastrous consequences of vacating the programmatic biological opinion in dozens of declarations filed in the District of Maryland. *See Sierra Club v. NMFS*, 8:20-cv-03060 (D. Md.) (Dkts. 212-2 to 212-33; Dkt. 211-2 to 211-4). In response to those declarations, the district court stayed its vacatur order to allow completion of the 2025 BiOp. *Id*. (Dkt. 220). Accordingly, the 2025 BiOp should be remanded without vacatur.

## VII.  CONCLUSION

Plaintiffs request that the Court declare that the 2025 BiOp and incidental take statement are arbitrary, capricious, and contrary to law, and remand the 2025 BiOp and incidental take statement to NMFS to timely correct these errors.

DATED:

Respectfully submitted,

/s/*James A. Holmes*
JAMES A. HOLMES – BAR #20571
CHRISTOVICH & KEARNEY, LLP
601 Poydras Street, Suite 2300
New Orleans, LA 70130-6078
Tel: (504) 561-5700
jaholmes@christovich.com
kanderson@christovich.com

STOEL RIVES LLP
Ryan P. Steen (*pro hac vice*)
Jason T. Morgan (*pro hac vice*)
Tiffany M. Wang (*pro hac vice*)
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500
ryan.steen@stoel.com
jason.morgan@stoel.com
tiffany.wang@stoel.com
*Attorneys for American Petroleum Institute*

/s/*Michael R. Phillips*
Michael R. Phillips (#21020)
Claire E. Juneau (#33209)
Jeffrey J. Gelpi (#37130)
KEAN MILLER LLP
BankPlus Tower
909 Poydras St., Suite 3600
New Orleans, LA 70112
(504) 585-3050
mike.phillips@keanmiller.com
claire.juneau@keanmiller.com
jeff.gelpi@keanmiller.com

ELIZABETH B. MURRILL
Attorney General of Louisiana
/s/ *Caitlin A. Huettemann*
CAITLIN A. HUETTEMANN –
BAR #40402
Assistant Solicitor General
OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 888-7903
HuettemannC@ag.louisiana.gov
*Attorneys for the State of Louisiana*

37

Sarah C. Bordelon (*pro hac vice*)
HOLLAND & HART LLP
5470 Kietzke Lane, Suite 100
Reno, NV 89511
(775) 327-3011
scbordelon@hollandhart.com

Sean Marotta (*pro hac vice*)
Dana A. Raphael (*pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

John S. Moran (*pro hac vice*)
MCGUIREWOODS LLP
888 16th Street N.W. Suite 500
Washington, D.C. 20006
(202) 828-2817
jmoran@mcguirewoods.com

*Counsel for Plaintiff Chevron U.S.A. Inc.*

35489327_v5