**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| STATE OF LOUISIANA, by and through its Attorney General, LIZ MURRILL; AMERICAN PETROLEUM INSTITUTE; and, CHEVRON U.S.A. INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> NATIONAL MARINE FISHERIES SERVICE; and HOWARD LUTNICK, in his official capacity as the Secretary of Commerce, <br><br> *Defendants.* | No. 2:25-cv-00691-JDC-TPL <br><br> Hon. James D. Cain, Jr. <br><br> Magistrate Judge Thomas P. LeBlanc |

## DECLARATION OF JOE T. GORDON

I, Joe T. Gordon, hereby attest as follows:

1.      I am over 21 years of age and competent to make this declaration.  The facts set forth herein are based on my personal knowledge gained in the course of my business activities.

### Basis for Personal Knowledge

2.      I am currently employed as the Gulf of America Regulatory Affairs Team Lead — Strategy, Operations and Advocacy for Chevron U.S.A. Inc. ("Chevron").  I have worked for Chevron for over 15 years and, before that, served in other roles relevant to Gulf of America oil and gas activities.  I have extensive knowledge of various activities (including regulatory processes and approvals) needed to execute exploration, appraisal, drilling and completions, development, production, and decommissioning operations for offshore oil and gas in the Gulf of America.  I am also familiar with federal laws and regulations governing offshore oil and gas activities.

1

3.     I am familiar with the Biological Opinion issued by the National Marine Fisheries Service (NMFS) pursuant to Section 7 of the Endangered Species Act (ESA) on May 20, 2025, which Plaintiffs have challenged in the above-captioned litigation.

4.     The 2025 Biological Opinion evaluates the impacts of oil and gas activities in the Gulf of America on federally listed species.  The 2025 Biological Opinion considers the full range of oil and gas activities authorized by the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE) from pre-lease surveys through exploration, development, production, and decommissioning.

### Chevron's Interests in the Gulf of America

5.     Chevron has for many decades engaged in oil and gas activities in the Gulf of America.  Chevron is a significant producer in the Gulf, currently delivering over 200,000 barrels of oil equivalent per day.  Chevron's Gulf business is focused on deepwater exploration, appraisal, drilling and completions, identifying and developing new projects, and production operations.  Chevron maintains interests in hundreds of leases in the Gulf, primarily in the areas BOEM has designated as the Western and Central Planning Areas.

6.     Chevron's Gulf interests are significant.  For example, out of the 32 companies that participated in Gulf Lease Sale 259, held in March 2023, Chevron bid by far the most money on the most leases—more than $120 million on 81 leases—representing more than a third of the bid totals.[1]  BOEM ultimately awarded Chevron 73 leases for which Chevron paid BOEM nearly $105 million in initial bonus bid payments.

7.     Chevron has invested billions of dollars in maintaining its leases and in exploration, appraisal, project development, asset development and production, and

---

[1] BOEM, Lease Sale 259 Summaries of Company Bids, at 1 (Mar. 2023), https://tinyurl.com/tfzzxtre.

*Louisiana v. NMFS*, No. 2:25-cv-00691, Declaration of Joe T. Gordon

decommissioning activities.  Chevron currently operates six deepwater Gulf production facilities and holds interests in multiple jointly owned fields or facilities operated by other companies. Over 1,500 employees are dedicated to Chevron's Gulf business, primarily at its offices in Covington, Louisiana, and Houston, Texas.  Chevron also contracts with hundreds of service companies, equipment suppliers, and other businesses that provide equipment, thousands of additional labor and support personnel, and other specialized services to support its Gulf business, including several drilling rigs.

### Complying With The 2025 Biological Opinion Will Impose Costs On Chevron

8.     Chevron submitted extensive comments on the draft 2025 Biological Opinion. NMFS_2464-NMFS_2503.

9.     Implementing the 2025 Biological Opinion's "reasonable and prudent alternative" for Rice's whales will impose unrecoverable compliance costs on Chevron, including to, among other things, engage in the extensive monitoring and immediate reporting by operators that observe a whale that might be a Rice's whale.

