**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| STATE OF LOUISIANA,<br>By and through its Attorney General, LIZ<br>MURRILL;<br><br>AMERICAN PETROLEUM INSTITUTE;<br>and,<br><br>CHEVRON U.S.A. INC.<br><br>              Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE;<br>and<br><br>HOWARD LUTNICK, in his official capacity as<br>the Secretary of Commerce,<br><br>              Defendants. | NO.  8:25-cv-01627-DLB<br><br>DECLARATION OF HOLLY HOPKINS<br>IN SUPPORT OF MOTION FOR<br>SUMMARY JUDGMENT |

**DECLARATION OF HOLLY A. HOPKINS**

1.      My name is Holly A. Hopkins. I make this Declaration on the basis of personal knowledge and am competent to testify to the matters stated in this Declaration, which are true and correct to the best of my knowledge, information, and belief.

2.      I am the Vice President, Upstream Policy for the American Petroleum Institute ("API"), and have been employed at API for over 15 years. My work covers, among other things, regulatory and legislative matters related to development, drilling and production from offshore oil and gas leases, including environmental and safety laws, regulations, and policies relevant to those activities. I was employed by the Department of the Interior ("DOI") for over seven years prior to joining API. At DOI, I served as Special Assistant to the Deputy Secretary and as Chief of Staff at the Minerals Management Service, which is now organized into the Bureau of Safety

and Environmental Enforcement ("BSEE") and the Bureau of Ocean Energy Management

("BOEM") (collectively the "Bureaus"). In both positions, I performed a wide variety of tasks

that included significant work related to federal offshore leasing and development policies and

regulations. I have also authored and co-authored papers related to natural resources issues and

served as a guest speaker on multiple occasions.

3.     API is the primary national trade association of the oil and gas industry. API

represents nearly 600 member companies, including Chevron U.S.A. Inc., involved in all aspects

of the U.S. oil and gas industry, including explorers, producers, refiners, suppliers, pipeline

operators, marine transporters, and service and supply companies. Together with its member

companies, API is committed to ensuring a strong, viable U.S. oil and gas industry capable of

meeting the energy needs of the Nation in an efficient and environmentally responsible manner.

API's overall purpose includes representation of the interests of the oil and gas industry in

litigation, and API has on numerous occasions intervened as a party in litigation affecting those

interests. API also develops oil and gas standards, conducts and sponsors research, engages with

regulatory agencies, and participates in regulatory processes on behalf of its members and the oil

and gas industry.

4.     Oil and gas development in the United States is carried out exclusively through

private oil and gas companies (including publicly traded companies). These companies acquire

leases through a sealed bidding process, and then engage in exploration efforts that, if successful,

will lead to production. API's members have extensive experience with successful exploration

and development of U.S. oil and gas resources, including the oil and gas resources of the Gulf of

America (the "Gulf").

129571424.1 0078439-00078

5.    API's members currently operate many of the offshore wells in the Gulf. API's members are directly engaged in oil and gas exploration in the Gulf and have for decades been among the principal developers of offshore leases in the Gulf. In addition to leaseholders and operators, API's members include companies that conduct geophysical and geological exploration activities and provide support services for offshore oil and gas development. These members provide, among other things, material, equipment, and other support services to federal lessees in developing their oil and gas resources. Almost all of API's members' Gulf activities occur in areas offshore of Texas or Louisiana, with most of the associated vessel traffic to those areas originating from the Port of Galveston, Texas, and Port Fourchon, Port of Morgan City, and Port of Iberia, Louisiana. Many of those activities are carried out by members who are either headquartered in, or have offices in, Houston, Texas or New Orleans, Louisiana. Overall, API members invest billions of dollars each year to further the exploration and development of the oil and gas resources in the Gulf.

6.    Offshore oil and gas activities in the Gulf are essential to the nation's economy and energy security. For example, in 2023 alone, oil and gas operations on the OCS in the Gulf produced approximately 674 million barrels of oil and 795 billion cubic feet of gas, supported over 412,000 jobs, contributed over $34.3 billion to the U.S. gross domestic product, and generated $6.1 billion in federal government revenue. These resources are produced through an extensive network of 1,432 active platforms, 7,170 wells, and 3,956 pipelines.

