ADAM R.F. GUSTAFSON, Acting Assistant Attorney General
MEREDITH L. FLAX, Deputy Section Chief
MICHAEL R. EITEL, Acting Assistant Section Chief
DAVIS A. BACKER, Trial Attorney (CO Bar No. 53502)
SARA M. WARREN, Trial Attorney (GA Bar No. 966948)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, North Terrace, Suite 600
Denver, CO 80202
Tel: (202) 305-5469 (Backer)
Tel: (202) 598-5785 (Warren)
Fax: (202) 305-0275
Email: davis.backer@usdoj.gov
Email: sara.warren@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| STATE OF LOUISIANA, et al., | * | |
| | * | Hon. James D. Cain, Jr. |
| *Plaintiffs*, | * | Mag. Judge Thomas P. LeBlanc |
| | * | |
| v. | * | |
| | * | Civil No.: 2:25-cv-00691-JDC-TPL |
| NATIONAL MARINE FISHERIES | * | |
| SERVICE, et al., | * | |
| | * | |
| *Defendants*, | * | |
| | * | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................... 1

LEGAL BACKGROUND .................................................................................. 2

   I. Endangered Species Act .............................................................................. 2

   II. Marine Mammal Protection Act................................................................ 4

   III. The Outer Continental Shelf Lands Act.................................................. 5

FACTUAL BACKGROUND .............................................................................. 5

   I. The Agencies' Consultation History........................................................... 6

   II. NMFS' 2020 Biological Opinion and Resulting Litigation ..................... 7

   III. NMFS' 2025 Biological Opinion and Present Litigation ...................... 10

STANDARD OF REVIEW .............................................................................. 13

ARGUMENT .................................................................................................... 13

   I. NMFS' Jeopardy Analysis for the Rice's Whale Is Rational and Entitled to Deference. ...... 13

      A. NMFS used the best available scientific and commercial information and fully explained its rationale in the jeopardy analysis for the Rice's whale. ............................. 14

         1. NMFS used the best available scientific information in evaluating the status of Rice's whales. ........................................................................ 14

         2. NMFS used the best available scientific information in evaluating the risk of vessel strikes. ........................................................................ 16

      B. NMFS considered real world data in its vessel strike analysis. ...................................... 21

      C. NMFS properly declined to defer to the Bureaus on the vessel strike analysis. .............. 22

      D. NMFS' assumption of a five percent carcass recovery rate was rational. ...................... 23

      E. NMFS properly incorporated the Blondin methodology.................................................. 25

      F. NMFS rationally accounted for vessel traffic in its co-occurrence model. ..................... 26

      G. NMFS' conclusions about the effects of the action are reasonably certain to occur. ...... 27

      H. NMFS considered Applicants' comments but was not required to address Ms. King's last-minute opinion. ........................................................... 28

   II. The RPA Is Rational and Consistent with the Law............................................................. 32

i

III. NMFS' Conclusions Reached in the ITS Are Reasoned and Comply with the ESA. ........ 33

IV. NMFS' Reasonable and Prudent Measures Comport with the ESA. ................................. 41

V. Remedy ............................................................................................................................. 43

CONCLUSION............................................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Case**                                                                          **Page(s)**

*Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*,
    273 F.3d 1229 (9th Cir. 2001) ................................................................. 39

*Arizona Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*,
    1999 WL 33722331 (D. Ariz. Dec. 14, 1999) ........................................ 42

*Atieh v. Riordan*,
    727 F.3d 73 (1st Cir. 2013) .................................................................... 13

*Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ................................................................. 13, 18, 20

*BCCA Appeal Grp. v. U.S. E.P.A.*,
    355 F.3d 817 (5th Cir. 2003) ........................................... 14, 17, 21, 25

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ............................................................................... 44

*Castro v. United States*,
    540 U.S. 375 (2003) ............................................................................... 44

*Cook v. Heckler*,
    750 F.2d 391 (5th Cir. 1985) ................................................................ 13

*Cook Inletkeeper v. Raimondo*,
    533 F. Supp. 3d 739 (D. Alaska 2021) .................................................. 38

*Ctr. for Biological Diversity v. EPA*,
    861 F.3d 174 (D.C. Cir. 2017) ............................................................... 44

*Ctr. for Biological Diversity v. Salazar*,
    695 F.3d 893 (9th Cir. 2012) ................................................................ 36

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
    423 U.S. 326 (1976) ............................................................................... 44

*Goonsuwan v. Ashcroft*,
    252 F.3d 383 (5th Cir. 2001) ................................................................ 13

*Gulf Restoration Network v. Salazar*,
    683 F.3d 158 (5th Cir. 2012) ................................................................ 30

*Hayward v. U.S. Dep't of Labor*,
    536 F.3d 376 (5th Cir. 2008) ................................................................ 13

*Healthy Gulf v. U.S. Army Corps of Eng'rs,*
   81 F.4th 510 (5th Cir. 2023) ................................................................................ 30

*Louisiana v. Haaland,*
   86 F.4th 663 (5th Cir. 2023) ................................................................................. 9

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Service,*
   70 F.4th 582 (D.C.Cir. 2023) ................................................................... 20, 27, 28

*Marsh v. Or. Nat. Res. Council,*
   490 U.S. 360 (1989) ............................................................................................ 14

*McBride v. Merrell Dow & Pharm.,*
   800 F.2d 1208 (D.C. Cir. 1986) ........................................................................... 44

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.,*
   602 F.3d 687 (5th Cir. 2010) .......................................................................... 13, 14

*Melone v. Coit,*
   100 F.4th 21 (1st Cir. 2024) ................................................................................ 38

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ........................................................................................... 2, 13

*Nat. Res. Def. Council, Inc. v. Pritzker,*
   828 F.3d 1125 (9th Cir. 2016) ............................................................................. 38

*Native Village of Chickaloon v. NMFS,*
   947 F. Supp. 2d 1031 (D. Alaska 2013) .............................................................. 38

*Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.,*
   117 F.4th 628 (5th Cir. 2024) ............................................................................. 43

*Oregon Natural Desert Ass'n v. Tidwell,*
   716 F. Supp. 2d 982 (D. Or. June 4, 2010) ......................................................... 42

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
   747 F.3d 581 (9th Cir. 2014) ............................................................................... 44

*Sierra Club, et al. v. NMFS, et al.,*
   No. 8:20-cv-03060-DLB (D. Md. 2021) ......................................................... 8, 9, 22

*Sierra Club, et al. v. NMFS, et al.,*
   No. 8:25-cv-1627-DLB ........................................................................................ 43

iv

*Sw. Elec. Power Co. v. U.S. E.P.A.*,
  920 F.3d 999 (5th Cir. 2019) ............................................................ 14, 20, 21, 33

*Texas v. U.S. E.P.A.*,
  137 F.4th 353 (5th Cir. 2025) ........................................................... 20, 22

*Trump v. CASA, Inc.*,
  145 S. Ct. 2540 (2025) ...................................................................... 44

*United States v. Texas*,
  599 U.S. 670 (2023) .......................................................................... 43

*Wendt v. 24 Hour Fitness USA, Inc.*,
  821 F.3d 547 (5th Cir. 2016) ............................................................ 42

**Statutes**

5 U.S.C. § 706(2) ..................................................................................... 13

16 U.S.C. § 1362(18) .............................................................................. 34

16 U.S.C. § 1362(18)(A)(ii) ................................................................... 37

16 U.S.C. § 1371(a) ................................................................................. 4

16 U.S.C. § 1371(a)(5) ............................................................................ 33

16 U.S.C. § 1371(a)(5)(A)(i) ................................................................... 5

16 U.S.C. § 1371(a)(5)(B) ....................................................................... 36

16 U.S.C. § 1372 ...................................................................................... 4

16 U.S.C. § 1532(6) ................................................................................. 2

16 U.S.C. § 1532(19) .............................................................................. 4, 34

16 U.S.C. § 1532(20) .............................................................................. 2

16 U.S.C. § 1533(d) ................................................................................. 4

16 U.S.C. § 1536(a)(2) ............................................................................ 3, 13, 23

16 U.S.C. § 1536(a)(3) ............................................................................ 3

16 U.S.C. § 1536(a)(3)(A) ....................................................................... 3

16 U.S.C. § 1536(b)(1)(A) ....................................................................... 4

16 U.S.C. § 1536(b)(3)(A) ....................................................................... 3,13, 32

16 U.S.C. § 1536(b)(4)(C) ....................................................................... 36, 39

16 U.S.C. § 1536(b)(4)(C)(2) ................................................................... 41

16 U.S.C. § 1536(b)(4) ............................................................................ 4, 33, 35, 39

16 U.S.C. § 1536(o)(2) ......................................................................... 4, 33, 39

16 U.S.C. § 1538(a)(1)(B) ............................................................................. 4

16 U.S.C. § 1543 .................................................................................. 2, 34, 36

43 U.S.C. § 1332(3) ..................................................................................... 5

43 U.S.C. § 1337 ......................................................................................... 5

43 U.S.C. § 1340 ......................................................................................... 5

43 U.S.C. § 1344 ......................................................................................... 5

43 U.S.C. § 1351 ......................................................................................... 5

## Regulations

50 C.F.R. § 17.3 ......................................................................................... 37

50 C.F.R. § 216.3 ....................................................................................... 35

50 C.F.R. § 402.02 ..................................................................................... 41

50 C.F.R. § 402.13(a) ................................................................................... 3

50 C.F.R. § 402.14(b)(1) ............................................................................... 3

50 C.F.R. § 402.14(d) .............................................................................. 3, 28

50 C.F.R. § 402.14(g)(7) ............................................................................... 4

50 C.F.R. § 402.14(h) ................................................................................... 3

50 C.F.R. § 402.14(h)(3) ............................................................................. 23

50 C.F.R. § 402.14(i)(1) ............................................................................... 4

50 C.F.R. § 402.14(i)(2) ............................................................................. 41

50 C.F.R. § 402.14(i)(5) ............................................................................... 4

50 C.F.R. § 402.16 ....................................................................................... 4

50 C.F.R. § 402.16(a) ................................................................................... 4

## Other Authorities

86 Fed. Reg. 47,022 (Aug. 23, 2021) ............................................................ 8

89 Fed. Reg. 31,488 (Apr. 24, 2024) ........................................................... 34

## TABLE OF ACRONYMS

| | |
|---|---|
| AIS | Automatic Identification System |
| APA | Administrative Procedure Act |
| API | American Petroleum Institute |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| BOEM | Bureau of Ocean Energy Management |
| BOEMRE | Bureau of Ocean Energy Management, Regulation, and Enforcement |
| BSEE | Bureau of Safety and Environmental Enforcement |
| COA | Conditions of Approval |
| DPS | Distinct Population Segment |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| ITS | Incidental Take Statement |
| MMPA | Marine Mammal Protection Act |
| NMFS | National Marine Fisheries Service |
| OCS | Outer Continental Shelf |
| OCSLA | Outer Continental Shelf Lands Act |
| RPA | Reasonable and Prudent Alternatives |
| RPM | Reasonable and Prudent Measure |

# INTRODUCTION

NMFS' 2025 biological opinion on oil and gas program activities in the Gulf of America represents the agency's most comprehensive and up-to-date evaluation on how oil and gas activities in the Gulf affect species listed under the Endangered Species Act. The opinion is sweeping in both scope and detail, covering a forty-five-year planning horizon, canvassing an extensive range of activities from pre-lease exploration to well-decommissioning. Building on prior consultations and explicit direction from the courts, the result is a document reflecting the government's concerted effort to ensure that domestic offshore energy production in the Gulf proceeds in compliance with the law.

Plaintiffs see it differently. They argue that NMFS relied on flawed data, made overly pessimistic assumptions, and imputed risk to industry operations where none exists. But the record tells another story.

