IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| STATE OF LOUISIANA,<br>by and through its Attorney General, LIZ MURRILL.<br><br>AMERICAN PETROLEUM INSTITUTE; and<br><br>CHEVRON U.S.A. INC.,<br><br>              Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE; and<br><br>HOWARD LUTNICK, in his official capacity as the Secretary of Commerce,<br><br>              Defendants. | CIVIL ACTION NO. 2:25-cv-00691-JDC-TPL<br><br>Hon. James D. Cain, Jr.<br><br>Magistrate Judge Thomas P. LeBlanc |

**<u>REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT ................................................................................................... 3

    A.    NMFS's Jeopardy Analysis Is Arbitrary, Capricious, and Contrary to Law. ........ 3

        1.    NMFS violated the ESA and the Administrative Procedure Act ("APA") by disregarding the best available data and adopting biased and unexplained mathematical models. ........................................... 3

            a.    NMFS does not adequately explain why it rejected the best available, real-world data of zero vessel strikes. ........................... 3

            b.    NMFS's *post hoc* litigation position that one strike will cause jeopardy is not supported by the record and does not justify NMFS's modeling. ............................................................. 6

            c.    Not all of NMFS's models predicted at least one strike, but NMFS's arbitrary rounding methods guaranteed that result. ......... 8

            d.    NMFS fails to explain how averaging model results produces an outcome that is reasonably certain to occur. .............. 9

        2.    NMFS's Modeling Inputs Are Unsupported Assumptions and Speculation. ........................................................................... 9

            a.    The "vessel strike risk percentages" NMFS used are unreasonable and unsupported by real-world data. ..................... 11

            b.    The 5% carcass recovery rate is an improper pessimistic assumption. .............................................................................. 13

        3.    NMFS did not justify its departure from the Bureaus' findings. ............. 16

        4.    NMFS failed to respond to Applicants' comments. ................................ 17

    B.    NMFS's "Reasonable and Prudent Alternative" Violates the ESA. ................... 19

    C.    NMFS Intentionally Used the Wrong Standard for Take by Harassment. .......... 20

    D.    NMFS's "Reasonable and Prudent Measures" Violate the ESA. ....................... 24

III. THE APPROPRIATE REMEDY IS REMAND WITHOUT VACATUR ......................... 25

IV. CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................ passim

*Center for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012) ..........................................................................23, 24

*Cook Inletkeeper v. Raimondo*,
533 F. Supp. 3d 739 (D. Alaska 2021) ..................................................................23

*Louisiana v. Haaland*,
No. 2:23-cv-01157, 2023 WL 6450134 (W.D. La. Sept. 21, 2023), *order
modified, appeal dismissed in part*, 86 F.4th 663 (5th Cir. 2023) .........................3, 6

*Maine Lobstermen's Ass'n v. NMFS*,
70 F.4th 582 (D.C. Cir. 2023) ........................................................................... passim

*Melone v. Coit*,
100 F.4th 21 (1st Cir. 2024) ...................................................................................23

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...............................................................................................9, 19

*Nat'l Wildlife Fed'n v. NMFS*,
524 F.3d 917 (9th Cir. 2008) ....................................................................................7

*Native Village of Chickaloon v. NMFS*,
947 F. Supp. 2d 1031 (D. Alaska 2013) .................................................................23

*Natural Resources Defense Council, Inc. v. Pritzker*,
828 F.3d 1125 (9th Cir. 2016) ................................................................................23

*Ohio v. EPA*,
603 U.S. 279 (2024) ..........................................................................................17, 18

*PPL Wallingford Energy LLC v. FERC*,
419 F.3d 1194 (D.C. Cir. 2005) ..............................................................................17

*San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation Dist.*,
49 F.4th 1242 (9th Cir. 2022) .................................................................................22

*Sierra Club v. EPA*,
939 F.3d 649 (5th Cir. 2019) ..................................................................................16

## TABLE OF AUTHORITIES

(continued)

Page(s)

*Sovereign Iñupiat for a Living Arctic v. BLM,*
    701 F. Supp. 3d 862 (D. Alaska 2023), *aff'd in part, rev'd in part on other
    grounds and remanded sub nom. Ctr. for Biological Diversity v. BLM*, 141
    F.4th 976 (9th Cir. 2025) ........................................................................................23

*Sw. Elec. Power Co. v. EPA,*
    920 F.3d 999 (5th Cir. 2019) .....................................................................................3

*Texas v. EPA,*
    137 F.4th 353 (5th Cir. 2025) ...........................................................................passim

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS,*
    985 F.3d 472 (5th Cir. 2021) .....................................................................................6

**Statutes**

16 U.S.C. § 1362(18)(A) ...............................................................................................21

16 U.S.C. § 1536(a)(2) .............................................................................................2, 3, 7

16 U.S.C. § 1536(b)(4) ...................................................................................................22

16 U.S.C. § 1543 .............................................................................................................22

**Regulations**

50 C.F.R. § 17.3 .............................................................................................................21

50 C.F.R. § 402.02 ......................................................................................................9, 25

50 C.F.R. § 402.12(f)(4) .................................................................................................16

50 C.F.R. § 402.12(j) ......................................................................................................17

50 C.F.R. § 402.14(i)(2) .............................................................................................24, 25

50 C.F.R. § 402.14(c)(1)(iv) ...........................................................................................16

50 C.F.R. § 402.14(d) .................................................................................................18, 19

50 C.F.R. § 402.14(g)(1), (5) ......................................................................................18, 19

89 Fed. Reg. 31,488 (Apr. 24, 2024) ..........................................................................20, 21

90 Fed. Reg. 22,601 (May 23, 2025) ...............................................................................2

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Exec. Order No. 14303 ....................................................................................................2

**Other Authorities**

Richard M. Pace et al., *Cryptic Mortality of North Atlantic Right Whales*
    Conservation Sci. and Practice 1, 6 (2021)..............................................................14

## I.  INTRODUCTION

The central dispute in this case is the reasonableness of the National Marine Fisheries Service's ("NMFS") conclusion that the Gulf of America Oil and Gas Program (the "Oil and Gas Program" or "Program") vessels will jeopardize the continued existence of the Rice's whale. But NMFS admits there are no documented instances of a Program vessel *ever* striking a Rice's whale. So to justify its jeopardy determination, NMFS posits that Program vessels are striking Rice's whales without realizing or reporting it. NMFS's assumption that such "cryptic" strikes occur is the basis for NMFS's convoluted modeling that it goes to great lengths to defend. Dkt. 34-1 ("NMFS Br."). But all available evidence is to the contrary. On the one occasion that a Program vessel *did* fatally strike a whale of any kind (a juvenile sperm whale), the vessel immediately stopped, reported the strike, and cooperated with data-collection efforts. Simply put, the record evidence does not support NMFS's cryptic-strike modeling at the heart of the agency's jeopardy determination.