10.     The 2025 Biological Opinion's "reasonable and prudent measures" (RPMs) will also impose compliance costs on Chevron, including RPM #1, and associated Term and Condition #1, which requires operators to determine and use the "quietest configuration of equipment necessary to conduct geophysical surveys," as BOEM may define that standard.

### Chevron Does Not Request Vacatur Of The 2025 Biological Opinion

11.     In this lawsuit, Chevron and the other Plaintiffs seek only a declaration that certain aspects of the 2025 BiOp are unlawful and that the BiOp be remanded to NMFS. Plaintiffs do not seek vacatur of the 2025 Biological Opinion.  Vacatur of the 2025 Biological Opinion would present significant risks and harms to Chevron, as I have detailed in my

*Louisiana v. NMFS*, No. 2:25-cv-00691, Declaration of Joe T. Gordon

declarations in other cases where environmental groups requested vacatur of the Gulf programmatic biological opinion. *See* ECF Nos. 124-1, 179-3, 180-2, 198-1, 212-5, *Sierra Club v. NMFS*, 8:20-cv-03060 (D.M.D.).

12.    Virtually all of Chevron's Gulf activities depend on the ability to efficiently obtain new and revised permits and approvals from BOEM and BSEE. This includes activities such as seismic and geophysical operations, exploration for new sources of oil and gas, production from already-drilled wells, new wells to develop already-discovered oil and gas and maintain existing projects, day-to-day operations on and around production platforms, and ultimately the removal of oil and gas production infrastructure including facilities that are no longer in operation (referred to as decommissioning).

13.    BOEM and BSEE satisfy their obligations under the ESA by conditioning permits and approvals on compliance with the Biological Opinion. Chevron has already started to receive permits and approvals incorporating conditions from the 2025 Biological Opinion and anticipates that BOEM and BSEE will likewise condition Chevron's subsequent permits and approvals on compliance with the 2025 Biological Opinion.

14.    BOEM and BSEE have explained that the Biological Opinion serves a programmatic function, allowing BOEM and BSEE to approve thousands of permits and approvals without engaging in individual ESA consultations for each application. *See* ECF Nos. 211-3, 211-4, *Sierra Club v. NMFS*, 8:20-cv-03060 (D.M.D.). The government has "explained in detail that the agencies are not equipped to tackle the sheer volume of permits and applications that are submitted on an annual basis," as would be required if the applicable programmatic Biological Opinion is vacated. ECF No. 218 at 12, *Sierra Club v. NMFS*, 8:20-cv-03060 (D.M.D.).

4

15.     Any permitting backlog created by vacatur of the 2025 Biological Opinion would have severe consequences for Chevron.  It could delay Chevron's ability to respond to unplanned, routine maintenance activities on production facilities.  In some scenarios, the inability to obtain timely approvals of Development Operations Coordination Documents (DOCD) amendments and supplements could cause curtailment of production until Chevron received agency approvals to replace equipment, which would be logistically difficult to implement and extraordinarily expensive.

16.     If permitting logjams and regulatory uncertainty from vacatur of the 2025 Biological Opinion precluded or delayed planned drilling activities, Chevron would face enormous logistical challenges and costs.  As just one example, unless commercial arrangements and contracts could be suspended, amended, or deferred, I anticipate that Chevron and its co-owners would incur additional costs in the range of hundreds of thousands of dollars to a million dollars or more per rig, per day if drilling is delayed or discontinued due to disruptions in permitting and approvals.

17.     Additionally, delays in obtaining permits and approvals resulting from vacatur of the 2025 Biological Opinion could adversely impact Chevron's ability to produce or to meet other affirmative activity requirements in its leases, thus threatening Chevron's ability to maintain certain leases.

18.     In light of the enormous operational and financial impacts that vacatur of the 2025 Biological Opinion would have on Chevron, Chevron respectfully requests that the 2025 Biological Opinion not be vacated.

5

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on August __6__, 2025 in Covington, Louisiana.

_Joe T. Gordon_

Joe T. Gordon

_Louisiana v. NMFS_, No. 2:25-cv-00691, Declaration of Joe T. Gordon