7.    I am familiar with the Endangered Species Act ("ESA") "Biological and Conference Opinion on [BOEM] and the [BSEE]'s Oil and Gas Program Activities in the Gulf of America" issued by the National Marine Fisheries Service ("NMFS") on May 20, 2025 (the "2025 BiOp"). The 2025 BiOp addresses, *inter alia*, Gulf oil and gas leasing, exploration,

development, production, and decommissioning activities authorized by the Bureaus. The 2025 BiOp concludes that those activities are likely to jeopardize the Gulf's Rice's whale and not likely to jeopardize various other ESA-listed whale, turtle, and fish species that are found in the Gulf.

8.    The 2025 BiOp inflates the effects and incidental take estimates of oil and gas activities on the Gulf's Rice's whale. To offset the impacts of the inflated effects and take estimates, the 2025 BiOp imposes substantial regulatory burdens on API's members operating in the Gulf through the reasonable and prudent measures. These measures include unnecessary and financially burdensome restrictions, such as requiring an applicant to make material changes in planned surveys in order to comply with reasonable and prudent measure #1 (requiring use of the "quietest configuration" to conduct geophysical surveys). The 2025 BiOp makes compliance with those measures a prerequisite for compliance with the ESA. Because API's members must comply with the terms of the 2025 BiOp to carry out their activities, the 2025 BiOp directly harms their economic interests, the safety of its members' workers, and its members' ability to operate in an efficient and environmentally responsible manner. The 2025 BiOp establishes a programmatic framework that allows the Bureaus to comply with ESA Section 7(a)(2) for the thousands of annual federal approvals that are necessary to maintain API members' continued oil and gas operations in the Gulf. If the 2025 BiOp were to be vacated, the Bureaus would no longer be able to timely issue the thousands of permits and approvals API members rely on for their ongoing oil and gas operations in the Gulf, effectively halting all stages of oil-and-gas operations. The 2025 BiOp also is essential for continued operations under permits that have already been issued. Finally, the inflation of the take estimates also causes reputational injury to

- 4 -

API and its members by representing speculative harms as actual harms caused by oil and gas activities.

9.      API and its members participated in various aspects of the public processes relating to actions addressed in the 2025 BiOp. For example, API participated in the development and submittal of multiple detailed comment letters during the course of a federal rulemaking process to establish new regulations authorizing and governing the incidental take of marine mammals by oil and gas exploratory activities under the Marine Mammal Protection Act ("MMPA"). *See* 86 Fed. Reg. 5322 (Jan. 19, 2021). Those regulations are one of the federal actions evaluated in the 2025 BiOp and, therefore, rely upon the 2025 BiOp for ESA compliance. As another example, API participated in the public processes, including the submittal of detailed comments, related to the federal environmental review of certain activities evaluated in the 2025 BiOp pursuant to the National Environmental Policy Act. *See* 82 Fed. Reg. 36,418 (Aug. 4, 2017).

10.     On March 10, 2025, the Bureaus issued a letter recognizing the ESA Section 7 "applicant" status of API. As an applicant, API had a right under the ESA to fully participate in the Section 7 consultation process. On March 31, 2025, the Bureaus provided API with a draft copy of the 2025 BiOp, as required by the ESA. API was given seven days (five business days) to review the draft biological opinion and provide comments. On April 7, 2025, API provided comments to the Bureaus and NMFS identifying the speculative nature of the methodology used to reach the conclusion that oil and gas activities in the Gulf are likely to jeopardize the continued existence of the Rice's whale, among other key problems. On May 12, 2025, API provided additional comments detailing the flaws in the vessels strike analysis.

129571424.1 0078439-00078

11.    Relatedly, three other courts have granted API intervention status to protect its interest in NMFS's biological opinions regulating oil and gas activities in the Gulf. *See Nat. Res. Def. Council et al. v. Salazar et al.*, No. 2:10-cv-1882 (E.D. La.) (all parties executed a settlement agreement (as amended) providing that the plaintiffs would dismiss their case once, *inter alia*, NMFS issued a biological opinion for certain actions at issue in the lawsuit); *Gulf Restoration Network et al. v. NMFS et al.*, No. 8:18-cv-1504 (M.D. Fla.) (all parties executed a settlement agreement, which required NMFS to issue a biological opinion by a certain date); *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. 8:20-cv-3060 (D. Md.) (concluding that NMFS's biological opinion issued in March 2020 was unlawful). API moved to intervene in those three federal lawsuits because, just as here, API's and its members' oil and gas-related activities in the Gulf directly relied on the coverage and programmatic framework established by a biological opinion, and without a biological opinion in place, API and its members would have been injured and unable to proceed with their oil and gas operations in the Gulf.