For one, the ESA requires NMFS to answer the following question when it gives its expert, biological opinion to another federal agency on a proposed federal action: is the action likely to jeopardize the continued existence of any threatened or endangered species? For oil and gas activities in the Gulf of America, the answer to that question was yes. NMFS determined that one component of oil and gas activities—vessel traffic—is likely to jeopardize the continued existence of the endangered Rice's whale. In reaching that conclusion, NMFS used its expert scientific judgment, fully explained its decisionmaking, and reached a rational result based on the best available scientific and commercial information. Thus, NMFS fully complied with the ESA's requirements.

NMFS also was careful when authoring its incidental take statement to include take reasonably certain to occur for ESA-listed marine mammals and other ESA-listed species alike. To do this, it reconciled both ESA and MMPA standards of harm, recognizing that Congress intended

1

these statutes to be construed together, with the MMPA's more restrictive provisions taking precedence. The substantial overlap in the statutory, regulatory, and agency guidance language, as well as NMFS' efforts to reconcile the statutory mandates, ensured that the ITS appropriately captured the full scope of activities that cause take. NMFS' decision thus carries out Congress' legislative intent to draw on both statutes, as appropriate, depending on the species at issue.

Considering this careful and reasoned analysis, Plaintiffs' challenge presents mere disagreement with NMFS' expert judgments. They do not, and cannot, meet their heavy burden of proving that NMFS' analysis and conclusions are "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). They cannot meet this burden because NMFS appropriately considered the relevant factors, drew upon its expertise, and reached conclusions entirely consistent with its statutory duties. For these reasons, as explained more fully below, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion.

## LEGAL BACKGROUND

### I.    Endangered Species Act

The ESA protects threatened and endangered species[1] in several ways, subject to Congress' mandate that, except as expressly provided in the ESA, "no provision of [the ESA] shall take precedence over any more restrictive conflicting provision of the Marine Mammal Protection Act of 1972." 16 U.S.C. § 1543.

As relevant here, ESA Section 7(a)(2) directs each federal agency (the action agency) to ensure, in consultation with NMFS (the consulting agency), that "any action authorized, funded,

---

[1] "Endangered" species are those which are in danger of extinction through all or a significant portion of their range. 16 U.S.C. § 1532(6). Meanwhile, "threatened" species are those which are likely to become an endangered species within the foreseeable future throughout all or a significant portion of their range. *Id.* § 1532(20).

or carried out by such agency . . . is not likely to jeopardize the continued existence of" a listed species or "result in the destruction or adverse modification" of designated critical habitat. *Id.* § 1536(a)(2). "Formal consultation" is required if either the action agency or NMFS determines that the proposed action is "likely to adversely affect any listed species or critical habitat." 50 C.F.R. §§ 402.14(b)(1), 402.13(a).

As part of the consultation process, the ESA provides for "applicant" involvement. Specifically, the ESA states that federal action agencies shall:

> consult with [NMFS] on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that a [listed species] may be present in the area affected by [the applicant's] project and that implementation of such action will likely affect such species.

16 U.S.C. § 1536(a)(3). The ESA's implementing regulations further support applicant involvement, requiring that in providing the best scientific and commercial data available, action agencies "shall provide any applicant with the opportunity to submit information for consideration during the consultation." 50 C.F.R. § 402.14(d).

Upon the conclusion of formal consultation, NMFS issues a biological opinion "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(a)(3)(A). If NMFS finds that the proposed action is likely to jeopardize the continued existence of a threatened or endangered species, NMFS will suggest reasonable and prudent alternatives, if any, that can be taken by the action agency in implementing the proposed action to avoid the likelihood of jeopardizing the continued existence of listed species. *See id*. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h). NMFS must use "the best scientific and commercial data available" in formulating its BiOp. 16 U.S.C. § 1536(a)(2).

Additionally, ESA Section 9(a)(1) prohibits the unauthorized "take" of members of an

endangered species. *Id*. § 1538(a)(1)(B). The ESA allows NMFS to extend that prohibition to threatened species. *Id*. § 1533(d). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19).

If, after formal consultation, NMFS concludes that the proposed action will incidentally take members of a listed species, the agency provides an ITS with the BiOp. 16 U.S.C. § 1536(b)(4). An ITS is provided when take "is reasonably certain to occur." 50 C.F.R. § 402.14(g)(7). An ITS must specify the impact (*i.e.*, the amount or extent) of anticipated take, measures to minimize such impact, and terms and conditions to implement those measures. *Id*. § 402.14(i)(1). Any taking in compliance with the terms and conditions specified in an ITS is exempt from Section 9's take prohibition. *See* 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

After consultation is complete, the action agency may be required to reinitiate consultation, where discretionary Federal involvement or control over the action has been retained or is authorized by law," and certain enumerated circumstances have been met. *Id*. § 402.16(a). There is no fixed deadline for the completion of reinitiated consultation. *See* 16 U.S.C. § 1536(b)(1)(A); 50 C.F.R. § 402.16.

## II.    Marine Mammal Protection Act

Under the MMPA, it is unlawful "to take any marine mammal" in "waters or on lands under the jurisdiction of the United States" or "on the high seas," except as expressly provided in the MMPA. 16 U.S.C. § 1372; *see also id*. § 1371(a). Upon request, however, NMFS can permit the "incidental, but not intentional, taking" of "small numbers of marine mammals" by citizens of the United States who engage in a specified activity (other than commercial fishing, which is separately addressed by another MMPA provision) within a specified geographical region for up to

five years, provided certain findings are made, regulations are issued, and notice is provided to the public. *Id*. § 1371(a)(5)(A)(i).

### III.    The Outer Continental Shelf Lands Act

Congress declared that the Outer Continental Shelf[2] is "a vital national resource" "which should be made available for expeditious and orderly development, subject to environmental safe-guards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). OCSLA establishes a graduated four-stage process governing oil and gas development on the OCS: (1) establishment of a national "five-year leasing program" of potential lease sales in areas of the Shelf; (2) lease sales through a competitive sealed-bid auction; (3) approval of plans allowing lessees to conduct exploration activities on the leased areas; and (4) if lessees discover valuable oil and gas deposits, approval of plans authorizing the production of oil and gas from the leased areas. 43 U.S.C. §§ 1337, 1340, 1344, 1351.

### FACTUAL BACKGROUND

The offshore extraction of crude oil, natural gas, and other mineral resources dates back decades. By the late 1800s, industrious wildcatters extended onshore oil fields into the ocean by drilling from piers built out over the water. Today, leading operators deploy semi-submersible drilling rigs miles offshore, floating in nearly 8,000 feet of water. While these innovations have yielded enormous value for producers and consumers alike, they have carried with them the attendant risks inherent in such extraordinary engineering challenges. Notably, this risk came to bear on April 20, 2010, when the Deepwater Horizon mobile drilling unit exploded, caught fire, and eventually sank off the coast of Louisiana. AR 31080. Eleven workers were killed, and seventeen workers were injured by the explosion and ensuing fire, followed by the release of approximately

---

[2] The OCS refers to all submerged lands lying seaward of state coastal waters under the jurisdiction of the United States. *See* AR 147.

3.19 million barrels of oil after initial efforts to cap the well were unsuccessful. AR 31080-81.

Since then, the federal action agencies responsible for overseeing the development of off-shore mineral resources have taken extraordinary steps to ensure similar accidents do not happen again. The Department of the Interior reorganized the Minerals Management Service into two separate agencies: the Bureau of Ocean Energy Management, Regulation, and Enforcement for leasing and safety enforcement; and the Office of Natural Resources Revenue for revenue collection. BOEMRE was further reorganized, effective October 1, 2011, into two separate agencies: the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement (collectively, the "Bureaus"). *See* AR 72887. The Bureaus implemented sweeping reforms, including the Drilling Safety Rule, Workplace Safety Rule, and later the Well Control Rule, which collectively imposed stricter requirements for well design, casing, cementing, and blowout preventer performance. In sum, the post-Deepwater Horizon reforms represent the most significant overhaul of offshore drilling oversight in U.S. history, designed to reduce the likelihood of another catastrophic blowout and to ensure greater accountability in the event of a spill.

## I.    The Agencies' Consultation History

For more than fifty years, the relevant action agencies responsible for permitting and regulating oil and gas development in the Gulf have consulted with the expert wildlife agencies—NMFS and FWS.[3] *See* AR 72888 (describing consultation history and biological opinions dating back to 1979). Prior to Deepwater Horizon, NMFS issued a BiOp for federally regulated oil and gas program activities in the Gulf in 2007. The accident prompted the now-defunct BOEMRE to request the reinitiation of ESA Section 7 consultation with NMFS to reevaluate the baseline and

---

[3] The U.S. Fish and Wildlife Service is not a party to the present lawsuit. FWS' latest consultation over federally regulated oil and gas program activities in the Gulf is subject to challenge in a parallel lawsuit in the District of Columbia. *See Center for Biological Diversity v. Haaland*, No. 1:24-cv-990-DLF (D.D.C).

status of listed species and their habitat in light of the impacts of Deepwater Horizon. AR 72890.

Meanwhile, a group of plaintiffs brought a lawsuit in the United States District Court for the Eastern District of Louisiana in 2010, alleging that BOEMRE violated the National Environmental Policy Act by issuing authorizations for seismic surveys related to oil and gas development in the Gulf of America. *See* AR 72889. The parties settled the case in 2013, which, *inter alia*, committed BOEM to consult with NMFS under the ESA over seismic survey-related take NMFS separately authorized under the MMPA. *Id*. NMFS ultimately completed the consultation and issued its 2020 programmatic BiOp. *See* AR 72860-73579.

## II.    NMFS' 2020 Biological Opinion and Resulting Litigation

The 2020 programmatic BiOp concluded ESA Section 7 consultation between NMFS (as the consulting agency) and BOEM, BSEE, the Environmental Protection Agency, and NMFS' Office of Protected Resources, Permits and Conservation Division (as action agencies) as to all federally regulated oil and gas program activities expected over the next 50 years in the Gulf of America. AR 72887. These activities pertain to "all stages of the leasing program" including exploration (such as pre-leasing geophysical surveys); development (construction of facilities); production (oil and gas extraction); and maintenance and decommissioning (removal of facilities). *Id*.; *see also* AR 72908-10 (describing stages of lease sale). Based on its species-by-species analysis, including its evaluation of measures to mitigate or avoid effects to species, NMFS concluded that the proposed action was "not likely to jeopardize the continued existence of sperm whale, Northwest Atlantic loggerhead sea turtle, Kemp's ridley sea turtle, North Atlantic DPS and South Atlantic DPS green sea turtle, leatherback sea turtle, hawksbill sea turtle, Gulf sturgeon, giant manta ray, and oceanic whitetip shark"; was "not likely to destroy or adversely modify loggerhead or Gulf sturgeon designated critical habitat"; but was "likely to jeopardize the continued existence

of the Gulf of Mexico [Rice]'s whale." AR 73482.[4] NMFS proposed an RPA "to avoid the likeli-hood of jeopardizing [the Rice's whale's] continued existence[.]" AR 73482-83.

In October 2020, a coalition of environmental plaintiffs led by Sierra Club challenged the 2020 BiOp in the District of Maryland, alleging violations of the ESA and the APA. *See generally Sierra Club, et al. v. NMFS, et al.*, No. 8:20-cv-03060-DLB (D. Md.). Several oil-and-gas-aligned entities, including API and Chevron U.S.A. Inc., intervened as defendants. *See id.* ECF No. 55. Nearly two years later, in October 2022, the Bureaus voluntarily reinitiated consultation to revisit the 2020 BiOp in light of (1) a reevaluation of the oil spill risk analysis presented in the 2020 BiOp, as well as BOEM's preparation of a new oil spill risk analysis for proposed outer continental shelf oil and gas leasing in the Gulf of America that would consider updated information on oil production, transport, and spill rates; and (2) a request for a BiOp amendment to the development of conditions of approval with NMFS related to impact pile driving and potential transit through the Rice's whale habitat. *Id*. ECF No. 102-2. Given the reinitiated consultation, briefing was stayed and the case referred to a magistrate judge for settlement discussions. *See id.* ECF No. 106. Several months later, the parties stipulated to stay the litigation to allow NMFS to focus on the consulta-tion. *See id*. ECF No. 147. For its part, the government agreed to implement certain interim measures to protect Rice's whales during the stay—including speed, distance, and other vessel-related restrictions for oil and gas operators.