Indeed, the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement (jointly, the "Bureaus")—the agencies with real-world experience regulating the Program—examined the available data and found the likelihood of a Program vessel striking a Rice's whale to be so low that it is "discountable." But NMFS ignored the Bureaus' finding and their common-sense position that the observed effects from a reported sperm whale strike are representative of what would occur if a Program vessel struck a larger Rice's whale. Instead, NMFS's 2025 biological opinion (the "2025 BiOp") speculates—without evidence—that in unspecified "other circumstances" a Program vessel *might* overlook a strike. NMFS built its entire seven-step cryptic-strike modeling effort on this unsupported assumption.

Congress knew biological opinions have a "powerful coercive effect on the action agency." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Congress therefore imposed a critical

limitation to prevent overreach by the consulting agency—that is, requiring opinions to be based only on "the best scientific and commercial data available." *Id*. at 176 (quoting 16 U.S.C. § 1536(a)(2)). The Supreme Court unanimously explained that the "obvious purpose" of this limitation is "to ensure that the [Endangered Species Act ("ESA")] not be implemented haphazardly, on the basis of speculation or surmise," and "to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Id*. at 176-77.

The 2025 BiOp flunks this test. A model is only as good as its inputs, and NMFS shunned real-world data in favor of biased and speculative assumptions. A model that uses speculative inputs necessarily means that the model's outputs are nothing more than speculation and surmise. Garbage in, garbage out. This is particularly so when those assumptions are intentionally designed to be pessimistic—or "conservative"—presumptions that the ESA bans.

Retreating, NMFS argues it does not matter what model it used because even "a single lethal strike" by a Program vessel in the next 45 years would result in jeopardy to the Rice's whale, and that "all of NMFS' modeling predicted at least one lethal strike." NMFS Br. 20. But this "single lethal strike" conclusion is not in the 2025 BiOp and is without a record basis.

NMFS may not work backwards from a conclusion of "jeopardy" to a model to support it. Yet NMFS's models are designed so that they *always* produce at least one lethal strike and thus *always* justify NMFS's tacit jeopardy assumption. This is precisely the kind of "skewed" approach to science that President Trump has admonished agencies—and NMFS specifically—to abandon. *See* Exec. Order No. 14303, Restoring Gold Standard Science, 90 Fed. Reg. 22,601, 22,601 (May 23, 2025). NMFS's intransigence is unsurprising, however, because NMFS did the same thing two years ago when it "weaponize[ed]" the ESA against the oil-and-gas industry.

*Louisiana v. Haaland*, No. 2:23-cv-01157, 2023 WL 6450134, at *9 (W.D. La. Sept. 21, 2023), *order modified, appeal dismissed in part*, 86 F.4th 663 (5th Cir. 2023).

NMFS's 2025 BiOp is arbitrary, capricious, and contrary to law because it relies on speculation to reach a predetermined outcome. The 2025 BiOp should be remanded and NMFS ordered to produce a new, lawful opinion after re-consultation.

## II.  ARGUMENT

A.    **NMFS's Jeopardy Analysis Is Arbitrary, Capricious, and Contrary to Law.**

1.    **NMFS violated the ESA and the Administrative Procedure Act ("APA") by disregarding the best available data and adopting biased and unexplained mathematical models.**

NMFS leans heavily on claims of deference. NMFS Br. 13-14. In NMFS's view, so long as its "choices . . . 'conform to minimal standards of rationality,'" the Court must uphold them. *Id*. (quoting *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019)). But NMFS must use the "best scientific and commercial data available," not "speculation or surmise." 16 U.S.C. § 1536(a)(2); *see Bennett*, 520 U.S. at 176. NMFS's opinion also cannot include "pessimistic assumptions," "worst-case scenarios," or other biases intended to give the "benefit of the doubt" to the species. *Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 586 (D.C. Cir. 2023); *see also Texas v. EPA*, 137 F.4th 353, 374 (5th Cir. 2025) (agency violated the APA when it "seems to have forced a result on sparse and suspect evidence"). On the key issue in this case—whether to model "cryptic" strikes and, if so, how—NMFS fell well short of these guiding principles.

a.    **NMFS does not adequately explain why it rejected the best available, real-world data of zero vessel strikes.**

The best available data is real-world observation. As NMFS acknowledges, that real-world data reflects "the fact that no vessel strike of a Rice's whale has been connected to an oil and gas program vessel." NMFS Br. 21. NMFS nevertheless insists that "this should not be

interpreted to mean that no strikes have occurred," because—according to NMFS—strikes "may even go unnoticed." *Id*.; NMFS_372. But as the Bureaus pointed out, the "absence of a report could also indicate complete compliance and effectiveness" of existing mitigation measures. Bureaus' Comments 382.[1] Without *some* reason to believe that Program vessels are unknowingly striking Rice's whales, the ESA compels the conclusion that past will be prologue and strikes are "unlikely." NMFS_2065. *See Maine Lobstermen's Ass'n*, 70 F.4th at 599-600 ("The statute is focused upon 'likely' outcomes, not worst-case scenarios," so when NMFS "lacks a clear and substantial basis for predicting an effect is reasonably certain to occur," "the effect must be disregarded in evaluating the agency action.").

NMFS points to three implausible data points to support its view that Program vessels are unknowingly striking Rice's whales. None of these points are effective. First, NMFS points out that over the past 20 years, three Rice's whales have been struck by non-Program vessels. But none of the strikes involved Program vessels, and only one—involving a cargo ship, a larger class of ship not regulated by the 2025 BiOp, that was likely transiting through the eastern Gulf—was fatal. *See* NMFS_78-81, 370. One death in 20 years from an enormous vessel hardly makes it "likely" that much-smaller Program vessels that do not transit through the whales' core habitat will fatally strike a Rice's whale.

Second, NMFS implies that a reported strike of a juvenile sperm whale near Galveston indicates that other strikes "go unnoticed by the crew." NMFS Br. 21. But the strike report tells a very different story. Despite the vessel being "one of the largest" used for Program activities, NMFS_182, and despite the relatively small size of the juvenile sperm whale, the strike caused

---

[1] Plaintiffs are filing a motion to complete or supplement the administrative record with the Bureaus' comments on the draft BiOp ("Bureaus' Comments") simultaneously with this filing.

"sudden extensive shuddering," NMFS_109360. The crew "immediately brought the vessel to an 'all stop'" and "cooperated completely with instructions from NMFS," including remaining on site for five hours and assisting with extensive documentation. NMFS_109360, 109364. The Bureaus' Comments give additional color, explaining that "several crew members and equipment fell to the deck" from the strike. Bureaus' Comments 631.