12.    For these reasons, API and its members are directly injured by the 2025 BiOp and the substantial regulatory burdens it imposes through the reasonable and prudent measures, which likely will cause delays or disruptions to ongoing operations in the Gulf and prevent members from operating in an environmentally responsible manner. Without an order remanding the 2025 BiOp to NMFS without vacatur to correct and revise the 2025 BiOp, API and its members will continue to be injured by the onerous regulatory burdens imposed by the 2025 BiOp.

13.    If the Court were to determine that vacatur of the BiOp (and the incidental take statement ("ITS")) was an appropriate remedy (which it is not), such an end result would be particularly catastrophic for API and its members. As described above, API's members' oil and

gas operations in the Gulf require ongoing permit approvals by BSEE for even minor changes. Vacatur of the BiOp would cause a *de facto* permit moratorium and prevent operators from obtaining necessary well-drilling permit revisions needed for safety purposes, which would also prevent operators from drilling wells at all. Properly drilling a well depends on the ability to obtain a permit revision, if necessary.

14.    Further, vacatur of the BiOp and ITS without a new biological opinion and incidental take statement in place would immediately place API members at risk of civil and criminal liability without "take" protection under the ITS. This will have immediate harmful consequences. API member companies cannot simply walk away from ongoing platform operations, ongoing drilling operations, or required pipeline maintenance activities without incurring massive financial losses and creating public safety issues. Every company involved in Gulf oil and gas operations (including API members) will be put in an impossible situation and forced to make a difficult choice: (a) immediately cease activities until a new biological opinion and incidental take statement are issued to avoid the possibility of ESA take liability (and, in doing so, suffer severe financial losses, breach of contract claims, and other negative consequences); or (b) proceed with activities at the risk of incurring ESA liability. In other words, an API member must either halt operations and risk non-compliance with lease obligations, contractual obligations, and permit conditions, or proceed with necessary operations while risking ESA liability and reputational damage. In both scenarios, API members face real and significant irreparable damage.

15.    The severe impacts of vacatur will be felt beyond API members. While impossible to accurately estimate the costs and implications, a long-duration outage of approximately 14 percent of total U.S. crude oil production would have numerous and

- 7 -

widespread consequences for global and domestic energy markets. The refineries along the U.S. Gulf coast provide 48 percent of the Nation's refining capacity. Many of those same refineries use the medium-density crude oil high in sulfur content (medium-sour) produced in the Gulf, which is different from most onshore U.S. production, which is lighter and lower in sulfur. Because there is no readily available alternative domestic source for replacement crude oil, removing this supply would cause operational difficulties for the refineries on the Gulf coast, with consequences for petroleum product supply chains throughout the nation. Refiners would be forced to import similar crude oils from the global market, the supply of which would likely be delayed. But even after production resumes, the shut-ins may have long-lasting consequences, such as permanent damage to production wells and inability to produce at the same scale once reactivated. In addition, a halt to decommissioning risks exposing aged infrastructure to degradation from the elements and lack of activity, which poses multiple environmental and safety risks.

16.    In sum, vacatur of the BiOp or the ITS would have irreparably harmful impacts on API's members, enormously disruptive consequences for the oil and gas industry in the Gulf, and significant negative effects on people, businesses, local and state governments, and the United States. Resolution of this lawsuit in favor of API would help API achieve its mission to ensure a strong, viable, U.S. oil and gas industry capable of meeting the energy needs of the Nation in an efficient and environmentally responsible manner. A favorable outcome for API would also further its interest in the responsible and correct application of existing federal regulations and laws, thereby providing more regulatory, economic, and conservation certainty for the U.S. oil and gas industry.

129571424.1 0078439-00078

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information and belief.

Executed on August 7, 2025, in Washington, D.C.

Holly A. Hopkins

129571424.1 0078439-00078