The intervenor defendants, joined by the State of Louisiana, immediately sued BOEM in this District, challenging the inclusion—in an impending offshore lease sale—of the stipulated measures to protect Rice's whales. *Louisiana v. Haaland*, No. 2:23-cv-01157-JDC-KK (W.D. La.). This Court preliminarily enjoined BOEM from including those protective measures in that lease

---

[4] Based on additional taxonomic research, the ESA-listed population of Gulf of Mexico Bryde's whale was renamed Rice's whale. *See* 86 Fed. Reg. 47,022 (Aug. 23, 2021).

sale and the government appealed the Court's order to secure additional time to comply with the injunction. The Fifth Circuit ultimately left in place the injunction and granted the government's request for additional time to comply. *Louisiana v. Haaland*, 86 F.4th 663, 666-67 (5th Cir. 2023).

Back in the District of Maryland, the environmental plaintiffs moved to lift the stay considering a central prong of the negotiated stipulation had been enjoined. *Sierra Club, et al. v. NMFS, et al.*, No. 8:20-cv-03060-DLB, ECF No. 165. Litigation resumed, and on August 19, 2024, the court granted summary judgment for plaintiffs where it identified four broad deficiencies in the 2020 BiOp and ITS.

First, the District of Maryland found NMFS failed to adequately consider the likelihood and effects of oil spills by (1) improperly deferring to BOEM's conclusion that an oil spill over 1 million barrels was unlikely in the next 50 years, even as NMFS itself identified a 1.1-million-barrel spill as a possible outcome, and (2) failing to analyze the effects of smaller spills over 100,000 barrels that NMFS acknowledged would likely occur. *Id*. ECF No. 204 at 12-28. Second, the court found that in its jeopardy analysis for the Rice's whale and another species, NMFS erroneously assumed that their populations were the same as before the Deepwater Horizon spill—which, notably, killed about 17 percent of Rice's whales. *Id*. at 28-40. Third, the court faulted NMFS for failing to explain why its RPA addressed only two of the five Rice's whale stressors (vessel strikes and vessel noise, but not seismic noise, marine debris, or oil spills) or why the RPA, which was estimated to result in 12 whale deaths and 4 injuries, would not jeopardize Rice's whales. *Id*. at 56-65. Fourth, the court found that the ITS failed to account for take due to oil spills even though NMFS accounted for take from other illegal activities, and the ITS also irrationally adopted total vessel distance traveled—without regard to vessel location—as a standalone surrogate for estimating the number of takes from vessel strikes. *Id*. at 65-76.

Over the government's objection, the court vacated the BiOp in its entirety, concluding that it lacked authority to remand to the agency without vacatur. *Id*. at 77-79. But, recognizing its equitable power to select an appropriate vacatur date, the court deferred vacatur for four months, to give regulating agencies and regulated parties time to prepare. *Id*. at 80-83. The court explained that immediate vacatur of the BiOp would have serious disruptive consequences, including delaying a replacement BiOp, and would not necessarily mitigate harm to listed species. *Id*. at 81-82. On September 16, 2024, the government filed a Rule 59(e) motion to alter or amend the judgment, requesting that the court postpone the vacatur date to May 21, 2025. The accompanying declarations explained that NMFS could not complete a new BiOp until the May date and detailed how a lapse in ESA coverage would severely disrupt federally regulated oil and gas activities across the Gulf, leading to immense economic, safety, and environmental consequences. The court granted the government's post-judgment motion in full, delaying the vacatur date until May 21, 2025, thereby providing NMFS the full additional five months it had requested to complete a new BiOp.

## III.    NMFS' 2025 Biological Opinion and Present Litigation

In late 2022, while the prior litigation was still pending, the Bureaus sent a letter to NMFS formally requesting the reinitiation of consultation on federally regulated offshore oil and gas activities in the Gulf of America with the intent to update the oil spill risk analysis and reexamine additional concerns raised by the litigation over the 2020 BiOp. AR 28. The letter requesting reinitiation triggered a technical assistance period during which NMFS provided guidance to the Bureaus for the preparation of a focused biological assessment. *Id*. Over the next several months, NMFS held a series of meetings with the Bureaus to discuss topics relating to the content of the Bureaus' BA. AR 29. The Bureaus provided their initial BA to NMFS in late-2023, however, NMFS informed them that it required additional information before it could formally reinitiate

consultation. *Id*. Thus began an iterative process between the agencies, with the Bureaus providing additional effects determinations to NMFS over the course of spring and summer 2024. *Id*.

Following this process, and after receiving the District of Maryland's ruling on the 2020 opinion, NMFS then took the necessary time in late-2024 and early-2025 to distill the information the Bureaus had provided, incorporate the best available science, and generate a new BiOp that would replace the 2020 opinion in its entirety.[5] The agencies took the remand seriously. They were committed to addressing the various concerns that had been raised in the course of litigation and NMFS worked closely with the Bureaus and others to ensure the reinitiated consultation was comprehensive, grounded in the best available science, and responsive to the Court's findings.

The result was the 2025 BiOp—an opinion incorporating updates to the best available science since 2020, including that provided by the action agencies' 2023 amended BA, and additional changes fully addressing each of the District of Maryland's findings of error in the 2020 opinion.[6]

---

[5] In early 2025, the Bureaus received separate requests from both API and Chevron to be granted applicant status for the purpose of reviewing the draft BiOp and to help inform any RPA that may be designed. On March 10, 2025, the Bureaus issued letters to both parties granting their respective requests. *See* AR 2358-59 (granting API applicant status); AR 2360-61 (granting Chevron applicant status). Consistent with the conditions for their participation, both API and Chevron provided a raft of comments on the draft BiOp and RPA. *See generally* AR 2435-44; AR 2466-76; AR 2506-17; AR 2518-32. In addition to written comments, NOAA held two meetings with applicant representatives to further clarify technical comments on the draft BiOp. *See* AR 796 (summarizing discussion held on May 1); AR 107608 (summarizing discussion held on May 8).

[6] This document represents NMFS' opinion on the effects to Rice's whales (*Balaenoptera ricei*), sperm whales (*Physeter macrocephalus*), Kemp's ridley sea turtles (*Lepidochelys kempii*), loggerhead sea turtles (Northwest Atlantic DPS, *Caretta caretta*), green sea turtles (North Atlantic DPS, *Chelonia mydas*), hawksbill sea turtles (*Eretmochelys imbricata*), leatherback sea turtles (*Dermochelys coriacea*), Gulf sturgeon (*Acipenser oxyrinchus desotoi*), oceanic whitetip shark (*Carcharhinus longimanus*), giant manta ray (*Manta birostris*), proposed critical habitat for Rice's whale, and designated critical habitat for Gulf sturgeon and green North Atlantic DPS and loggerhead Northwest Atlantic DPS sea turtles. NMFS also considered the following species in this consultation: fin whale (*Balaenoptera physalus*), blue whale (*Balaenoptera musculus*), sei whale (*Balaenoptera borealis*), North Atlantic right whale (*Eubalaena glacialis*), queen conch (*Aliger gigas*), smalltooth sawfish (U.S. population, *Pristis pectinata*), Nassau grouper (*Epinephelus striatus*), boulder star coral (*Orbicella franksi*), elkhorn coral (*Acropora palmata*), lobed star coral (*Orbicella annularis*), mountainous star coral (*Orbicella faveolta*), and designated critical habitat for boulder star coral, lobed star coral, and mountainous star coral.

First, the 2025 BiOp contains a new oil spill risk analysis that incorporates the action agency's science while making an independent determination, presenting a consistent record, and appropriately considering the discrete acute effects of large oil spills on protected species. *See* AR 499. Second, NMFS updated the jeopardy analysis for all species, including the Rice's whale and the Gulf sturgeon, with the most recent, post-Deepwater Horizon oil spill abundance numbers available. AR 569, 588. Third, after again arriving at a jeopardy conclusion regarding the Rice's whale, in its RPA NMFS developed measures that will ensure the likelihood of jeopardy is avoided, explaining the agency's reasoning and why measures focused solely on reducing the chance of vessel strike are appropriately included in the RPA. AR 598-600, 606-608. Finally, NMFS adopted a consistent approach to its treatment of oil spill and marine debris take, AR 611, and incorporated additional spatial data into its surrogate measure for determining how many listed species would be taken by vessel strikes. *See, e.g.*, AR 361.

On May 20, 2025, within hours of NMFS issuing the new BiOp, two separate lawsuits were filed challenging the opinion—one in the District of Maryland by the same group of environmental plaintiffs that challenged the 2020 BiOp, and the instant lawsuit led by the State of Louisiana and industry plaintiffs. Perhaps unsurprisingly, the two challenges attack the 2025 BiOp from opposite ends, with the latter alleging that NMFS was overly conservative in its assumptions and the former alleging that NMFS was not conservative enough. The present predicament, thus, is dueling litigation alleging that NMFS has done both too little and too much in the service of its statutory and regulatory obligations. It cannot be both, and it is in fact neither too little nor too much, and this case ultimately requires the Court to determine whether the careful balance the agency has struck reasonably addresses the conservation demands of the ESA, as required by law.

## STANDARD OF REVIEW

The Court's review of the 2025 BiOp and ITS is governed by the standard of review in the Administrative Procedure Act, 5 U.S.C. §§ 701-706. Under that standard, courts may "set aside" agency action only if it is found to be arbitrary, capricious, or contrary to law, *id.* § 706(2). This "arbitrary and capricious" standard is "highly deferential," *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 379 (5th Cir. 2008) (per curiam), and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). The court instead determines only whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (citation modified). Plaintiffs carry the burden of proving that the agency's determination is arbitrary and capricious. *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). Because APA review generally "involves neither discovery nor trial," the "focal point of APA review is the existing administrative record." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013); *accord Goonsuwan v. Ashcroft*, 252 F.3d 383, 391 n.15 (5th Cir. 2001).

## ARGUMENT

**I.      NMFS' Jeopardy Analysis for the Rice's Whale Is Rational and Entitled to Deference.**

As explained above, ESA Section 7 requires federal agencies to consult with NMFS to ensure their actions are "not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). At the conclusion of consultation, NMFS provides its biological opinion as to whether a federal action is likely to jeopardize the continued existence of an ESA-listed species. *Id.* § 1536(b)(3)(A). The jeopardy analysis is at the heart of the opinion, and NMFS' scientific determination on jeopardy—a complex scientific inquiry on an issue squarely within its

13

expertise—is entitled to a high level of deference. *See Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983); *Medina Cnty. Env't Action*, 602 F.3d at 699 (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376–77 (1989)); *BCCA Appeal Grp. v. U.S. E.P.A.*, 355 F.3d 817, 824 (5th Cir. 2003). An agency's choices are subject to review only to ensure they "conform to minimal standards of rationality." *Sw. Elec. Power Co. v. U.S. E.P.A.*, 920 F.3d 999, 1013 (5th Cir. 2019) (citation omitted).

### A.     NMFS used the best available scientific and commercial information and fully explained its rationale in the jeopardy analysis for the Rice's whale.