NMFS never explains how a single strike of a juvenile sperm whale by one of the largest categories of Program vessels that was immediately detected and reported supports the agency's conclusion that there are many more undetected, unreported strikes. In other words, NMFS is using a whale strike that was both *noticed* and *reported* as its only support for the notion that whale strikes—of a much larger whale—go *unnoticed* and *unreported*. That is nonsense. As the Bureaus explained, this reported strike confirms that the chance "of a similar strike occurring, not being detected, and then not being reported" is "very unlikely." Bureaus' Comments 631, 633, 382. That is particularly true because most Program vessels are smaller and adult Rice's whales can be double the size of the struck sperm whale. *See* NMFS_184, 109360. The crew would "absolutely know when an object the size of a whale is struck." Bureau's Comments 644. NMFS's stubborn conclusion otherwise is entirely baseless.[2]

Third, NMFS insists that "oil and gas program vessels make up a large share of vessel traffic." NMFS Br. 21. But NMFS says nothing about the sizes of these vessels or where they transit or why they are likely to strike Rice's whales when that has never been observed. *See*

---

[2] The 2025 BiOp was similarly thin on evidence. Its sole citation for the claim that "the vast majority of marine mammal vessel strikes go undetected," NMFS_372, is a 20-plus-year-old paper that noted that "*large* ships, such as container ships, tankers, and cruise ships may not be aware that a collision with a whale has occurred," NMFS_47806 (emphasis added). But those are not the smaller Program vessels covered by the 2025 BiOp, *e.g.*, NMFS_44; *see* NMFS_2061-62, 2064-65; Bureaus' Comments 631, 644.

*infra* pp. 11-13. That NMFS believes Program vessels overall account for a plurality of Gulf vessel traffic says nothing about the factors most pertinent to vessel-strike risk: large size, high speed, and proximity to marine mammals. NMFS_175, 2065. As the Bureaus explained, the size, speed, and transit routes of Program vessels make such strikes improbable. NMFS_2065.

NMFS candidly admits it turned to complicated modeling because the agency did not believe that the "real-world data" of zero strikes was accurate. NMFS Br. 21. But "a model is arbitrary if that model bears no rational relationship to the reality it purports to represent." *Texas*, 137 F.4th at 373 (citation modified). That is precisely the problem here.

   **b.**  **NMFS's *post hoc* litigation position that one strike will cause jeopardy is not supported by the record and does not justify NMFS's modeling.**

NMFS now has revealed in litigation a position it did not provide in the 2025 BiOp—that "a single lethal strike results in jeopardy." NMFS Br. 20. But the reasons behind NMFS's modeling decisions must come from the administrative record—not "*[p]ost hoc* rationalizations" provided in litigation briefs. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021). And the 2025 BiOp distinctly does *not* support this new position.

The 2025 BiOp projects nine strikes[3] resulting in lethal or serious injury, which it concludes "are likely to appreciably reduce the survival of the Rice's whale in the wild" and thus "likely to jeopardize the continued existence" of the Rice's whale. NMFS_571-72. The 2025 BiOp does not evaluate whether a *single* vessel strike will result in jeopardy. NMFS's one-strike-is-jeopardy rationale is therefore entirely *post hoc*, which cannot be credited. *See Louisiana*, 2023 WL 6450134, at *8.

---

[3] NMFS has since admitted an error in its numbers, saying it meant six, not nine, lethal strikes. NMFS Br. 20, n.9 (citing a September 2025 errata). The errata says nothing about whether a *single* strike is jeopardy.

To prop up its *post hoc* conclusion, NMFS tries to massage a 2025 BiOp excerpt. NMFS Br. 20 (citing NMFS_571). The 2025 BiOp says that "[g]iven the population size and status of Rice's whale, any effects that may reduce the fitness of individuals or result in mortality will affect the population," and that "[t]he death of one female, assuming a 1:1 sex ratio, would affect vital rates because calf production would decline, and would constitute the loss of approximately 4% of the breeding population (Rosel 2016)." NMFS_571. That hedged, conditional statement is not a determination that a single strike in the next 45 years—*regardless* of age or gender of the whale struck—is likely to jeopardize the species. Just because something "will *affect* the population" does not mean it is "likely to *jeopardize* the continued existence of" the species. 16 U.S.C. § 1536(a)(2) (emphasis added).[4] Moreover, the cited paper—Rosel 2016—relies on population estimates of 33 total whales and only 8 breeding females, which NMFS admits is no longer the best available data. NMFS_107612. Current estimates are 51 whales, which NMFS acknowledges "may be an underestimate" and that the population "may be larger, with an abundance of 121 animals." NMFS_190.

To make a one-strike-is-jeopardy finding, the 2025 BiOp would have to demonstrate, based on the best scientific and commercial data available, that the Rice's whale is in a state of "precarious survival" such that a single lethal take will "tip" the species "into a state of likely extinction." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 930 (9th Cir. 2008). The 2025 BiOp does not make this finding, and it cannot do so. NMFS does not know the actual size of the Rice's whale population, its range and distribution across the Gulf, or whether the population is

---

[4] NMFS does not even try to explain how a single vessel strike, regardless of the whale's age or gender, would result in jeopardy. Even if there are only 51 whales, and even if a Program vessel is certain to strike one whale in the next 45 years, there is still only a 13 in 51 chance (about 25%) that the one strike would be a breeding-age female. That is not a "likely" outcome sufficient to support a jeopardy finding. *Maine Lobstermen's Ass'n*, 70 F.4th at 595.

increasing or decreasing. NMFS_190 ("There is insufficient information available to properly examine population trends for the Rice's whale."). NMFS even disproves its own conclusion by arguing, in defense of its arbitrary 5% carcass recovery rate, that the population could very well be sustaining "the death of between 5 to 7 whales each year" for the last 25 years. NMFS Br. 25. This estimate includes death by vessel strike, which NMFS says could include 20 lethal strikes over the last 23 years. NMFS_380. Under these circumstances, finding "jeopardy" based on one, six, or even eleven vessel strikes *over 45 years* is implausible and arbitrary. The ESA requires more. *Bennett*, 520 U.S. at 176.

<blockquote>

c.    **Not all of NMFS's models predicted at least one strike, but NMFS's arbitrary rounding methods guaranteed that result.**

</blockquote>

In its cryptic-strike modeling, NMFS adopted a mathematical convention of rounding up to the nearest whole number. This guaranteed that each model would predict at least one lethal strike. *See* NMFS Br. 20. That, in turn, guaranteed—before any analysis—that NMFS would find jeopardy in light of its newly-revealed view that a single lethal strike will jeopardize the species.

But one of NMFS's models, using the "Blondin method," projects only 0.783 lethal strikes over the next 45 years by Program vessels. *See* Plaintiffs Br. 15 (providing actual calculations). Of course, less than one Rice's whale is zero. But NMFS chose to round that number up, which artificially skews the results and reflects a "pessimistic" assumption that NMFS is not allowed to make. *Maine Lobstermen's Ass'n*, 70 F.4th at 586. Worse still, for each modeling scenario, NMFS took a totally different calculation—0.87, an assumed annual vessel lethal strike rate based on speculation—and multiplied it by a percentage of strike risk based on modeling, and then multiplied the result by 45 years. *See* Plaintiffs Br. 15 (explaining calculations). This equation will always produce a non-zero number unless the percentage of strike risk is set to 0.0—which NMFS will not do because it believes there must be *some* strike

risk—and so will always round up to at least one lethal strike. NMFS stacked the deck to find at least one strike, and thus, in NMFS's view, jeopardy.