In the 2025 BiOp, and as relevant here, NMFS determined that the proposed oil and gas program is likely to jeopardize the continued existence of the Rice's whale, after taking into account the description of the oil and gas program, the action area, stressors associated with the program, the status of the affected ESA-listed species, the environmental baseline, the effects of the proposed action on ESA-listed species, and any cumulative effects.[7]

### 1.     NMFS used the best available scientific information in evaluating the status of Rice's whales.

NMFS' analysis is rational because it considered the best available scientific information about the distribution, behavior, life history, and current status of and threats to the Rice's whale. AR 184-191. Until recently, the Rice's whale was thought to be a subspecies of the Bryde's whale. AR 184. Now, the Rice's whale is considered a separate species. It is the only whale known to live year-round in the Gulf of America. *Id.* Based on the concentration of sightings, its primary habitat

---

[7] Outside of a single, conclusory footnote, Plaintiffs only challenge NMFS' jeopardy analysis for the Rice's whale. Plaintiffs' Memorandum in Support of their Motion for Summary Judgment ("Pls.' Mem.") (ECF 33-1) at 33 (note: citations are to the ECF-stamped pagination at the top of filings and not to the original pagination at the bottom of filings). The entire 2025 BiOp, including the jeopardy analysis, is rational and consistent with the ESA and APA. However, because Plaintiffs have limited their arguments about the jeopardy analysis to the Rice's whale, Defendants' brief will also focus on the BiOp's analysis for the Rice's whale. *See id.* at 23-33.

was long considered the northeastern Gulf of America, near the De Soto Canyon. AR 185. However, the most current scientific data indicates that the Rice's whale has been acoustically detected in the western Gulf of America, and the species was sighted in 2023 and 2024 in waters near Louisiana and Texas. AR 187.

During the day, the Rice's whale dives to a depth of over 200 meters to feed on small schooling fish near the ocean floor. AR 185, 188. At night, it spends most of its time within 15 meters of the surface, which makes it more vulnerable to collisions with vessels. AR 188, 191. The Rice's whale grows to lengths of 40 to 55 feet, and its coloring is uniformly dark on its dorsal side (*i.e.*, the side visible above the surface of the ocean). AR 185, 188. Its dark coloring makes the whale difficult to see at night, which also increases its risk of collisions with vessels. AR 185, 191.

In its scientific judgment, NMFS determined the current best population estimate for Rice's whales is 51 individuals, although it acknowledged this may be an underestimate given recent information about Rice's whales outside the eastern Gulf of America. AR 189-90. Little is known about the life history of the whale, including life expectancy. AR 188. Rice's whales are thought to begin reproducing at 8 to 13 years old, and female Rice's whales give birth every other year, following a gestational period of 11 to 12 months. *Id.* Its genetic diversity is considered very low. AR 190.

There have been at least three documented ship strikes involving Rice's whales. One lethal strike occurred in 2009. That strike happened at sea, and the Rice's whale was carried into the port of Tampa Bay across the bow of the vessel, unbeknownst to the crew. AR 370. In 2019, a free-swimming Rice's whale was seen with a spinal deformation consistent with past vessel strike. *Id*. Also in 2019, a Rice's whale became stranded in the Everglades. The whale died as a result of consuming a sharp piece of plastic, but, after its death, experts at the Smithsonian identified a past

injury caused by vessel strike. *Id.* Little is known about their ability to avoid collisions, but, like the Bryde's whale, Rice's whales may be curious about ships. AR 188, 381. NMFS rationally concluded that vessel strikes are a threat to Rice's whales. AR 190-91.[8]

**2.    NMFS used the best available scientific information in evaluating the risk of vessel strikes.**

Next, NMFS evaluated the effects of vessel strikes related to the oil and gas program on the Rice's whale. AR 359-83. As an initial step, NMFS gathered the most recent and best available data on vessel speed, distance traveled, and transit routes. AR 360-62. NMFS evaluated data provided by the Bureaus about vessel trips and vessel data from the Automatic Identification System, which provides similar data. NMFS supplemented that data with a more robust set of AIS data obtained directly through the Department of Transportation. *Id.* In coordination with the Bureaus, NMFS identified in the AIS data the types of vessels associated with the oil and gas program. AR 362-64. NMFS used a targeted set of vessel data from 2022 to 2023, as those years provided the most current information and were likely to reflect future vessel traffic trends. AR 365.

Having identified the appropriate data set for vessel traffic, NMFS used an analytical method to estimate the number of vessel strikes of Rice's whales. In its scientific judgment, NMFS chose to use a "co-occurrence" method, a grid model of the action area in the Gulf of America, which allowed NMFS to consider the population density of the species alongside the most up-to-date vessel data. NMFS divided the action area into a grid consisting of 130 square kilometer (about 50 square mile) cells. AR 364. Then, to consider all the necessary data about vessel traffic

---

[8] Vessel strike is a well-documented, commonly lethal threat to large whales. For instance, in addition to the strikes of Rice's whale described here, there are multiple strikes and death recorded in the Gulf for the sperm whale, the other species of large whale commonly found in the Gulf. AR 370-71. The BiOp and record are replete with scientific literature regarding the existence of and well-documented nature of vessel strike impacts to various marine mammal species around the world. *See, e.g.*, AR 175, 369-72 (and sources cited therein). That science is directly relevant to the question of whether and how many vessel strikes to Rice's whales occur in the Gulf.

16

and the species, NMFS undertook the following seven-step analysis, *see* AR 373-74:

(1)     Calculate, by total kilometers traveled, all vessel traffic and oil and gas traffic in each cell of the grid for each month and year of the dataset;

(2)     Calculate the predicted abundance of the species as an average density for each cell of the grid;

(3)     Multiply the total kilometers of all vessel traffic and the oil and gas traffic by mean species density in each cell, by month and year. Step 3 gives two quantitative values for the co-occurrence of vessel traffic and the species—one for all vessel traffic, and one for oil and gas program vessel traffic;

(4)     Add the results for each grid cell together to provide Gulf-wide measures of vessel strike risk, by year;

(5)     Divide the estimated vessel strike risk associated with oil and gas program vessel traffic by the estimated risk associated with all vessel traffic. The result is the estimated proportion of vessel strike risk associated with the oil and gas program;

(6)     Estimate incidents of historic vessel strikes based on information about vessel strikes that have occurred to date, information about the severity of those incidents, and carcass recovery rates; and

(7)     Multiply the value in Step 5 (the estimated proportion of risk) by the estimated number of historic incidents of vessel strikes.

NMFS emphasized that this analysis was a tool to arrive at the best possible scientific estimate of vessel strike risk arising from oil and gas program vessel traffic. AR 374. And its use of a fully explained, rational model is entitled to a high level of deference. *See BCCA Appeal Grp.*, 355 F.3d at 834 (deferring to EPA's approval of state agency grid model where the agency

explained its reasoning and acknowledged the shortcomings of the model).  Applying the analysis above, at Step 1, for the Rice's whale, NMFS added an extra parameter: vessel speed. NMFS did the calculation in Step 1, first, using only data for vessels traveling greater than 10 knots, to account for only the most serious vessel strikes with the greatest chance of lethality or serious injury; and second, for vessels traveling at all speeds, to provide a better accounting of vessel strikes that result in no injury or minor injury. AR 374-75, 379. As to Step 2 (species density), NMFS used a peer-reviewed publication modeling Rice's whale density in the Gulf of America. AR 311. Applying those data sets to the analysis through Step 5, NMFS arrived at the following result: on average, the oil and gas program vessels accounted for 34 percent of the vessel strike risk to Rice's whale for vessels of all speeds, and 27 percent of the vessel strike risk to Rice's whales for vessels traveling at speeds greater than 10 knots. AR 379.

In Step 6, based on the scientific literature, NMFS estimated a 5 percent carcass recovery rate for Rice's whales struck by vessels. NMFS divided the one known instance of a lethal vessel strike by that 5 percent carcass recovery rate to estimate an annual rate of 0.87 lethal Rice's whale vessel strikes. In Step 7, NMFS calculated an estimate of 0.23 lethal Rice's whale strikes per year from oil and gas program vessel traffic exceeding 10 knots. AR 380. Over the duration of the 45 years of the Program covered by the BiOp, NMFS estimated there would be 11 fatal vessel strikes. AR 380-81. NMFS repeated the analysis for vessels traveling at all speeds and, after accounting for scientific literature about the percentage of collisions that do not result in serious injury, NMFS also estimated that approximately five Rice's whales would be struck by vessels but experience minor injuries or no injuries. AR 381. NMFS' assessment of this complex issue is squarely within its scientific expertise and is entitled to deference. *See Balt. Gas & Elec. Co.*, 462 U.S. at 103.

As noted above, this is called the "co-occurrence" method because it was based on "co-

occurrence" of whales and vessel traffic; this approach is frequently employed in the scientific literature. *See* AR 86993 (Schoeman et al. 2020, citing numerous studies and explaining "most studies have assessed the overlap between vessel and whale distributions to calculate the probability of an encounter, or have combined overlap in distributions with vessel speed to model probabilities of a lethal collision." (citations omitted)). However, in response to concerns raised by the Applicants, NMFS added an additional, preliminary analytical method to its lethal strike analysis to account for the specific characteristics of the Rice's whale and the whale's ability to avoid a collision. The additional analytical method, referred to here as the "Blondin methodology," is a grid-based model that accounts for co-occurrence, but it also accounts for numerous other factors, such as the probability that a whale may actively try avoiding the vessel "strike zone" by swimming deep enough below the vessel to avoid any collision. AR 7272-87. The Blondin methodology was based on a 2025 study and is at the cutting-edge of science. NMFS acknowledged that this new analysis was preliminary, noting there was no way to validate the absolute estimates of the model, and that more data specific to the Rice's whale, including additional swim speed data from the most recent tracking tag data, should be incorporated into future iterations of the model. AR 382. NMFS also acknowledged that there is little scientific information about whether Rice's whales will try to avoid vessel strikes. AR 381-82.

Applying the Blondin methodology, NMFS concluded there would be a relatively reduced risk of a lethal vessel strike related to oil and gas program vessels, compared to the co-occurrence model alone. This could be as low as one Rice's whale over the 45-year period of the BiOp, if the Rice's whale always tries to avoid vessel strikes, or five strikes, if the Rice's whale never actively tries to avoid a vessel strike. Given the preliminary nature of the Blondin methodology, NMFS averaged the eleven-strike estimate from the more traditional co-occurrence model, the five-strike

estimate from the Blondin "no avoidance" model, and the one-strike estimate from the Blondin "avoidance" model, producing a final estimate of six lethal strikes. Far from a pessimistic approach, by taking the midpoint of all three model results, NMFS applied its scientific judgment to balance the output from the co-occurrence model endorsed repeatedly in the literature with the newest, best available information, allowing NMFS to account for additional variables. *See Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Service*, 70 F.4th 582, 599 (D.C. Cir. 2023) (NMFS should use the best available scientific data, not the most pessimistic).

Synthesizing all this information, NMFS rationally concluded that the oil and gas program is likely to jeopardize the continued existence of the Rice's whale.[9] AR 571. Given the whale's status and population size, NMFS concluded that "<u>any</u> effects that may reduce the fitness of individual [whales] or result in mortality will affect the population." By way of illustration, the loss of a single female whale could constitute the loss of four percent of the breeding population. *Id.* Thus, NMFS concluded, the effects of vessel strikes are likely to jeopardize the survival of the species. *Id.* In addition, the loss of individual whales or sub-lethal effects from vessel strikes would impede the recovery of the whale given the characteristics of its reproductive cycle. Put simply, a single lethal strike results in jeopardy, and all of NMFS' modeling predicted at least one lethal strike.