> ### d.   NMFS fails to explain how averaging model results produces an outcome that is reasonably certain to occur.

NMFS also fails to justify its strange decision to *average* the results of its three models as a substitute for an analysis of what is "reasonably certain to occur." *Maine Lobstermen's Ass'n*, 70 F.4th at 598 (quoting 50 C.F.R. § 402.02). As Plaintiffs pointed out—and NMFS studiously ignores—there is no principle of math, statistics, or reason to suggest that the "likely" or "reasonably certain" outcome is the average of three different scenarios. Nor does NMFS explain why its calculation did not include the Bureaus' highly probable scenario based on real-world, observed data: zero vessel strikes. If averaging is the answer, then NMFS "entirely failed to consider an important aspect of the problem" by omitting the Bureaus' finding based on real-world data from the numbers it used to calculate that average. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

NMFS suggests that by averaging the three models, it avoided using the kind of pessimistic assumptions prohibited by *Maine Lobstermen's Association.* NMFS Br. 28. But all three models are based on unrealistic, pessimistic, and unsupported, assumptions that bias the modeling results. Plaintiffs Br. 23-28; *infra* pp. 9-16. Averaging the biased results of three pessimistic and speculative models, and completely ignoring real-world data to the contrary, still results in an overly pessimistic and speculative outcome.

> ### 2.   NMFS's Modeling Inputs Are Unsupported Assumptions and Speculation.

NMFS contends it used both "tried and true" and "cutting edge" modeling scenarios. NMFS Br. 28. But NMFS's models are only as good as their percentage-of-strike-risk and carcass-recovery-rate inputs, and the record shows those inputs were entirely speculative. Rather

than assume the necessary inputs to run models, NMFS should have done what the Bureaus did: forgo the models and use the best *available* real-world data to make a reasoned, rational decision. And if NMFS disagreed with the Bureaus' conclusion because NMFS believed there was too much "uncertainty," then the ESA required NMFS to conclude that effects on Rice's whales are discountable, rather than use complex, speculative models to mask the uncertainty. *See Maine Lobstermen's Ass'n*, 70 F.4th at 600 ("If brute uncertainty does make it impossible for the Service to make a reasoned prediction . . . [t]he Service lacks a clear and substantial basis for predicting an effect is reasonably certain to occur, and so, the effect must be disregarded in evaluating the agency action.").

NMFS tries to avoid *Maine Lobstermen's Association*, contending that it "was fact-specific and is inapt here." NMFS Br. 28. Wrong. This case is exactly like *Maine Lobstermen's Association*. There, fishermen challenged a biological opinion that imposed restrictions on a lobster fishery based on NMFS's modeling that estimated a high level of mortality to the North Atlantic right whale. 70 F.4th at 586. As here, NMFS's modeled mortalities were almost all undetected deaths—called, as here, "cryptic" deaths—that were apportioned to fisheries. *Id.* at 589. And, as here, NMFS "made certain disputed assumptions about the unknown data and the unseen deaths," many of which were precautionary or conservative in nature. *Id.* The result of NMFS's pessimistic assumptions was that the agency "ultimately concluded the lobster and Jonah crab federal fisheries kill 46 whale[s] . . . per decade, a staggering departure from the two documented deaths known to have originated in all U.S. fisheries over a period of nine years." *Id.* at 600-01. The D.C. Circuit held NMFS's model violated the ESA, which "call[s] for an empirical judgment about what is 'likely.'" *Id.* at 586. NMFS's "role as an expert is undermined,

not furthered, when it distorts that scientific judgment by indulging in worst-case scenarios and pessimistic assumptions" about risks to species. *Id*.

This case is no different. NMFS's projection of nine—or maybe six—total lethal takes by Program vessels is a staggering departure from the *zero* strikes observed in recorded history. NMFS got there by making pessimistic, unsupported assumptions, such as the 5% carcass recovery rate and "strike risk" input. The only real difference between this case and *Maine Lobstermen's Association* is that NMFS in that case was transparent about its selection of overly "conservative" assumptions, whereas, here, NMFS hid those assumptions by selectively editing carry-over language from the last BiOp.[5]

> a.    The "vessel strike risk percentages" NMFS used are unreasonable and unsupported by real-world data.

When NMFS calculated its vessel-strike-risk percentage, it predicted a very high risk of a Program vessel striking a Rice's whale off the Port of New Orleans where 9,000 hours of continuous acoustic monitoring revealed *zero* Rice's whale detections. NMFS_188 (map showing no detections at Grand Isle); NMFS_2439. This result—that a Program vessel would kill a Rice's whale where the Rice's whale has never even been detected—should have caused NMFS to revisit its assumption. It did not.

Instead of explaining why it ignored real-world data, NMFS claims that its "co-occurrence" model used to predict the "vessel strike risk percentage" is "tried and true." NMFS Br. 28. But NMFS neglects to mention that it fudged its "tried and true" model for the Rice's

---

[5] Compare the 2020 BiOp for the Program—issued before *Maine Lobstermen's*—with the 2025 BiOp—issued after. In the 2020 BiOp, NMFS states that it "***conservatively*** divided the one known lethal vessel strike of [Rice's] whales by the Rockwood et al. (2017) five percent carcass recovery rate to account for unobserved vessel strikes." NMFS_73243 (2020 BiOp)(emphasis added). In the 2025 BiOp, NMFS said the same thing but deleted the word "conservatively": it "divided the one known lethal vessel strike of Rice's whales by the Rockwood et al. (2017) 5% carcass recovery rate to account for unobserved vessel strikes." NMFS_380.

whale because it lacked the necessary data to properly run the model. NMFS's "co-occurrence" model is based on two overlapping sets of data: (1) species-density data (roughly, the number of whales per square mile of ocean surface in a given area) and (2) vessel-traffic patterns. NMFS Br. 17 (steps 2 and 3). The problem is that NMFS has no species-density data for the Rice's whale in the western Gulf. NMFS_311-12. So, to run the model in the western Gulf off the Port of New Orleans, NMFS used an entirely different type of data to replace the missing species-density data. Instead of *species-density data*, NMFS used *habitat-suitability maps* from Garrison (2024). NMFS_0312, 381. These habitat-suitability maps identify areas in the Gulf within the 100 to 400 meter isobath that have some elements that *look like* the habitat used by Rice's whales in the Biologically Important Area in the eastern Gulf where the vast majority of Rice's whale observations have occurred. NMFS_38851-52. Thus, instead of an estimate of the number of Rice's whales in a square mile of ocean, the "co-occurrence" model instead relied on how much a given area looked like the Biologically Important Area.