In sum, NMFS considered the best available scientific and commercial data in its jeopardy analysis for the Rice's whale, and its decision was rational. *See Sw. Elec. Power Co.*, 920 F.3d at 1013. Moreover, the agency's analysis is entitled to deference. When an agency makes scientific

---

[9] The draft BiOp predicted nine lethal vessel strikes and three nonlethal strikes. *See* Errata Letter ("Errata Letter") from NMFS to BOEM and BSEE dated Sept. 2, 2025, https://www.fisheries.noaa.gov/s3/2025-09/Errata-Letter_9.2.2025.pdf. Later, the analysis was updated to incorporate the Blondin methodology and to update the vessel data. As a result of these updates, the final BiOp anticipated six lethal vessel strikes and five non-lethal strikes. On several pages of the BiOp, the original estimates from the draft BiOp were inadvertently retained. *Id.* (noting corrections to AR 401, 571 606, 607). NMFS issued an errata to correct those pages of the BiOp. *See id.*

predictions and uses models to address complex scientific issues, "a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co.*, 462 U.S. at 103; *see also Texas v. U.S. E.P.A.*, 137 F.4th 353, 369 (5th Cir. 2025) ("[C]ourts routinely defer to agency modeling of complex phenomena" where "model assumptions" "have a 'rational relationship' to the real world."); *BCCA Appeal Grp.*, 355 F.3d at 834. An agency's analytical method is entitled to a presumption of regularity, leaving any challengers with a "considerable burden." *Sw. Elec. Power Co*, 920 F.3d at 1013 (citation omitted). As explained below, Plaintiffs do not meet that burden here.

### B.    NMFS considered real world data in its vessel strike analysis.

Plaintiffs incorrectly argue that NMFS did not consider the best available scientific information in its jeopardy analysis for the Rice's whale because it did not give controlling weight to the fact that no vessel strike of a Rice's whale has been connected to an oil and gas program vessel. Pls.' Mem. at 17, 24-25. Plaintiffs ignore that Rice's whales have been struck by other vessels, and there is evidence of at least three such strikes in the past 20 years. AR 370. Plaintiffs also overlook that oil and gas vessels have hit other species of whales, and vessel strikes may even go unnoticed by the crew at sea. For instance, the crew of an oil and gas vessel that struck a sperm whale near Galveston did not observe the whale in advance and experienced the collision as "similar to hitting a big wave." AR 182, 372. And, oil and gas program vessels make up a large share of vessel traffic throughout the Gulf of America. AR 368. This information constitutes real-world data supporting NMFS' conclusion that the Rice's whale is at risk for strike by one or more program vessels. As explained above, the real-world data were supplemented by modeling because NMFS is required to use the best available scientific information in making its decisions. Even though modeling involves assumptions and uncertainties, NMFS has explained its assumptions and uncertainties and showed a rational connection between the model and the real-world data. As such, its modeling

is entitled to deference. *See Texas v. U.S. E.P.A.*, 137 F.4th at 369.

**C.    NMFS properly declined to defer to the Bureaus on the vessel strike analysis.**

Contrary to Plaintiffs' next argument, Pls.' Mem. at 25-26, NMFS explained why it disagreed with the Bureaus' biological assessment that the oil and gas program was not likely to adversely affect the Rice's whale because, in part, the risk of vessel strikes was low.

To the extent that Plaintiffs are claiming that NMFS should have stated, as a formal matter, that it was rejecting that portion of the BA, Plaintiffs' argument ignores the fact that both the BA and the BiOp are part of an interagency consultation that, here, clearly reflects an ongoing dialogue between NMFS and the action agencies. The Bureaus did not provide their BA to NMFS in a vacuum. Similarly, the BiOp is NMFS' biological opinion, provided to the Bureaus, about the effects of the oil and gas program. The entirety of the lengthy analysis in the vessel strike chapter of the BiOp provides NMFS' response to and assessment of the Bureaus' initial analysis in its BA. As discussed in the District of Maryland opinion regarding the 2020 BiOp, NMFS' statutory role is to render its biological opinion to the action agency, making an independent judgment. *See Sierra Club, et al. v. NMFS, et al.*, No. 8:20-cv-03060-DLB, ECF No. 204 at 12-19.

Moreover, NMFS discussed at length the materials and analyses provided by the Bureaus in connection with the BA and repeatedly indicated where it disagreed with their analyses. For example, the Bureaus' assessment was that the oil and gas program constituted a relatively low proportion of vessel traffic in the Gulf. AR 2079. In its analysis of vessel activity in the Gulf, NMFS expressly disagreed with the Bureaus about the quality of the Bureaus' vessel trip and AIS data for evaluating the risk of vessel strikes to whales, and NMFS supplemented the data set with the best available AIS data directly from the Department of Transportation. *See* AR 360-62. NMFS determined the Bureaus' vessel trip data was undercounting the impact of oil and gas program traffic because it did not account for mileage and duration, and NMFS' own AIS data set had better

22

coverage further offshore. *Id.* NMFS also worked with the Bureaus to identify the vessel types associated with the Program. AR 364. Then, NMFS developed an independent estimate of vessel traffic attributable to oil and gas program activities throughout the Gulf of America. After these updates, the difference in the analysis was apparent: the Bureaus concluded that oil and gas program vessels represented 22 percent of all Gulf vessel traffic, whereas NMFS concluded program vessels represented 48 percent of vessel traffic. AR 368, 2079.

Similarly, the Bureaus concluded that 14 knots was the threshold at which vessels were less likely to seriously injure a Rice's whale. AR 2061. NMFS' analysis pointed to 10 knots as the speed threshold. AR 374. NMFS noted other similar disagreements throughout the BiOp.

During a consultation, NMFS may adopt all or part of the Bureaus' BA, but it must also use the best available scientific and commercial information when developing its biological opinion. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(h)(3). Here, in some key respects, NMFS disagreed with the action agencies' analysis, and, in some cases, NMFS identified new scientific material and new data that reflected its independent assessment of the proposed action and its effects on species. In a consultation, NMFS is not required to flag every instance of disagreement with the action agencies, and Plaintiffs cite no case suggesting otherwise.

> **D.    NMFS' assumption of a five percent carcass recovery rate was rational.**

NMFS arrived at the five percent carcass recovery rate for unobserved vessel strikes of Rice's whales based on its scientific judgment and the best available information in the literature. NMFS explained that the agency "sought information on carcass recovery rates," but that information was not available in the literature, and NMFS was only aware of a single lethal vessel strike for the Rice's whale. AR 380. NMFS considered a 2017 publication by Rockwood that used other species as a proxy to model recovery rates for three other species of baleen whales, specifically,

blue, humpback, and fin whales. AR 380, AR 84748. Rockwood observed that recovery estimates

for other cetacean species included 17 percent for right whales, less than 5 percent for gray whales,

6.5 percent for killer whales, and 3.4 percent for sperm whales. AR 84748. Rockwood also noted

that the right whale is an outlier because it is the most buoyant whale species. *Id.* Right whales live

in colder water and have more blubber. Thus, Rockwood used five percent as a best estimate for

baleen whales, with 17 percent to produce minimum estimates for vessel strikes. AR 84748. Sim-

ilar to Rockwood, NMFS used a five percent best estimate for the carcass recovery rate for the

Rice's whale. NMFS declined to use 17 percent to produce minimum estimates for Rice's whales

because Rice's whales live in warmer waters and have less blubber than a cold-weather right whale.

AR 380. In other words, Rice's whales are more likely to sink than a cold-water whale like the

right whale. In sum, NMFS used the best available scientific information to develop a carcass

recovery rate for Rice's whales in unobserved vessel strikes.

Plaintiffs argue, citing nothing other than an *ipse dixit* statement in their own expert report,

that the five percent carcass recovery rate is statistically impossible because it would mean 140

whales died in the last 20 years and that result "seems" too high. Pls.' Mem. at 28; AR 2513. The

data on which Plaintiffs rely comes from a 2021 article by Rosel, which found that there were 22

Rice's whale strandings between 1954 and 2021, and seven Rice's whale strandings in the past 25

years. AR 84912. But, this data set covers all strandings from all causes—not just strandings

caused by vessel strikes on the open sea.

Even if the data Plaintiffs cited was squarely applicable, Plaintiffs' attempts to muddy the

math are unavailing. Applying a five percent carcass recovery rate to Rosel's data set of 22 total

strandings would mean the deaths of 440 whales over 67 years, or about 6.5 whales each year.

Applying the same carcass recovery rate to the previous 25 years, in which there were just seven

strandings, would lead to the conclusion that there were about 5.5 whale deaths each year. Healthy female Rice's whales give birth every other year once they reach sexual maturity, and NMFS has estimated the proportion of the Rice's whale population that is sexually mature to be 51 percent of the total population, with a 1:1 sex ratio. AR 188; AR 107599 at pp. 40-41. For a population of 51 individuals, this could mean about 13 Rice's whales are females of reproductive age, or about 6 to 7 whales give birth each year. Contrary to Plaintiffs' assumption, the death of between 5 to 7 whales each year is far from a statistical impossibility or unduly pessimistic. Of course, this back-of-the-napkin math is hypothetical. But Plaintiffs make the argument without offering any calculation or data of their own, and they point to nothing more than bald assertions that this number must be a statistical impossibility because it "seems" high. In addition, NMFS acknowledged in the BiOp that the current, best population estimate for the Rice's whale may be a low estimate, as additional information becomes available about Rice's whales in the western Gulf of America. AR 189-90.

### E.     NMFS properly incorporated the Blondin methodology.

As explained above, NMFS appropriately used the Blondin methodology, which was incorporated into the final analysis, in part, to address Applicants' concerns about the co-occurrence methodology. *See supra* at 20 n.9. Plaintiffs argue that one parameter in the Blondin analysis— reaction distances (*i.e.*, how far the whale travels before it shows a behavior response to an approaching vessel)—came from observed data about right whales, not Rice's whales. Pls.' Mem. at 28. That's true. But NMFS explained that it was using data for right whales as a proxy because no data specific to the Rice's whale was available. In addition, the right whale's reaction distance ranged from 10 to 1,200 meters, which accounts for a wide range of potential behavioral responses. AR 381. NMFS' use of data specific to a more abundant and heavily studied baleen whale species was rational, and NMFS explained its choice. *See BCCA Appeal Grp.*, 355 F.3d at 834.

Plaintiffs also misstate how NMFS applied the "no avoidance" and "avoidance" analyses in the Blondin analysis, arguing that NMFS modeled a "worst-case scenario." Pls.' Mem. at 28. NMFS acknowledged there is little data on whether Rice's whales will try to avoid a vessel strike. AR 381-82. So, NMFS ran the analysis both ways: once assuming Rice's whales will always try to avoid a vessel strike; and once assuming that Rice's whales will not try to avoid a strike. AR 381-82 ("Because little is known about active avoidance of oncoming vessels by Rice's whales, we *also* ran this analysis with the exclusion of the probability of avoidance parameter, which assumes that Rice's whales do not actively avoid an incoming vessel." (emphasis added)). To the extent Plaintiffs misread this sentence as saying NMFS only ran the "no avoidance" analysis, that misreading is undermined by the modeling results: NMFS modeled "avoidance" and "no avoidance" behavior to account for both scenarios. AR 382. This is not inconsistent with the analysis in Blondin (2025), which discussed that blue whales (another baleen whale) will try to avoid vessel strikes by diving 55 percent of the time, but not by moving laterally around the vessel. AR 7276. Far from the worst-case scenario, NMFS simply ran the model both ways to account for the uncertainty, and incorporated both results into its final estimate. Again, this was a rational decision, and NMFS adequately explained its choice based on its scientific judgment.