Substituting habitat-suitability assumptions for species-density data turns the "tried and true" model into gobbledygook. The model results do not reflect a 27% share of the risk of *striking a Rice's whale*. Instead, they show a 27% share of the risk of *passing through supposedly suitable Rice's whale habitat* and, even then, only habitat outside of the Biologically Important Area. NMFS offered no explanation for why habitat-suitability data can be a proxy for species-density data. And that equivalence is especially dubious when (1) Rice's whales have seldom been seen in that so-called suitable habitat and (2) habitat suitability inexplicably predicts high strike risk in an area where no Rice's whales were detected after 9,000 hours of monitoring.

NMFS_188, 2439.[6] Equating habitat suitability with species density is an exercise in precisely the kind of unexplained guesswork the ESA prohibits. *Bennett*, 520 U.S. at 176-77.

>    b.    **The 5% carcass recovery rate is an improper pessimistic assumption.**

NMFS's strike predictions are driven largely by the speculative assumption that there is a 5% carcass recovery rate for the Rice's whale—that is, for all the Rice's whales that die at sea, only 5% of the carcasses will be found. NMFS claims it used its "scientific judgment" and the "literature" to pick that number. NMFS Br. 23. But NMFS cites no literature, and there is none, that provides a carcass recovery rate for the Rice's whale. To the contrary, the literature states that determining a carcass recovery rate requires knowing two variables: (1) an accurate abundance estimate for the species and (2) a "species specific mortality rate." NMFS_103368. NMFS has neither for the Rice's whale. *Id*. As the 2025 BiOp concedes, "[l]ittle is known about the Rice's whale's life history"; its population size ("the population may be larger"); its distribution (may include "Mexican waters"); or its population trends ("insufficient information"). NMFS_188, 190. It was arbitrary and capricious for NMFS to use models that necessarily rely on carcass recovery rates when NMFS has none of the data required to calculate one for the Rice's whale.

The only literature NMFS cites is Rockwood (2017). NMFS Br. 23. But Rockwood does not discuss Rice's whales or calculate, study, or evaluate carcass recovery rates for *any* species. *See* NMFS_2514. The 5% number in Rockwood is just an average from three *other* whale species, from different locations. *Id*. This is like predicting the number of deer killed on the road in Oregon by averaging the percentage of moose carcasses found in Alaska, elk carcasses found

---

[6] NMFS says that Rice's whales have been "sighted increasingly in the western Gulf." NMFS Br. 27. But sightings in the western Gulf are still exceedingly rare despite intensive survey efforts and increased scrutiny. And NMFS does not contend that a handful of anecdotal Rice's whale sightings are a substitute for species-density data.

in Montana, and buffalo carcasses found in Wyoming. A carcass recovery rate demands species-specific data, not comparisons to other species. NMFS_103368. Thus, far from being the best data, the 5% recovery rate is based on a "highly speculative chain of uncertainties" that the 2025 BiOp presents with false precision. NMFS_2514.[7]

Nor does NMFS explain why its only choice was supposedly to pick between a 5% recovery rate or a 17% recovery rate. *See* NMFS Br. 24. NMFS was not *required* to use modeling at all. *See supra* pp. 9-11. And it was arbitrary for NMFS to choose to use models that *require* accurate carcass-recovery-rate data, knowing that no such data exists for the Rice's whale. Rather than use recovery-rate-dependent models, NMFS should have followed the same approach used by the Bureaus and relied on the observed data. Instead, NMFS improperly "forced a result on sparse and suspect evidence." *Texas*, 137 F.4th at 374.

Regardless, the framed choice between the 5% and 17% rates is a false one. The 17% recovery rate is an old data point from the 1980s and 1990s for a different whale, and current data show that the carcass recovery rate for the North Atlantic right whale is actually 37%. NMFS_007286. NMFS knows this because it used a 36% carcass recovery rate in its 2021 biological opinion for the lobster fishery. *See Maine Lobstermen's Ass'n*, 70 F.4th at 589 (NMFS's analysis was based on Richard M. Pace et al., *Cryptic Mortality of North Atlantic Right Whales*, 3 Conservation Sci. and Practice 1, 6 (2021), which calculated a 36% carcass recovery rate). Positing the Rice's whale recovery rate as a choice between irrelevant data (5%) and a data point that NMFS knows is wrong and outdated (17%) is both arbitrary and misleading.

---

[7] NMFS suggests, without citation to the BiOp, that carcass recovery rates might be different for vessel strikes than for other sources of mortality. But carcass recovery rates should be higher, not lower, for vessels strikes because evidence indicates that at least some strikes will be immediately observed and reported. NMFS_109364; *see also* NMFS_2515.

Even if it were plausible to simply pick carcass recovery rates from different species, NMFS's decision to eschew the actual North Atlantic right whale recovery rate is all the more arbitrary in light of its choice to use the North Atlantic right whale as a *proxy* for Rice's whale behavior and movement in the Blondin model. NMFS_381-82. Apparently, the North Atlantic right whale is a good proxy for a *live* Rice's whale but a bad proxy for a *dead* one. If there is a reason for this obvious contradiction, it is not in the record. This is exactly the kind of unexplained inconsistency that makes agency action arbitrary and capricious. *Texas*, 137 F.4th at 369.

The only stated justification in the 2025 BiOp for choosing the 5% recovery rate is that the Rice's whale "likely has less blubber" than the North Atlantic right whale. NMFS_380. But carcass recovery rates are not based on blubber. NMFS_103368. Nor is blubber a proxy for the missing species-specific mortality data. Regardless, NMFS's "blubber" explanation is just speculation. NMFS cites no studies discussing the blubber content of the Rice's whale or the post-mortem tendencies for Rice's whales to float. Nor does NMFS make any effort to account for the effects of the Gulf's currents and warmer waters.

Finally, NMFS does not cogently explain how the 5% carcass recovery rate is reasonable, given that it would mean that 140 Rice's whales died in the last 23 years. *See* Plaintiffs Br. 23.[8] For one thing, NMFS's back-of-the-envelope math cannot be reconciled with NMFS's current insistence that a *single* death in 45 years would jeopardize the species. If 140 deaths in 23 years do not jeopardize the species, it just can't be the case that one death in 45 years would. In any event, NMFS's defense of its 5% recovery rate is entirely *post hoc* and reflects only NMFS's

---

[8] This is not *ipse dixit*, as NMFS claims. The number of Rice's whale carcasses recovered since 2005—seven—comes directly from the administrative record. NMFS_1214; NMFS_84913-16.

(inconsistent) belief that the Rice's whale population *could* sustain deaths on the order of 5.5 whales per year. But this is just a guess, as NMFS has no actual data on the Rice's whale mortality rate.[9] *Post hoc,* inconsistent, implausible explanations do not satisfy the ESA.