### F.    NMFS rationally accounted for vessel traffic in its co-occurrence model.

NMFS rationally concluded, using the co-occurrence methodology, that oil and gas program vessels account for 27 percent of the risk of vessel strikes to Rice's whales in the Gulf. Plaintiffs challenge that conclusion, Pls.' Mem. at 29-30, but cite no contrary or better data. Instead, they simply assert that their share of the risk must be low because they infrequently operate in the De Soto Canyon area—the core area for the Rice's whale. To be clear, NMFS' co-occurrence methodology estimated that program vessels account for 27 percent of the risk of vessel strikes of

Rice's whales, and just one-third of NMFS' lethal vessel strike estimate. AR 382. When NMFS used the Blondin methodology, it assessed lower shares of the risk, at 2 percent and 11 percent. *Id.*

In any event, Plaintiffs' assertion that program vessels cannot be responsible for the vessel strike risk to the Rice's whale overlooks three key parts of NMFS' analysis: First, there is relatively little vessel activity *at all* in the De Soto Canyon region in the northeast Gulf of America (AR 366); second, NMFS' analysis shows there was an extremely low risk of an oil and gas program vessel striking a Rice's whale over the next 45 years in the De Soto Canyon region, and, a strike is more likely in the western Gulf of America (AR 379); and third, a quantitative analysis of vessel traffic in the Gulf of America indicates that oil and gas program traffic makes up nearly half the vessel traffic throughout the Gulf (AR 368). Rice's whales have been sighted increasingly in the western Gulf, where oil and gas program vessels make up a large share of the vessel traffic, and the co-occurrence methodology indicated that lethal collisions are likely within the next 45 years. According to NMFS estimates, oil and gas program vessel traffic makes up roughly 48 percent of vessel traffic across the Gulf, and NMFS relied on peer-reviewed distribution literature in determining the density of the Rice's whale. It was rational for NMFS to conclude that 27 percent of the risk of a vessel strike to Rice's whale is attributable to Program vessels.[10]

### G.     NMFS' conclusions about the effects of the action are reasonably certain to occur.

The lethal and non-lethal vessel strikes modeled by NMFS are reasonably certain to occur. NMFS fully explained its model inputs and the limitations of its modeling, as discussed in detail above, and Plaintiffs do not point to a single unexplained assumption. Moreover, unlike in *Maine*

---

[10] Plaintiffs also assert that the oil and gas program's share of the proportional threat to the Rice's whale increased between the draft and final BiOp. Pls.' Mem. at 29. The final BiOp used the most recent two years of AIS data, rather than the 2018 to 2022 data the Bureaus provided, as the most accurate representation of current conditions and likely future conditions, as those two years exclude pandemic-era data. AR 361, 365.

*Lobstermen's Association v. National Marine Fisheries Service*, 70 F.4th at 598-600, NMFS did

not rely on worst-case scenario modeling it believed was "very likely" wrong. That case, repeat-

edly invoked by Plaintiffs without analysis, Pls.' Mem. at 6, 9, 13, 22-23, 25-28, 31, 33-35, was

fact-specific and is inapt here. In *Maine Lobstermen's Association*, the D.C. Circuit explained that,

when faced with uncertainty in its scientific analysis, NMFS is responsible for making a scientifi-

cally defensible decision without resort to "presumption" in favor of the endangered species.

70 F.4th at 600. When it does so, its modeling is entitled to deference. *Id.*

Here, NMFS stands by its modeling. The BiOp affirmatively stated that, based on NMFS'

quantitative analysis, lethal vessel strikes were reasonably certain to occur. AR 571. NMFS used

a combination of tried-and-true modeling and more cutting-edge modeling to account for the latest

data about whale behavior, an additional analysis NMFS undertook specifically to address Appli-

cants' concerns during the consultation. And every scenario NMFS modeled predicted a fatal ves-

sel strike caused by oil and gas program activities, resulting in jeopardy to the species.

Plaintiffs also make much of a transcription error in the BiOp, in which references to

NMFS' modeling results in the draft BiOp were inadvertently retained on several pages. *See supra*

at 20 n.9 (noting corrections to AR 401, 571 606, 607). That transcription error has since been

corrected and did not affect the jeopardy analysis. *See id.*

### H.    NMFS considered Applicants' comments but was not required to address Ms. King's last-minute opinion.

On March 10, 2025, the Bureaus granted Plaintiff API applicant status for the purpose of

reviewing the draft BiOp and informing any subsequent RPA. AR 2359; *see* 50 C.F.R. § 402.14(d).

In granting API applicant status, the Bureaus informed API that it would have the opportunity to

review a draft of the BiOp concurrent with the Bureaus' period of review. AR 2359. The Bureaus

explained that the parties would have five days for review because the Bureaus wanted to avoid

28

any lapse in ESA coverage with the District of Maryland's vacatur of the BiOp, which was then set to go into effect within weeks. *Id.* The Bureaus cautioned API that it would be limited to "a single review and comment period." *Id.*

On March 31, 2025, NMFS transmitted a copy of the draft BiOp to the Bureaus and Applicants for their review. AR 2372-73. In an email confirming the transmittal, NMFS indicated that any comments were due on April 7, 2025, giving Applicants a full seven days to provide comments. AR 2373. API submitted its comments on the draft BiOp to the Bureaus and NMFS within the deadline. AR 2419. In its comments, API unilaterally attempted to "reserve the right" to provide additional comments because, API felt, it had not been given an opportunity to provide input on events that occurred long before it was granted applicant status (such as the reinitiation of consultation), and that seven days was insufficient for comprehensive review. AR 2436. In addition to receiving comments from API, on May 1, 2025, and May 8, 2025, NMFS met with API and other Applicants "to connect on the comments received." AR 796, 107608.

On May 12, 2025—more than a month after API's window to submit comments closed and just a week before the BiOp was to be finalized—API sent an email to the Bureaus and NMFS indicating that it had "continued to review the Draft BiOp and [had] commissioned" a report providing additional comments on the vessel strike analysis in the BiOp. AR 2504. Plaintiffs provided NMFS with the report of Heidi King, an economist, commenting on the vessel strike analysis in the BiOp. AR 2508-16.

NMFS and the Bureaus gave Plaintiffs, as Applicants, a seat at the table during the consultation and considered their numerous comments. AR 2354-65, 2383-2503. Parts of the BiOp, including the addition of the Blondin methodology discussed above, were included in direct response to Applicant comments. Plaintiffs nonetheless argue that NMFS failed to consider and address Ms.

29

King's "expert opinion." Yet, NMFS was not required to address Ms. King's report for the simple reason that it was untimely. *Healthy Gulf v. U.S. Army Corps of Eng'rs*, 81 F.4th 510, 522 (5th Cir. 2023); *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 174-75 (5th Cir. 2012). What's more, Plaintiffs offer no explanation for why Ms. King's experience in public policy and background in economics qualifies her to give an expert opinion on the specific analytical methods that NMFS' scientists used in their evaluation of vessel strike risk to the Rice's whale. *See* AR 2517.

Moreover, Ms. King's report fails to identify any flaws in NMFS' analysis. First, the report suggests a sensitivity analysis of two variables that NMFS considered in the vessel strike analysis: assumed percentage of vessel strikes related to oil and gas program vessels, and carcass recovery rate. AR 2510. But even Ms. King's sensitivity analysis shows that changing the inputs on those variables would not change the projection that an oil and gas program vessel will lethally strike Rice's whales. AR 2511. And, as discussed above, NMFS was fully transparent about how it arrived at its inputs for both of those variables.

Second, the King report says NMFS' grid modeling is unsound because NMFS had to make assumptions about the distribution and behavior of whales and the operational behavior of vessels in developing the grid model. *Id.* Ms. King acknowledges that a grid model could be appropriate for data visualization but contends that a "heat map" of potential whale collisions is not necessarily appropriate to use as a predictive model. This criticism misunderstands how NMFS calculated the risk of a Rice's whale collision with an oil and gas program vessel. True, NMFS also used the grid to produce a "heat map" to aid in data visualization, but the map was a visual aid. AR 379. As explained above in detail, NMFS used its grid model—an approach repeatedly endorsed in literature—to make an analytical determination of the risk of a vessel strike of a Rice's whale, using calculations to estimate the proportion of risk within the action area, per year, associated with oil

30

and gas vessel traffic. *Id.*

Ms. King also challenges the model's inputs because it contains uncertainties about the location of whales, the avoidance behavior of whales, and the operational behavior of vessels. Yet, NMFS updated its analysis to include the Blondin methodology precisely to address the avoidance behavior of whales, among other parameters. AR 381-83. In addition, NMFS disclosed its model parameters and accounted for uncertainties. As to the distribution of Rice's whales, NMFS used a peer-reviewed 2024 publication that modeled Rice's whale distribution throughout the Gulf. AR 381, AR 38837. Regarding vessel behavior, NMFS accounted for feature most likely to result in a vessel strike that causes death or serious injury: vessel speed. AR 375. Thus, NMFS limited its analysis of lethal strikes to vessels traveling at or above 10 knots, accounting for that variable. *Id.*

Ms. King also challenges the five percent carcass recovery rate used for the Rice's whale, an area well outside her claimed expertise. For the reasons discussed above, Ms. King's blunt assertion that the five percent carcass recovery rate "seems highly implausible" is without merit. AR 2513-14. NMFS fully explained its use of the carcass recovery rate based on the scientific literature, and its use of that percentage is rational based on the real-world data.

Finally, Ms. King suggests that NMFS made "subjective judgments" about the interpretation of data. She argues the oil and gas program's adoption of best practices could lead the agency to conclude that there is a probability of zero vessel strikes by oil and gas program vessels to Rice's whales because there has only been a single observed lethal vessel strike in recent years, by a vessel not associated with the program. NMFS accounted for the program's best practices by using the most up-to-date data, which includes practices such as not traveling at high speeds or at night in areas where Rice's whales are more prevalent in the eastern Gulf of America. AR 365. Contrary to Ms. King's suggestions, NMFS analyzed the data and the scientific information and used only

its scientific—not its subjective—judgment.

## II.    The RPA Is Rational and Consistent with the Law.

Under the ESA, if NMFS determines that a federal action is likely to jeopardize an ESA-listed species' continued existence, it will suggest RPAs, if any, to avoid the likelihood of jeopardy. 16 U.S.C. § 1536(b)(3)(A). Here, NMFS determined the oil and gas program—specifically, the risk of vessel strikes—was likely to jeopardize the continued existence of the Rice's whale. AR 571. Having reached a "jeopardy" conclusion, NMFS proposed a multi-pronged RPA to allow the program to proceed in compliance with ESA Section 7(a)(2). The RPA was designed to reduce the risk of vessel strikes by implementing strike avoidance and monitoring requirements with the use of technology. AR 600-05. The RPA first calls for the use of *existing* technology, including a near real-time monitoring platform (for example, a readily available application called "WhaleAlert") and the incorporation of data from existing sources, such as passive acoustic monitoring, into the platform. The RPA also has a forward-looking component. Under the RPA, the Bureaus, NMFS, and others will develop and implement a peer-reviewed Rice's whale vessel strike avoidance technology plan. In addition, the Bureaus and NMFS will develop and implement monitoring plans for the population, abundance distribution, and health of the Rice's whale, all vessel strike data associated with the action, and all potential vessel strikes of Rice's whales.

Plaintiffs argue the RPA is arbitrary and capricious because the jeopardy analysis was flawed, and, therefore, NMFS had no statutory basis to suggest an RPA. The RPA is a suggestion and recommendation to the action agency "that would allow the action to proceed in compliance with section 7(a)(2)" of the ESA. AR 598. Plaintiffs' claim that they have been injured by the RPA seems speculative at this juncture, before the RPA has been adopted by the Bureaus.

In any event, Plaintiffs' argument that the RPA itself is unlawful is part and parcel of their challenge to the jeopardy analysis. Plaintiffs' challenge to the RPA therefore fails for the same

reason their challenge to the jeopardy analysis fails: NMFS is entitled to a high level of deference on its jeopardy analysis, and that analysis was rational. *Sw. Elec. Power Co*, 920 F.3d at 1013. In addition, Plaintiffs' contention that the RPA is unlawful because it requires an advanced assessment of the vessel strike risk to Rice's whales in the Gulf of America misses the point. As explained above, the RPA calls for the immediate implementation of technologies available now to reduce the risk of vessel strikes, but it also expressly contemplates that technology may improve in the future. AR 601-05. The RPA is not, as Plaintiffs suggest, a mere data gathering exercise. NMFS has the data it needs now to understand the risk of vessel strikes and how operators can avoid strikes. But it also knows that technology and data may improve in the future, and it accounts for that in the RPA.