### 3. NMFS did not justify its departure from the Bureaus' findings.

As the permitting agencies, the Bureaus provided a biological assessment that reviewed all the available data and concluded that "the potential for vessel strikes to whales is unlikely to occur and, therefore, discountable." NMFS_2065. The ESA regulations charged the Bureaus with producing this analysis and determining the likely effects of the action. *See* 50 C.F.R. §§ 402.12(f)(4), 402.14(c)(1)(iv). And yet NMFS ignored the Bureaus' work and reached the opposite conclusion with no explanation as to why the Bureaus were supposedly wrong. An agency action is not reasonable if there are "unexplained inconsistencies" in the record. *Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019) (citation omitted). A "failure to address or reconcile" conflicting data or predictions creates an "unexplained inconsistency in the rulemaking record," rendering the 2025 BiOp arbitrary and capricious under the APA. *Texas*, 137 F.4th at 369 (citation modified).

NMFS responds with misdirection, first explaining that it "declined to defer to the Bureaus' vessel strike analysis." NMFS Br. 22. But the question is whether NMFS *explained*—in the record—the radical inconsistency between its and the Bureaus' views. It did not.

Next, NMFS suggests it was free to silently reject the Bureaus' findings in the biological assessment without actually stating "as a formal matter, that it was rejecting that portion." NMFS

---

[9] This guess is absurdly backwards. Carcass recovery rate is determined based on a "species specific mortality rate." NMFS_103368. Since the 5% rate is not specific to Rice's whales, NMFS just speculates about a possible species-specific mortality rate based on the carcass recovery rate for a *different species*. That is like trying to calculate the mortality rate of a coyote population in Arizona based on the percentage of wolf carcasses found in Montana.

Br. 22. NMFS's own regulations say otherwise. When the Bureaus submit a biological assessment, NMFS must "respond in writing within 30 days as to whether or not [NMFS] concurs with the findings of the biological assessment." 50 C.F.R. § 402.12(j). Following this protocol, NMFS sent the biological assessment back to the Bureaus multiple times for revisions. *See* NMFS Br. 10-11. NMFS ultimately accepted the biological assessment with the zero-strike finding and proceeded to formal consultation without ever stating in writing that it did not concur with the Bureaus' vessel strike finding. 50 C.F.R. § 402.12(j).

Without record support, NMFS falls back to more *post hoc* rationales by pointing to the minor differences between the vessel traffic data used by NMFS and the Bureaus, and arguing that these differences show that NMFS "expressly disagreed" with some of the Bureaus' data. NMFS Br. 22. But if the different data was why NMFS diverged from the Bureaus, then NMFS should have said so somewhere. When an agency receives comments from sister agencies that are at odds with its own conclusions, the agency must, at a minimum, acknowledge and explain the difference of opinion, or its "decision can hardly be classified as reasoned." *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (citation omitted).

###    4.    NMFS failed to respond to Applicants' comments.

NMFS also ignored Applicants' material comments on the draft BiOp. In its brief, NMFS insists that it "considered" Applicants' first set of comments but was not required to address the King Report. NMFS Br. 28-31. NMFS is wrong on both counts.

NMFS's choices must be "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted). An action is not "reasonably explained" where "commenters posed [a] concern" to the agency and the agency "offered no reasoned response." *Id.* at 292-93. The only "response" NMFS identifies in the record is that it added the Blondin model "to account for the specific characteristics of the Rice's whale and the whale's ability to avoid a

17

collision." NMFS Br. 19, 29. Fair enough. That was a response to *a* comment, but Rice's whale avoidance was hardly the *only* comment Applicants provided. NMFS ignored the core comments provided by Applicants, including the following two critical examples.

*First*, Applicants commented that the draft BiOp impermissibly and arbitrarily substituted habitat "suitability" maps for species-density data that do not reflect "the likelihood of *whales* being present in that habitat area." NMFS_002439. Applicants explained that this "leads to illogical results," including "very high relative strike risk (100%) near the Port of New Orleans in locations where no Rice's whale has ever been seen or acoustically detected," including near "the Grand Isle site (off the Port of New Orleans)" where there were "*no acoustic detections* despite over 9,000 hours of monitoring." *Id*. There is no response in the record, and that violates the APA. *Ohio*, 603 U.S. at 292.

*Second*, Applicants commented that the 5% carcass recovery rate was "overly conservative" and that "[a]ny lethal vessel strike estimate based on such uncertainty and speculation is highly prone to extrapolation error and not reasonably certain to occur." NMFS_002439. NMFS did not respond to that comment either.

Without mentioning these comments, NMFS focuses instead on the American Petroleum Institute's supplemental comments that provided the King Report, contending that the report was "untimely." NMFS Br. 30. Hardly. Applicants provided their comments on the 700-page draft BiOp within seven days as requested, but reserved the right to supplement those comments because seven days was obviously insufficient and unreasonable. NMFS_2436. NMFS's regulations required it to "provide any applicant with the opportunity to submit information for consideration during the consultation," to consider all information that is "otherwise available," and to accept comments submitted by an applicant "through the Federal agency." 50 C.F.R. §

402.14(d), (g)(1), (g)(5). Applicants submitted the King Report through this process. NMFS_2504. Nothing in the ESA or its regulations cuts off an applicant's right to submit information after a mere seven days or otherwise relieves NMFS of the obligation to consider an applicant's comments submitted through the sanctioned regulatory channels. In any event, the King Report does not raise new issues but rather elaborates on the problems identified by Applicants in their comments, including the problems with the overly conservative 5% carcass recovery rate and the strike-risk analysis—both of which NMFS ignored. NMFS_2513-15.

NMFS's efforts in its litigation brief to substantively respond to the contents of the King Report for the first time are too little, too late, as the Court "may not accept . . . *post hoc* rationalizations for agency action." *State Farm*, 463 U.S. at 50. The King Report is in the record and NMFS was obligated to reconcile its decision with that report *in the record*.

**B.    NMFS's "Reasonable and Prudent Alternative" Violates the ESA.**

Plaintiffs and NMFS agree that if the jeopardy analysis is unlawful, then there is no basis for NMFS to recommend a "reasonable and prudent alternative." Plaintiffs Br. 29-30; NMFS Br. 32-33. NMFS nonetheless contends that Plaintiffs' concerns about the "reasonable and prudent alternative" are premature because the Bureaus have not yet adopted it. NMFS Br. 32. Unsurprisingly, the Bureaus under the Trump Administration appear to have reservations about wasting federal and private resources implementing a burdensome conservation program based on a speculative jeopardy finding that is contrary to the observed data and the Bureaus' own findings. But although the Bureaus may be waiting for the outcome of this litigation before deciding to implement those unnecessary measures, that does not make the matter unripe. A biological opinion has a "powerful coercive effect" that confers immediate standing on the regulated community to challenge it. *Bennett*, 520 U.S. at 169. This Court can and should set aside NMFS's "reasonable and prudent alternative" now.