### III.    NMFS' Conclusions Reached in the ITS Are Reasoned and Comply with the ESA.

Under the ESA, NMFS may issue an ITS in parallel with its biological opinion. ESA Section 7(b)(4) sets forth the requirements governing any ITS. *See* 16 U.S.C. § 1536(b)(4). Incidental take covered by an ITS is exempt from liability under ESA Section 9, provided terms and conditions to minimize take of listed species are implemented. *See id*. § 1536(o)(2). Further, ESA Section 7(b)(4)(C) provides for additional provisions "in the case of marine mammals," requiring that take of marine mammals only be included and exempted to the extent that such take is separately authorized under MMPA Section 101(a)(5). *See id*. § 1536(b)(4); *id*. § 1371(a)(5).

Here, NMFS issued an ITS that accounted for this intersection between the ESA and MMPA. *See, e.g.*, AR 609 (acknowledging that NMFS issued a regulation governing the unintentional take of marine mammals incidental to geophysical survey activities conducted by oil and gas industry operators in the Gulf of America over the course of five years, effective through April

2026).[11] And because the MMPA rule for seismic activity will expire under its terms and require renewal, NMFS further acknowledged: "[s]ubsequent MMPA rulemaking may require revisions to the ITS for incidental take of ESA-listed marine mammals [ ], or reinitiation of ESA [S]ection 7 consultation, if the scope and subsequent effects of the MMPA rulemaking change." *Id.*

Under the ESA, to "take" a listed species means to "harass, hunt, pursue, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The ESA, however, does not include a statutory definition of what it means to "harass" listed species. Meanwhile, the MMPA defines "harassment" as "any act of pursuit torment, or annoyance which: (i) has the potential to injure a marine mammal or marine mammal stock in the wild [Level A]; or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering [Level B]." 16 U.S.C. § 1362(18).

NMFS found take reasonably certain to occur for both ESA-listed marine mammals and non-marine mammal species. *See, e.g.*, AR 610. For non-marine mammal species, like sea turtles, NMFS applied the ESA definition of take and quantified the appropriate levels where it could, or used suitable surrogates where precise numbers were unavailable. AR 609-11. Meanwhile, for marine mammals, NMFS quantified take in the form of harassment and looked to prior MMPA authorizations to estimate the amount / extent of take. AR 39-40. NMFS referred to the analysis performed under the MMPA as a proxy for take of marine mammals under the ESA, in part, because the ESA expressly requires NMFS to do so. Section 17 of the ESA states that "no provision of this chapter shall take precedence over any more restrictive conflicting provision of the Marine

---

[11] On January 19, 2021, the NMFS Permits and Conservation Division issued a final rule for "Taking Marine Mammals Incidental to Geophysical Surveys Related to Oil and Gas Activities in the Gulf of Mexico" ("MMPA seismic rule"). AR 33. The rule was later corrected in 2024 to address errors in the original anticipated take levels from the 2021 rule. 89 Fed. Reg. 31,488 (Apr. 24, 2024).

Mammal Protection Act of 1972." 16 U.S.C. § 1543. This is important as it reflects Congress's

clear direction that, in the context of incidental take of marine mammals, the ESA must yield to

the MMPA. Likewise, Section 7 states that an ITS may authorize take only to the extent that take

has first been authorized under the MMPA. *Id*. § 1536(b)(4). Thus, for take of marine mammals,

NMFS relied on the MMPA take anticipated under the seismic rule as a proxy for anticipated ESA

take. This approach was reasonable and complies with the law. It described its decision in detail.

> The 2020 opinion, and this consultation, considered MMPA Level B harassment estimates as a reasonable approximation given the overlap in the MMPA and ESA definitions to determine the extent of ESA take resulting from harassment.
>
> …
>
> NMFS' guidance notes that ESA harassment does not specifically equate to MMPA Level A or Level B harassment, but shares some similarities with both levels in the use of the terms 'injury/injure' and a focus on a disruption of behavior patterns. In this opinion, and the 2020 programmatic, available data and models that provide estimates of MMPA Level B harassment were used to determine how many of the estimates correspond to ESA harassment of ESA-listed marine mammals, whereas available data and models that provide estimates of MMPA Level A harassment are considered to be instances of harm and/or injury under the ESA, depending on the nature of the effects.

AR 39-40.

Plaintiffs take issue with NMFS' decision only for marine mammals. *See* Pls.' Mem. at 35-

37. Specifically, Plaintiffs assert that MMPA Level B harassment can never amount to harassment

under the ESA, and therefore NMFS should not have included any of the anticipated MMPA Level

B harassment from NMFS' seismic rule as harassment take under the ESA for purposes of the

2025 ITS. Plaintiffs rely on the regulatory definition of MMPA Level B harassment describing

actions "which do[] not have the potential to injure a marine mammal," 50 C.F.R. § 216.3, and

contrast that against NMFS' guidance describing ESA harassment as actions that "[c]reate the

likelihood of injury to wildlife," NMFS Procedure 02-110-19. That is, Plaintiffs argue that "injury"

is expected under the ESA, but "injury" is not expected under the MMPA and that therefore the two frameworks are at odds. Pls.' Mem. at 37. Plaintiffs' argument depends entirely on their selective use of the "likelihood of injury" language from NMFS' guidance, while ignoring the remainder of that policy, which states that its definition of harassment (and injury) is broad enough to encapsulate MMPA Level B harassment to include the disruption of behavioral patterns. NMFS Procedure 02-110-19 ("[A] significant disruption in behavior patterns establishes the 'likelihood of injury'"). Ultimately, Plaintiffs' cramped reading of the ESA and MMPA is wrong.

As a threshold matter, Plaintiffs overlook Congress' decision to expressly bind the MMPA's and ESA's take provisions. As noted, the ESA is intended to yield to the more restrictive provisions of the MMPA. *See* 16 U.S.C. § 1543. For the take prohibitions, the MMPA prohibits take but allows limited "harassment," parsed as Levels A and B, under certain circumstances. The ESA, in turn, defines "take" to include harassment. Both statutes use the same terms, and Congress was express that NMFS must first authorize take—including harassment—under the MMPA *before* it could consider providing an ITS exemption for "take"—including harassment—under the ESA. 16 U.S.C. § 1536(b)(4)(C).

The Ninth Circuit explained the practical harmony between MMPA and ESA harassment determinations. Section 101(a)(5)(B) of the MMPA provides that NMFS "shall withdraw, or suspend[,]" its incidental take authorization if the agency finds that take from the specified activity "is having, or may have, more than a negligible impact on the species or stock concerned." 16 U.S.C. § 1371(a)(5)(B). Because "negligible impact" under the MMPA is a more stringent constraint on authorizing take, consistency with those limits typically obviates any ESA reinitiation trigger—an acknowledgement that MMPA take accounting functions as a reliable surrogate for ESA take accounting. *See Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 913-914 (9th Cir.

36

2012) (Noting it is "reasonable to expect" that an activity would exceed MMPA limits before it would approach ESA jeopardy, so staying within MMPA-analyzed take limits should keep ESA take within anticipated levels). The ESA and MMPA are unquestionably linked, but Plaintiffs' argument would have the Court assume that Congress silently intended to create a new, lower level of harassment through MMPA Level B that could never amount to harassment under the ESA. Neither the plain language of the statutes, nor their respective legislative history bears this out.

Setting aside this threshold conflict, the definition of "harassment" under the MMPA, particularly Level B harassment, is consistent with the scope of "harass" under the ESA. As interpreted by both NMFS and FWS, both statutes encompass conduct that disrupts normal behavioral patterns of marine mammals without requiring physical injury. Under the MMPA, Level B harassment includes acts that have the potential to disturb marine mammals by causing disruption of behavioral patterns such as migration, breathing, nursing, breeding, feeding, or sheltering. 16 U.S.C. § 1362(18)(A)(ii). Similarly, FWS' implementing regulation defines "harass" as an intentional or negligent act that creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering. 50 C.F.R. § 17.3.[12] Although the latter assigns a mental state to the act of harassment, both definitions recognize disturbance-induced behavioral disruption as a form of take, even in the absence of direct physical harm.

This alignment means that activity qualifying as Level B harassment under the MMPA will generally satisfy the ESA threshold for harassment because both standards focus on the *likelihood of behavioral disruption* rather than the certainty of physical harm. Courts and agencies alike have

---

[12] The U.S. Fish and Wildlife Service, which shares responsibility for co-administering the ESA alongside NMFS, promulgated this regulation. NMFS adopted similar language in its "Guidance on the Endangered Species Act Term 'Harass.'" NMFS Procedure 02-110-19 at 2.

acknowledged this conceptual overlap, noting that the ESA's prohibition on take extends beyond
lethal or injurious acts to encompass significant behavioral interference. For example, the Ninth
Circuit accepted NMFS' use of acoustic thresholds and behavioral-response modeling to quantify
non-injury harassment from sonar, expressly describing Level B harassment as covering behav-
ioral disruptions like delayed migration and reproduction. *Nat. Res. Def. Council, Inc. v. Pritzker*,
828 F.3d 1125, 1131 (9th Cir. 2016). Likewise, the First Circuit upheld NMFS' MMPA authori-
zation that relied on predicted Level B harassment exposure as non-lethal take, reinforcing these
metrics as best available science for disturbance-based effects that the ESA also treats as take when
they significantly disrupt normal behavioral patterns. *Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024).

District courts have followed suit. In *Cook Inletkeeper v. Raimondo*, the court faulted
NMFS for undercounting tug-noise disturbance to ESA-listed beluga whales—a marine mam-
mal—and required the agency to carry those harassment exposures through both the MMPA inci-
dental take regulation and the ESA BiOp—treating Level B harassment as take that must be con-
sistently estimated across both statutes. 533 F. Supp. 3d 739, 755-59, 763-64 (D. Alaska 2021).
Similarly, in *Native Village of Chickaloon v. NMFS*, NMFS used the MMPA Level B harassment
take estimates as a proxy for identifying potential take under the ESA. 947 F. Supp. 2d 1031, 1066
(D. Alaska 2013). Just as NMFS did here, the BiOp in that case incorporated the Level B harass-
ment take predicted under the MMPA authorization for seismic surveys, expected to affect belu-
gas. The court ultimately concluded this was reasonable: "Reliance on the MMPA harassment take
estimates in a BiOp has been expressly approved by the Ninth Circuit." *Id*. (footnote omitted).
Taken together, these rulings support NMFS' decision to use MMPA Level B harassment esti-
mates as a reasonable proxy for quantifying and enforcing incidental take under the ESA.

For their part, Plaintiffs assert that NMFS' approach "has consequences." Pls.' Mem. at

38

37. Plaintiffs, however, decline to explain what those consequences are or why they are unintended or inappropriate consequences. Nor could they. NMFS' approach adopting the MMPA Level B harassment take expected in its seismic rule in the BiOp as a "reasonable approximation" of ESA harassment take ensures that *both* the action agencies (here, the Bureaus) *and* the Applicants (here, API and Chevron) are in compliance with ESA Section 7(b)(4)(C). *See* 16 U.S.C. § 1536(b)(4)(C) (provision requiring that any anticipated take of ESA-listed marine mammals be first authorized under Section 101 of the MMPA). This approach promotes certainty for regulating agencies and regulated parties alike. This is important as, without this authorization, it is unclear whether activities under the seismic rule—activities undertaken by the same cohort of industry operators as Plaintiffs here—are being conducted in compliance with the ESA.