**C.      NMFS Intentionally Used the Wrong Standard for Take by Harassment.**

The 2025 BiOp's incidental take statement ("ITS") assigns to the oil and gas industry over 13,000 instances of ESA take of endangered sperm whales and 30 instances of take of Rice's whales—out of an estimated population size of 51—by harassment in a *single* year. NMFS_614 (Table 103). This supposed "harassment" will occur from "sound exposure," but none of it, NMFS admits, will create the "likelihood of injury." Nor will it create the "potential to injure," as demonstrated by the Marine Mammal Protection Act ("MMPA") incidental take rule ("MMPA Rule") NMFS cited, where NMFS found that *zero* sperm whales and *zero* Rice's whales would be exposed to sound from Program activities at a level that creates the "potential to injure" (*i.e.,* "Level A harassment" under the MMPA). *See* 89 Fed. Reg. 31,488, 31,514 (Apr. 24, 2024) (Table 6); *see id.* at 31,534 ("The absence of survey activity in this area and significant reduction in associated exposures of Rice's whales to seismic airgun noise is expected *to eliminate the likelihood of auditory injury* of Rice's whales." (emphasis added)).

NMFS admits it has adopted the U.S. Fish and Wildlife Service's ("FWS") regulatory definition of ESA "harassment"—that is, an action "*which creates the likelihood of injury* to wildlife by annoying it to such an extent as to *significantly* disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3 (emphases added). But NMFS justifies its classification of ESA "harassment" for tens of thousands of events that do not meet this standard on the basis that "activity qualifying as Level B harassment under the MMPA will generally satisfy the ESA threshold for harassment because both standards focus on the *likelihood of behavioral disruption* rather than the certainty for physical harm." NMFS Br. 37 (emphasis added). This is entirely erroneous.

ESA harassment does not involve a "likelihood of behavioral disruption"—it requires a "likelihood of injury" caused by a "significant" disruption of behavioral patterns. 50 C.F.R.

§ 17.3. But MMPA Level B harassment does not require either a "likelihood of injury" or "significant" behavioral disruption—only the "potential to disrupt" behavioral patterns. If the act causing that disruption is so significant that it creates a "potential to injure," then it is Level A harassment under the MMPA, *not* Level B harassment. *See* 16 U.S.C. § 1362(18)(A).[10] And there is a clear difference between the "potential to disrupt" and the "potential to injure" (or a "likelihood of injury"), as demonstrated by the MMPA Rule, in which NMFS found tens of thousands of the former and *zero* of the latter. 89 Fed. Reg. at 31,514.

NMFS also argues that "an activity that qualifies as Level B harassment under the MMPA may reasonably be understood as harassment under the ESA as well, ensuring consistency in the protection of marine mammals and listed species across both statutory schemes." NMFS Br. 41. This justification is equally bad. Level B harassment cannot "reasonably be understood as harassment under the ESA" because, it can never have the "potential to injure" and thus never have the required "likelihood of injury." If NMFS were interested in consistency, it could have counted MMPA *Level A* harassment as ESA harassment, given the similar standards. But counting Level B harassment as ESA harassment only creates *inconsistencies*. For example, by doing so, NMFS applied the correct "likelihood of injury" standard to all animals covered by the 2025 BiOp *except* to marine mammals. And there is nothing consistent about one NMFS decision—the MMPA Rule—finding that zero Rice's whales and sperm whales will experience a "potential for injury" and another NMFS decision—the 2025 BiOp—finding those whales will suffer a "likelihood of injury" from the *same*

---

[10] Level A harassment is "*any* act of pursuit, torment, or annoyance"—whether act causing behavioral disturbance or otherwise—that creates the "potential to injure a marine mammal or marine mammal stock in the wild." 16 U.S.C. § 1362(18)(A)(i) (emphasis added).

*activities*. Activities that do not have the "potential to injure" cannot under any rational formulation lead to a "likelihood of injury."

As support, NMFS cites Section 17 of the ESA, which states that "no provision of this [Act] shall take precedence over any more restrictive *conflicting* provision of the Marine Mammal Protection Act of 1972." 16 U.S.C. § 1543 (emphasis added). But NMFS identifies no conflict between the ESA and MMPA, and there is none. *San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation Dist.*, 49 F.4th 1242, 1249 (9th Cir. 2022) ("only where two statutes are mutually prohibitive does an irreconcilable conflict exist").

ESA Section 7(b)(4) simply requires that any ESA incidental take—whether harassment or otherwise—of marine mammals that has separately been authorized under the MMPA is exempted from the ESA's take prohibition. 16 U.S.C. § 1536(b)(4). For example, if NMFS had found that sperm whales would suffer a "likelihood of injury" sufficient to cause ESA "harassment," and if those acts of harassment were also authorized under the MMPA as Level A harassment, then NMFS would be required to "exempt" that take. And if the harassment was not authorized under the MMPA, then NMFS could not have exempted that take—just as it did not exempt take associated with alleged vessel strikes or pile driving.[11] But nothing in the ESA or the MMPA requires or even allows NMFS to exempt acts from the ESA take prohibition that do not qualify as ESA take in the first place—such as MMPA Level B harassment.

NMFS also tries to muddy the water by citing cases that do not address whether MMPA Level B harassment can be treated as ESA harassment. For example, *Natural Resources Defense*

---

[11] *See* NMFS_610 ("while we quantify incidental take of Rice's whale and sperm whale from vessel interaction, and Rice's whale from pile driving sound, incidental take of animals from stressors from these activities cannot be exempted under the ESA until such time as takes are authorized under section 101(a)(5) of the MMPA").

*Council, Inc. v. Pritzker*, 828 F.3d 1125, 1131 (9th Cir. 2016), and *Melone v. Coit*, 100 F.4th 21, 30-32 (1st Cir. 2024), do not even involve any ESA issues. *See* NMFS Br. 28. *Cook Inletkeeper v. Raimondo,* 533 F. Supp. 3d 739, 755-59, 763-64 (D. Alaska 2021), is inapt because it merely held that NMFS failed to consider the effects of tug noise generally in its MMPA authorization and in its ESA biological opinion. *Cook Inletkeeper* involved no claims challenging an ITS or the application of "harassment." In *Native Village of Chickaloon v. NMFS*, 947 F. Supp. 2d 1031, 1066 n.272 (D. Alaska 2013), NMFS claimed that its opinion broadly "consider[ed] all potential takes associated with this action, including the ones covered under the more inclusive MMPA definition of harassment," but the propriety of that position was never disputed.