Second, to the extent Plaintiffs assert NMFS' jeopardy analysis was misinformed based on anticipated MMPA harassment take, *see, e.g.*, Pls.' Compl., ECF No. 1 ¶ 78, that argument is without basis. Plaintiffs neglect that an ITS issues "after consultation" and after the issuance of a BiOp, 16 U.S.C. § 1536(b)(4), (o)(2), and the ITS provides an exemption for any incidental "take" found reasonably certain to occur in the BiOp. *See Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1239, 1242 (9th Cir. 2001). It is therefore *the BiOp's* analysis that informs what "take" NMFS found reasonably certain to occur and subsequently exempted in the ITS. *Id*. Further, any distinction between how the MMPA and ESA treats harassment is irrelevant here because the taking of marine mammals by harassment did not factor into the lone finding of jeopardy that NMFS made in the 2025 BiOp. That finding—anticipated jeopardy to Rice's whales—was based solely on the expectation of lethal vessel strikes, and not in any way related to harassment. *See* AR 598 ("The RPA described below reduces or avoids the primary threat to Rice's whales in our analysis, the risk of injurious and lethal vessel strike interaction. The impacts of

other stressors that are part of the proposed action are more limited in space and time, diffuse, or not likely to result in adverse effects to Rice's whale.").

Finally, to the extent Plaintiffs assert that inclusion of MMPA Level B harassment expected under NMFS' seismic rule has influenced measures required under the ITS's RPMs, that argument too is largely without basis. The ITS includes four RPMs. *See* AR 618-19 (describing each of the four RPMs). Only the first RPM, which requires use of the "quietest configuration of equipment" when conducting geophysical seismic surveys, could conceivably bear a connection to the MMPA Level B harassment of which Plaintiffs complain. That measure, however, was not imposed to address only those takes which were identified under the seismic rule as MMPA Level B harassment to Rice's whales and sperm whales, and later classified as ESA harassment under the BiOp. While the measure does address those risks, it is also intended to address "the risk of sound from oil and gas-related activities to . . . North Atlantic DPS green sea turtles, Kemp's ridley sea turtles, leatherback sea turtles, and Northwest Atlantic DPS loggerhead sea turtles[.]" AR 618-19. The RPM protects the many sea turtles which NMFS also predicts will be taken through temporary hearing loss and behavioral disturbance and the MMPA is irrelevant to the protection of sea turtles under the ESA. Put another way, the only RPM that bears any relationship to the MMPA Level B harassment would remain in place with or without anticipated risk to Rice's whale, sperm whale, and other marine mammals and Plaintiffs would still be subject to its conditions.

Ultimately, courts have recognized that the ESA's definition of "take" is broad and inclusive, designed to capture not only lethal or injurious acts but also those that impair essential life functions. *See supra at* 38-39. Similarly, Congress intended the MMPA to guard against both immediate harm and the cumulative effects of repeated behavioral disruptions. The substantial overlap in the statutory, regulatory, and guidance language ensures that incidental take

40

authorizations—whether sought under the MMPA or ESA—appropriately capture the full scope of activities that may jeopardize marine mammals and listed species. As a result, an activity that qualifies as Level B harassment under the MMPA may reasonably be understood as harassment under the ESA as well, ensuring consistency in the protection of marine mammals and listed species across both statutory schemes. NMFS' decision reflects this understanding and was entirely reasonable.[13]

## IV.    NMFS' Reasonable and Prudent Measures Comport with the ESA.

The ESA requires NMFS to assign RPMs to minimize the impact of incidental take. *See* 16 U.S.C. § 1536(b)(4)(C)(2) ("[NMFS], shall provide the Federal agency and the applicant concerned, if any, with a written statement that … specifies those reasonable and prudent measures that [NMFS] considers necessary or appropriate to minimize such impact."). Of the four RPMs included in the ITS, Plaintiffs challenge two but neither is availing. *See* Pls.' Mem. at 37-39.

RPM #1 requires seismic surveys to use the "quietest configuration of equipment necessary to conduct geophysical surveys." AR 619. Plaintiffs assert that this measure directs operators to "alter the basic design, location, scope, duration, or timing of" planned surveys, in violation of 50 C.F.R. § 402.14(i)(2) and the "minor change" rule. Pls.' Mem. at 38. As a threshold matter, the BiOp describes at length the impacts to listed species from sound. *See, e.g.*, AR 401-479 (providing 78 pages of analysis on how sound will affect listed species). These wide-ranging impacts and the substantial take anticipated from sound support the agency's consideration under 50 C.F.R. § 402.02 that some reasonable means of minimizing the effects are necessary. For instance, the BiOp anticipates and provides take coverage for over 40,000 instances of hearing impairment from geophysical surveys to both leatherback and green sea turtles, and over 1,000,000 instances of

---

[13] For the same reasons, the Court should reject Plaintiffs' argument that NMFS' RPM #1 is unlawful.

hearing impairment to both loggerhead and Kemp's ridley sea turtles. AR 612. The "quietest configuration" approach applied through RPM #1 is, in NMFS' considered judgment, necessary to help minimize the extensive impacts of these and other takings expected in the ITS.

In drafting this RPM, NMFS was careful to tailor its requirements to the needs of regulated parties. The relevant Terms and Conditions for RPM #1 provide that:

> BOEM, in conjunction with BSEE, shall require that industry *consider* all configurations of equipment available for the type of survey being conducted *without compromising data acquisition*. The selected configuration should produce the lowest sound source levels (rms and/or peak to peak) over frequencies audible to the aforementioned ESA-listed species, *while still accomplishing the goals of the survey*.

AR 619 (emphasis added). That the RPM allows for regulated parties to operate in a way that accommodates their specific survey needs only underscores that the RPM is reasonable and appropriate, and that it does not require changs that are more than "minor" under NMFS' regulations.

Plaintiffs also assert that NMFS' RPM #4—addressing the unauthorized release of trash, debris, or oil associated with oil and gas program activities—is unlawful. Pls.' Mem. at 39. This RPM, however, does not impose any requirements on Plaintiffs or other operators. *See* AR 619. Rather, it requires the *Bureaus* to report on measures designed to control the unauthorized releases described above. Because this RPM does not limit or direct Plaintiffs, they do not have standing to challenge the RPM. *Cf. Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 550 (5th Cir. 2016).[14]

---

[14] In plaintiffs' view, it appears that no change that is "material" at all could ever also be "minor," and thus allowable under the regulations. This could not have been Congress' intent in providing for RPMs, and it has not been the courts' view. *See, e.g., Oregon Natural Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1000 (D. Or. June 4, 2010) (changes to stringency of stream bank alteration limitations for grazing, even where imposing a ten percent alteration, found to be "minor"); *Arizona Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 1999 WL 33722331, at *20-21 (D. Ariz. Dec. 14, 1999) ("While altering to some degree the design, location, duration, and timing of the proposed action, the terms and conditions contained in the ITS do not alter the basic design, location, duration, or timing of the proposed action. The FWS merely requires some site-specific analyses and limits to a degree where livestock can go on the allotment and when they can do so").

## V.    Remedy

Plaintiffs have not demonstrated that NMFS' 2025 BiOp or ITS is arbitrary, capricious, or otherwise not in accordance with law and therefore Plaintiffs are entitled to no relief. But, if the Court finds the BiOp or ITS deficient in any way, it should allow the parties to provide supplemental briefing on the issue of remedy. Remedy briefing must be tailored to the Court's merits rulings, as the appropriate scope of any remedy turns on the precise nature of any deficiencies that the Court identifies. Moreover, given the complexity of the issues in this case, the potential consequences of any remedy could be far reaching and highly disruptive to entire swaths of activities across the Gulf of America. The parties should have the opportunity to ensure that the Court is fully informed of these potential consequences in light of the Court's decision before it issues any final remedy. Federal Defendants therefore respectfully request an opportunity to file supplemental briefs on remedy if the Court finds any legal violations.

For their part, Plaintiffs made the exact same request in their capacity as Defendant-Intervenors in the parallel proceedings in the District of Maryland. *See Sierra Club et al. v. NMFS*, No. 8:25-cv-1627-DLB, ECF No. 43 at 3 (describing API and Chevron's position that "briefing on appropriate remedy should be deferred until after the Court rules on the merits."). Plaintiffs should have no objection to proceeding similarly here. *Cf. Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 117 F.4th 628, 638 (5th Cir. 2024) (equitable doctrines, like judicial estoppel, "preclude[] litigants from 'playing fast and loose' with the courts, and prohibits parties from deliberately changing positions based upon the exigencies of the moment" (citation omitted)).

In any event, the appropriate recourse if there is a legal violation, as Plaintiffs acknowledge, is a remand of the BiOp and ITS to NMFS without vacatur.[15] The Supreme Court has long held

---

[15] Nor, for that matter, is vacatur authorized by the APA. *See United States v. Texas*, 599 U.S. 670, 690-91 (2023) (Gorsuch, N., concurring). Section 703 of the APA addresses judicial remedies and refers to

that the proper course upon finding a violation is to remand to the agency so that it "can exercise its administrative discretion in deciding how, in light of internal organizational considerations, it may best proceed." *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976). In the case of remand, however, Plaintiffs also ask that the Court impose a 12-month deadline for its completion. Pls.' Mem. at 40. But a reviewing court should not dictate to the agency "the methods, procedures and *time dimension* of the needed inquiry[.]" *Id*. at 333 (emphasis added). Indeed, artificial deadlines and timetables can constrain an agency's ability to conduct a proper, thorough analysis. *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 606 (9th Cir. 2014) ("We wonder whether anyone was ultimately well-served by the imposition of tight deadlines in a matter of such consequence. Deadlines become a substantive constraint on what an agency can reasonably do."); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 189 n.12 (D.C. Cir. 2017) (declining to retain jurisdiction and oversee deadlines).

It is a bedrock principle that relief must be no more burdensome than necessary to provide complete relief to each plaintiff. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*" (emphasis added)). In this case, Plaintiffs have requested declaratory relief in addition to remand without vacatur, citing the risk of disruptive consequences in the event of vacatur. Pls.' Mem. at 39-40. "Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment).

---

traditional remedies such as 'actions for declaratory judgments or writs of prohibitory or mandatory injunctions or habeas corpus," with no reference to vacatur. Of course, the Court need not engage with the question of authority because even assuming the APA authorizes vacatur, it is not appropriate here.

"[C]ourts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) (citation omitted). As such, because neither party advocates for vacatur of the 2025 BiOp—indeed, both parties recognize the highly disruptive consequences were the Court to order vacatur—the Court need not consider the issue.

## **CONCLUSION**

The 2025 BiOp reflects the painstaking work of assessing the effects of offshore energy development in the Gulf of America to ESA-listed species, which resulted in a comprehensive opinion spanning nearly 700 pages, grounded in the best available science, forged through years of interagency cooperation and consultation, designed to ensure that offshore energy production proceeds in compliance with the law. Plaintiffs fault NMFS' choices, but the record reveals an agency doing exactly what Congress asked of it: confronting complex issues, weighing scientific evidence, and rendering a sound judgment. That is the essence of lawful decisionmaking. Dissatisfaction with the outcome does not render the process arbitrary, capricious, or contrary to law. NMFS considered the relevant factors, applied its expertise, and delivered a reasoned opinion consistent with its statutory duties. The Court should defer to NMFS' scientific judgments and uphold the 2025 BiOp and ITS.

Dated: September 15, 2025

ADAM R.F. GUSTAFSON,
Acting Assistant Attorney General
MEREDITH L. FLAX, Deputy Section Chief
MICHAEL R. EITEL, Acting Assistant Section Chief

*/s/ Davis A. Backer*
DAVIS A. BACKER, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section

45

999 18th Street, North Terrace, Suite 600
Denver, Colorado 80202
Tel: (202) 305-5469
Fax: (202) 305-0275
Email: davis.backer@usdoj.gov

SARA M. WARREN, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Benjamin Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 598-5785
Fax: (202) 305-0275
Email: sara.warren@usdoj.gov

*Attorneys for Federal Defendants*