By contrast, in a more recent case, the same judge that decided *Chickaloon* approved an ITS in a FWS BiOp that expressly *excluded* MMPA Level B harassment:

> MMPA Level B harassment constitutes acts causing a "potential to disturb" and Level A harassment includes acts causing a "potential to injure." In contrast, "no ESA take can occur unless the act creates a 'likelihood of injury' (an element of 'harass' under the ESA) or 'actually kills or injures' a marine mammal (an element of 'harm' under the ESA)." Accordingly, MMPA Level B harassment is generally not ESA take, and "not all instances of MMPA Level A harassment rise to the level of ESA harm."

*Sovereign Iñupiat for a Living Arctic v. BLM*, 701 F. Supp. 3d 862, 908 (D. Alaska 2023) (citations omitted), *aff'd in part, rev'd in part on other grounds and remanded sub nom. Ctr. for Biological Diversity v. BLM*, 141 F.4th 976, 992 n.4 (9th Cir. 2025). The court agreed that where an action "would not create a likelihood of injury" to a protected species, then "there would be no ESA harassment or take" *Id*. at 913 (citation modified).[12]

---

[12] NMFS also cites *Center for Biological Diversity v. Salazar*, 695 F.3d 893, 913-14 (9th Cir. 2012), claiming it approves "MMPA take accounting functions as a reliable surrogate for ESA take accounting." NMFS Br. 36. But that case did not address any "take accounting" because

(continued . . .)

In sum, the consequence of NMFS's unlawful action is the attribution of tens of thousands of ESA "takes" of whales to the Program that, under NMFS's own definition, are not ESA take. NMFS says the discrepancy is irrelevant because it would have imposed a reasonable and prudent measure anyway. NMFS Br. 40. But that is just another *post hoc* rationalization. It is equally plausible (if not probable) that NMFS developed its first reasonable and prudent measure—for seismic surveys to use the quietest configuration of equipment necessary to conduct geophysical surveys—because it had attributed tens of thousands of sperm whale takes to the Program. NMFS's misapplication of the standard was harmful.

**D.    NMFS's "Reasonable and Prudent Measures" Violate the ESA.**

"Reasonable and prudent measure" #1 requires seismic surveys to use the "quietest configuration of equipment necessary to conduct geophysical surveys." NMFS_618-19. NMFS acknowledges that it cannot "alter the basic design, location, scope, duration, or timing of" planned surveys, or make more than a "minor change." NMFS Br. 41 (citing 50 C.F.R. § 402.14(i)(2)). But its only defense of "reasonable and prudent measure" #1—which requires changes to the basic design of surveys—is to cite the terms and conditions for the measure. The terms and conditions caveat that the selected configuration need not compromise "data acquisition" and still must "accomplish[] the goals of the survey." NMFS_619. These are empty promises. The goals of a seismic survey are almost always to gather the most data possible in the shortest amount of time practicable. Requiring the "quietest configuration possible" necessarily requires changing the basic "design, location, scope, duration, or timing of" planned surveys. Applicants provided NMFS with recommended changes to this measure and the associated terms

---

(. . . continued)
FWS did not quantify take. Rather, the court held that the "more conservative" MMPA standards operate as reasonable surrogates for the ESA "jeopardy" standard. *Salazar*, 695 F.3d at 913-14. *Salazar* does not address whether MMPA Level B harassment can qualify as ESA harassment.

and conditions that could have avoided these problems and complied with 50 C.F.R. § 402.14(i)(2). *See* NMFS_2519. But, like Applicants' other comments, NMFS ignored them.

"Reasonable and prudent measure" #4 addresses "unauthorized releases of trash, debris, or oil associated with the Oil and Gas Program activities." NMFS_619. NMFS does not dispute, and therefore concedes, that this measure exceeds the scope of its authority because illegal trash release is not "incidental." 50 C.F.R. § 402.02 (defining incidental take). NMFS instead argues that Plaintiffs lack standing because the Bureaus, not industry, are the ones required to implement "reasonable and prudent measure" #4. That is wrong. The oil and gas lessees are the ones who must implement the marine debris collection protocols and provide the Bureaus with the data required for this measure. *See* NMFS_734-39. Plaintiffs therefore have standing to challenge "reasonable and prudent measure" #4. *Bennett*, 520 U.S. at 169 (farmers had standing to challenge biological opinion based on its coercive effect on action agencies).

## III.  THE APPROPRIATE REMEDY IS REMAND WITHOUT VACATUR

Plaintiffs and NMFS agree that the appropriate remedy is remand without vacatur. The only dispute appears to be whether a remand should also include a judicially imposed deadline. NMFS Br. 43-45. NMFS asks for separate remedy briefing on this narrow issue. NMFS Br. 43. This is an unnecessary waste of time. The Court clearly has authority to impose a reasonable deadline and retain jurisdiction. *See* Plaintiff Br. 35. If NMFS believes it needs more time to complete a remand, it can provide an alternative reasonable timeline to the Court in its reply.

## IV.  CONCLUSION

The Court should declare the 2025 BiOp arbitrary, capricious, and contrary to law, and remand to NMFS to reconsult with the Bureaus and Applicants and produce a new, lawful BiOp.

DATED: October 6, 2025.

Respectfully submitted,

/s/ *James A. Holmes*
JAMES A. HOLMES – BAR #20571
CHRISTOVICH & KEARNEY, LLP
601 Poydras Street, Suite 2300
New Orleans, LA 70130-6078
Tel: (504) 561-5700
jaholmes@christovich.com
kanderson@christovich.com

STOEL RIVES LLP
Ryan P. Steen (*pro hac vice*)
Jason T. Morgan (*pro hac vice*)
Tiffany M. Wang (*pro hac vice*)
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500
ryan.steen@stoel.com
jason.morgan@stoel.com
tiffany.wang@stoel.com

*Attorneys for American Petroleum Institute*

/s/*Michael R. Phillips*
Michael R. Phillips (#21020)
Claire E. Juneau (#33209)
Jeffrey J. Gelpi (#37130)
KEAN MILLER LLP
BankPlus Tower
909 Poydras St., Suite 3600
New Orleans, LA 70112
(504) 585-3050
mike.phillips@keanmiller.com
claire.juneau@keanmiller.com
jeff.gelpi@keanmiller.com

Sarah C. Bordelon (*pro hac vice*)
HOLLAND & HART LLP
5470 Kietzke Lane, Suite 100
Reno, NV 89511
(775) 327-3011
scbordelon@hollandhart.com

ELIZABETH B. MURRILL
Attorney General of Louisiana

/s/ *Caitlin A. Huettemann*
CAITLIN A. HUETTEMANN –
BAR #40402
Assistant Solicitor General
OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 888-7903
HuettemannC@ag.louisiana.gov

*Attorneys for the State of Louisiana*

Sean Marotta (*pro hac vice*)
Dana A. Raphael (*pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

John S. Moran (*pro hac vice*)
MCGUIREWOODS LLP
888 16th Street N.W. Suite 500
Washington, D.C. 20006
(202) 828-2817
jmoran@mcguirewoods.com

*Counsel for Plaintiff Chevron U.S.A. Inc.*