ADAM R.F. GUSTAFSON, Principal Deputy Assistant Attorney General
MEREDITH L. FLAX, Deputy Section Chief
MICHAEL R. EITEL, Acting Assistant Section Chief
DAVIS A. BACKER, Trial Attorney (CO Bar No. 53502)
SARA M. WARREN, Trial Attorney (GA Bar No. 966948)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, North Terrace, Suite 600
Denver, CO 80202
Tel: (202) 305-5469 (Backer)
Tel: (202) 598-5785 (Warren)
Fax: (202) 305-0275
Email: davis.backer@usdoj.gov
Email: sara.warren@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| STATE OF LOUISIANA, et al., | * | |
| | * | Hon. James D. Cain, Jr. |
| *Plaintiffs*, | * | Mag. Judge Thomas P. LeBlanc |
| | * | |
| v. | * | |
| | * | Civil No.: 2:25-cv-00691-JDC-TPL |
| NATIONAL MARINE FISHERIES | * | |
| SERVICE, et al., | * | |
| | * | |
| *Defendants*, | * | |
| | * | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR
## CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.  NMFS' vessel strike analysis and jeopardy determination are entitled to deference. ........ 2

    A.  NMFS rationally considered real-world vessel strike incidents. ............................... 3

    B.  NMFS did not engage in a *post-hoc* rationalization of its jeopardy determination. .................................................................................................... 7

    C.  NMFS' analytical approach is rational and entitled to deference. ............................ 8

        1.  NMFS' conclusions were rational and did not apply a presumption in favor of the species. ............................................................................... 8

        2.  NMFS' analysis properly incorporated Blondin (2025). .................................. 10

        3.  NMFS considered the best available scientific information about the distribution of the Rice's whale in the western Gulf of America. .................... 11

        4.  NMFS' carcass recovery rate assumption for the Rice's whale is a rational estimate based on the best available science. ....................................... 13

        5.  NMFS explained its disagreement with the Bureau's findings. ........................ 15

        6.  NMFS considered the Applicants' comments. .................................................. 17

II.  The RPA is rational. .................................................................................................. 17

III.  NMFS applied the correct legal standard when estimating anticipated take levels in its ITS. ........................................................................................................... 18

    A.  Plaintiffs' theory collapses under the statutory structure Congress created expressly tying ESA marine mammal take to the MMPA. ...................................... 18

    B.  Plaintiffs' attempt to sever ESA harassment from MMPA Level B harassment ignores long-recognized overlap between significant behavioral disturbance and injury. ..................................................................................... 19

    C.  Plaintiffs' harassment argument is irrelevant to NMFS' jeopardy determination and does not undermine the BiOp. ................................................................... 21

IV.  RPM #1 complies with the ESA and NMFS' statutory authority. .................................... 22

V.  Remedy ................................................................................................................... 24

CONCLUSION ................................................................................................................... 25

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*BCCA Appeal Grp. v. U.S. EPA,*
   355 F.3d 817 (5th Cir. 2003) ................................................................. 3

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
   462 U.S. 87 (1983) ................................................................. 3, 8, 14

*Camp v. Pitts,*
   411 U.S. 138, (1973) ................................................................. 6

*Corley v. United States,*
   556 U.S. 303 (2009) ................................................................. 19

*Ctr. for Biological Diversity v. EPA,*
   861 F.3d 174 (D.C. Cir. 2017) ................................................................. 24

*Ctr. for Marine Conservation v. Brown,*
   917 F. Supp. 1128 (S.D. Tex. 1996) ................................................................. 23

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.,*
   423 U.S. 326 (1976) ................................................................. 24

*Gulf Restoration Network v. Salazar,*
   683 F.3d 158 (5th Cir. 2012) ................................................................. 17

*Healthy Gulf v. U.S. Army Corps of Eng'rs,*
   81 F.4th 510 (5th Cir. 2023) ................................................................. 17

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.,*
   120 F. Supp. 2d 1005 (M.D. Fla. 2000) ................................................................. 23

*M.D. by Stukenberg v. Abbot,*
   907 F.3d 237 (5th Cir. 2018) ................................................................. 24, 25

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.,*
   70 F.4th 582 (D.C. Cir. 2023) ................................................................. 8, 9, 10

*Milliken v. Bradley,*
   418 U.S. 717 (1974) ................................................................. 24

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................................................. 4

*Nat. Res. Def. Council v. Pritzker*,
   828 F.3d 1125 (9th Cir. 2016) ................................................................. 21

*Nat'l Wildlife Fed'n v. NMFS*,
   524 F.3d 917 (9th Cir. 2008) ............................................................... 7, 8

*PPL Wallingford Energy LLC v. FERC*,
   419 F.3d 1194 (D.C. Cir. 2005) ............................................................ 16

*Pub. Emps. for Env't Resp. v. Beaudreau*,
   25 F. Supp. 3d 67 (D.D.C. 2014) .......................................................... 15

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ..................................................... 14, 15, 24

*Sierra Club v. Nat'l Marine Fisheries Serv.*,
   No. 8:20-cv-3060, 2024 WL 3860211 (D. Md. Aug. 19, 2024) ................. 4

*Sierra Club v. U.S. Dep't of Interior*,
   990 F.3d 898 (5th Cir. 2021) ................................................................. 14

*Sovereign Inupiat for a Living Arctic v. BLM*,
   701 F. Supp. 3d 862 (D. Alaska 2023) .................................................. 21

*Sw. Elec. Power Co. v. U.S. EPA*,
   920 F.3d 999 (5th Cir. 2019) ................................................................... 3

*Texas v. U.S. EPA*,
   137 F.4th 353 (5th Cir. 2025) ............................................................ 3, 14

*United States v. Bowen*,
   818 F.3d 179 (5th Cir. 2016) ................................................................. 12

**Statutes**

16 U.S.C. § 1362(18)(A)(ii) ........................................................................ 20

16 U.S.C. § 1536 ........................................................................................ 16

16 U.S.C. § 1536(a)(2) ............................................................................ 8, 15

16 U.S.C. § 1536(b)(3) .............................................................................. 17

16 U.S.C. § 1536(b)(3)(A) ......................................................................... 17

16 U.S.C. § 1536(b)(4)(C) ........................................................................... 18

16 U.S.C. § 1536(b)(4)(C)(ii) ..................................................................... 23

16 U.S.C. § 1543 ........................................................................................ 18

## Regulations

50 C.F.R. § 17.3 ......................................................................................... 20

50 C.F.R. § 402.14(d) ................................................................................... 2

50 C.F.R. § 402.14(h)(3) ............................................................................ 15

## Federal Register

86 Fed. Reg. 47022 (Aug. 23, 2021) .......................................................... 12

## <u>TABLE OF ACRONYMS</u>

| APA | Administrative Procedure Act |
|-----|------------------------------|
| API | American Petroleum Institute |
| BiOp | Biological Opinion |
| BOEM | Bureau of Ocean Energy Management |
| BSEE | Bureau of Safety and Environmental Enforcement |
| ESA | Endangered Species Act |
| ITS | Incidental Take Statement |
| MMPA | Marine Mammal Protection Act |
| NMFS | National Marine Fisheries Service |
| RPA | Reasonable and Prudent Alternatives |
| RPM | Reasonable and Prudent Measure |

## <u>INTRODUCTION</u>

The National Marine Fisheries Service's 2025 biological opinion on oil and gas program activities in the Gulf of America reflects the agency's painstaking work of assessing the effects of offshore energy development on ESA-listed species. The result was a comprehensive opinion spanning nearly 700 pages, that is grounded in the best available science, and is designed to ensure that offshore energy production proceeds in compliance with the law. Plaintiffs' opposition only highlights the fundamental flaw in their case: they refuse to engage with the actual record or the governing legal standards, instead repackaging policy disagreements as supposed violations of the APA and ESA. Their critique depends on the premise that NMFS must accept Plaintiffs' preferred assumptions, disregard uncertainty, and treat the limited accounts of reported vessel strikes as proof that none can occur. But NMFS was obligated to evaluate likely effects on ESA-listed species using the best available scientific information—not the optimistic conjecture Plaintiffs urge—and to apply its expert judgment to a record that shows that Rice's whales face risks primarily from vessel traffic. Plaintiffs' insistence that NMFS should adopt their preferred narrative only underscores how little their case is grounded in the administrative record.

In the end, Plaintiffs cannot point to a single determination in NMFS' 2025 BiOp that is unsupported by the record or irrational on its face. For good reason. NMFS explained in detail why real-world data, the species' status and distribution, and established scientific literature require a more rigorous analysis of vessel-strike risk. And NMFS properly applied the law in performing this inquiry. For these reasons, Plaintiffs' challenge fails. NMFS fully complied with its statutory obligations and the Court should grant Defendants' cross-motion for summary judgment.

1

## ARGUMENT

**I.    NMFS' vessel strike analysis and jeopardy determination are entitled to deference.**

NMFS rationally determined that vessel collisions are the primary risk to the Rice's whale. It explained that the northern Gulf of America, where the Rice's whale lives, is an area with a high amount of vessel traffic. Also, the Rice's whale tends to spend the majority of the night near the surface of the water, which makes it more vulnerable to ship strikes. AR 190-91. NMFS therefore evaluated the effects of vessel strikes involving oil and gas program vessels on the Rice's whale in its biological opinion. AR 359-83.

Defendants' opening brief describes NMFS's analytical method in detail. ECF No. 35 at 24-29 ("Defs.' Mem."). Briefly summarizing that method here, NMFS evaluated vessel data for the Gulf of America provided by the Bureaus and supplemented that data with vessel data obtained directly from the Department of Transportation. After NMFS identified the data set for vessel traffic, it used an analytical method known as a "co-occurrence method," which allowed NMFS to consider the population density of the Rice's whale alongside the vessel traffic data to determine an estimate of the vessel strike risk of the Rice's whale. NMFS' use of the co-occurrence model is an approach with ample support in scientific literature. *See* AR 86993. Based on this model, NMFS estimated that, over the forty-five year duration of the Program covered by the BiOp, there would be eleven fatal vessel strikes of Rice's whales, and that approximately five Rice's whales would be struck by vessels but experience minor injuries or no injuries. AR 380-81.

To account for the most up-to-date science, and, in part, to address the concerns raised by certain Plaintiffs,[1] NMFS added a new analytical method to its lethal strike analysis to account

---

[1] Federal action agencies provide Applicants an opportunity to provide information during formal consultation. *See* 50 C.F.R. § 402.14(d). During the consultation, Plaintiffs American Petroleum Institute

for the specific characteristics of the Rice's whale and the whale's potential ability to avoid a collision. Incorporating that additional analytical method, referred to here as the "Blondin methodology," NMFS concluded there would be a relatively reduced risk of a lethal vessel strike related to oil and gas program vessels, compared to the risk assessed by the co-occurrence model alone. This could be as low as one Rice's whale over the forty-five-year period covered by the BiOp, if the Rice's whale always tries to avoid vessel strikes, or five strikes, if the Rice's whale never actively tries to avoid a vessel strike. Given the preliminary nature of the Blondin methodology, NMFS averaged its initial estimate that eleven Rice's whales would be struck (based on the co-occurrence model) with the estimates from the Blondin methodology, supplementing the output from the co-occurrence model with the newest analytical information.

When, as here, an agency makes scientific predictions and uses models to address complex scientific issues, as NMFS did here, "a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983); *see also Texas v. U.S. EPA*, 137 F.4th 353, 369 (5th Cir. 2025) ("[C]ourts routinely defer to agency modeling of complex phenomena" where "model assumptions" "have a 'rational relationship' to the real world."); *BCCA Appeal Grp. v. U.S. EPA*, 355 F.3d 817, 834 (5th Cir. 2003). An agency's analytical method is entitled to a presumption of regularity, leaving any challengers with a "considerable burden." *Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (citation omitted).

### A.    NMFS rationally considered real-world vessel strike incidents.

As explained above, NMFS used modeling to estimate the total number of Rice's whales

---

("API") and Chevron U.S.A., Inc. ("Chevron") were granted Applicant status and were given an opportunity to provide information.

likely to be struck by oil and gas program vessels. Before explaining its modeling, NMFS explained that Rice's whales are vulnerable to vessel strikes in the Gulf of America based on real-world incidents of such vessel strikes. In 2009, a cargo vessel struck a Rice's whale, unbeknownst to the crew, and carried the whale carcass into port in Tampa Bay on the ship's bow. AR 370. In 2019, a Rice's whale was seen swimming with a spinal deformation consistent with past vessel strike injury. Also in 2019, another Rice's whale stranded in the Everglades and was found to have a healed break in its scapula and one of its ribs, likely consistent with a healed vessel-strike injury. NMFS noted that, in December 2020, an oil and gas program vessel fatally struck a sperm whale. *Id.* NMFS also noted other instances of lethal strikes of sperm whales dating to the 1990s. AR 371. In their reply, Plaintiffs argue that NMFS should have ignored this real-world evidence that Rice's whales have been killed and injured in collisions with vessels in the Gulf of America, and that an oil and gas vessel struck and killed a different species of whale in the Gulf of America in 2020. ECF No. 36 ("Pls.' Reply") at 8-11. Plaintiffs argue that, instead, NMFS should have only considered that no oil and gas vessel has reported a lethal Rice's whale strike and ended the inquiry there. *Id.* Plaintiffs cannot carry their burden of showing that NMFS's consideration of those real-world examples of whale-vessel collisions in the Gulf of America was arbitrary and capricious. NMFS evaluated the relevant information and did not—as Plaintiffs suggest it should have done—ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And, Plaintiffs' argument that NMFS should not have used any analytical method is at odds with the court's order vacating the 2020 BiOp in the District of Maryland. *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. 8:20-cv-3060, 2024 WL 3860211, at *35 (D. Md. Aug. 19, 2024) ("How many protected animals are hit by ships depends on two variables: *how much* vessels travel and

*where* they travel."), *amended*, 2024 WL 6817999 (D. Md. Oct. 21, 2024).

Plaintiffs continue to quibble with the vessel data—that oil and gas program vessels are too small, too slow, and in the wrong location to strike whales—but their arguments about the impossibility of a vessel strike are belied by the fact that an oil and gas program vessel struck and killed a sperm whale in 2020. Pls.' Reply at 10-11; AR 182, 372. And, despite Plaintiffs' repeated efforts to minimize the size of the vessels associated with the oil and gas program (Pls.' Reply at 10-11), a variety of vessels are involved in program activities, including smaller service vessels *and* barges and tankers, including tankers with a 550,000-barrel cargo capacity. AR 78-80. As another example, in connection with floating production and storage and off-loading units in the Gulf of America, BOEM expects up to 110 shuttle tanker transits across the Gulf of America annually. AR 363.

Both the co-occurrence method and the Blondin methodology used by NMFS also account for vessel speed. *See* AR 374-76, 382. NMFS specifically accounted for vessel speed in assessing the oil and gas program's proportion of vessel strike risk. *See* AR 379-82. There is also anecdotal information indicating that oil and gas vessels travel at speeds that can result (and have resulted) in a fatal strike. AR 110986. Finally, as to Plaintiffs' argument that oil and gas program vessels do not travel in areas used by the Rice's whale, Plaintiffs understate the vessel data. In 2023 alone, program vessels traveled approximately 23 million kilometers, crisscrossing the Gulf of America. AR 368. As to the species data, NMFS used density estimates based on actual Rice's whale sightings and peer-reviewed literature. AR 311. NMFS found a strike of a Rice's whale by a program vessel is more likely in the western Gulf of America, where Rice's whales have been sighted and detected more in recent years. AR 379.

NMFS also rationally concluded that vessel strikes of whales in the Gulf of America,

including by oil and gas program vessels, may go unnoticed and, in some cases, noticed but unreported. AR 369-72. Plaintiffs argue that any oil and gas program vessels would notice and report any strikes of Rice's whales, and therefore such strikes could not have happened. (Pls.' Reply at 10.) But NMFS pointed to evidence otherwise in the BiOp. In 2009, a vessel lethally struck a Rice's whale without the crew noticing. AR 370. NMFS also acknowledged reports from a protected species observer that indicated vessel strikes are sometimes unreported "on a fairly regular basis." AR 370. But even the December 2020 strike of a sperm whale by an oil and gas program vessel—which BSEE concluded was an unfortunate accident—illustrates how difficult it can be to avoid a strike, and why the crew might not even notice the strike at the time. *See* AR 182, 372, 110981-91. The December 2020 strike occurred when the vessel was traveling at twelve knots, an average speed for an outer continental shelf vessel (but above the threshold at which a strike typically becomes fatal for a whale), during good weather and sea conditions for visibility. AR 110986. The crew was trained to avoid vessel strikes of whales, and the second officer and other crew were keeping watch on the bridge. *Id.* Despite those precautions, a strike occurred, and the crew only experienced the strike as "similar to hitting a big wave." AR 372. For that reason, NMFS concluded that strikes could go unnoticed depending on the circumstances at sea.[2] *Id.*

NMFS also relied on Jensen and Silber's 2004 research on vessel strikes in concluding that many vessel strikes of whales go unnoticed. *Id*. Jensen and Silber compiled a database of 292 confirmed or possible vessel strikes, and forty-two of those collisions were unnoticed until

---

[2] Plaintiffs' arguments rely, in part, on the document that is the subject of Plaintiffs' untimely motion to complete or supplement the record. *See* Pls.' Reply at 9-10; ECF No. 37. That document is not part of the administrative record and should not be considered by the Court. *See* ECF No. 47; *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). It is also unclear how this document adds anything new.

the whale was brought into port draped across the bow of the vessel. AR 47790. In many other cases, whale carcasses were observed, and whale strike was suspected or determined to be the cause of death based on the results of a necropsy or other circumstances. *E.g.*, AR 47801.

**B.     NMFS did not engage in a *post-hoc* rationalization of its jeopardy determination.**

Plaintiffs argue that Federal Defendants offered a *post-hoc* rationalization that NMFS found even a single lethal strike could lead to jeopardy, but NMFS' express findings in the BiOp say otherwise. AR 571-72. NMFS concluded that the lethal and sublethal effects of vessel strike are likely to appreciably reduce survival and recovery of the Rice's whale in the wild and therefore the action is likely to jeopardize the continued existence of the Rice's whale. AR 572. "Given the population size and status of Rice's whale, *any* effects that may reduce the fitness of individual [whales] or result in mortality *will affect the population*. The death of one female . . . would affect vital rates because calf production would decline, and would constitute the loss of approximately 4% of the breeding population." AR 571 (emphasis added). In reaching the jeopardy conclusion, NMFS emphasized the low growth rate of the Rice's whale, its current population size, and its reproductive characteristics. AR 572. Based on these findings, NMFS proposed an RPA that, if implemented, would avoid jeopardizing the whale by reducing the risk of vessel strikes of Rice's whales to zero. AR 605, 615.

Next, Plaintiffs seem to suggest there is a heightened standard for making a jeopardy determination, but their misplaced reliance on *National Wildlife Federation v. NMFS*, 524 F.3d 917, 930 (9th Cir. 2008), fails to support that argument. In that case, the Ninth Circuit evaluated whether NMFS properly considered the environmental baseline in a BiOp and restated the requirements of Section 7 as "an agency may not take action that will tip a species from a state of precarious survival into a state of likely extinction." But there, NMFS did not make a positive

jeopardy finding, and, in fact, there was no discussion of numeric take in the Ninth Circuit's opinion. *See id.*

Plaintiffs also overlook the very next sentence in *National Wildlife Federation* after the sentence it cited: "[E]ven where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm." *Id.* The bedrock principle of the ESA—that Federal agencies like the Bureaus consult with NMFS to ensure that their actions are not likely to jeopardize the continued existence of the species, *see* 16 U.S.C. § 1536(a)(2)—rebuffs Plaintiffs' argument that the Rice's whale cannot be in jeopardy from just one vessel strike each year because, based on the carcass recovery rate NMFS assumed for the Rice's whale, it is possible that several Rice's whales die of all causes each year. As the Ninth Circuit explained, the consultation process protects species; it does not give license to deepen jeopardy where a species is already in trouble. *Nat'l Wildlife Fed'n*, 524 F.3d at 930.

**C.    NMFS' analytical approach is rational and entitled to deference.**

**1.    NMFS' conclusions were rational and did not apply a presumption in favor of the species.**

NMFS' analytical approach in this case is sound. NMFS used a fully-explained model informed by real-world evidence of vessel strikes of Rice's whales and other whales in the Gulf of America, and based on assumptions grounded in the best available scientific and commercial data about vessels, species density, and the behavior and characteristics of the Rice's whale. *See Balt. Gas & Elec. Co.*, 462 U.S. at 103.

Plaintiffs continue to rely on *Maine Lobstermen's Association v. National Marine Fisheries Service*, 70 F.4th 582, 599 (D.C. Cir. 2023), a case that is inapposite here. Pls.' Reply at 13-16. *Maine Lobstermen's Association* involved a Section 7 consultation between two different divisions within NMFS about the impacts of fisheries on the North Atlantic right whale.

NMFS ultimately reached a "no jeopardy" determination for the species by relying on a conservation framework. 70 F.4th at 590. But, in its analysis, NMFS found that the lobster and Jonah crab fisheries would kill an unsustainable forty-six North Atlantic right whales each decade through entanglements alone. *Id.* at 600-01. NMFS faced numerous uncertainties in making that determination, including attributing whale deaths not just to different causes like fishing gear entanglement and vessel strikes but also attributing those deaths to sources in different countries, and NMFS stated in the BiOp that it made assumptions in its analytical approach to provide "the benefit of the doubt to the species." *Id.* at 589-90. The Court determined that this presumption was legal error because (1) NMFS did not explain a departure from its own interpretive rules in applying that presumption and (2) the presumption had no basis in the statute. *Id.* at 598-600. That presumption, combined with NMFS' own acknowledgment that it did not stand by its modeling, led the Court to conclude that the BiOp was arbitrary and capricious. *Id.*

Here, unlike in *Maine Lobstermen's Association*, NMFS made no presumption in favor of the Rice's whale. The BiOp affirmatively stated that, based on NMFS' quantitative analysis, lethal vessel strikes were reasonably certain to occur. AR 571. And this was not a pessimistic presumption. NMFS used the co-occurrence method—an analytical approach repeatedly endorsed by the literature—to estimate the effects of vessel strike on the species. NMFS also incorporated the Blondin methodology to account for a new analytical method that would let NMFS consider additional variables, including whale avoidance. NMFS' modeling is based on the best available scientific and commercial information, and NMFS fully explained its assumptions. As the court explained in *Maine Lobstermen's Association*, "in most realistic cases, however, the Service will be able to make a scientifically defensible decision without resort to a

presumption in favor of the species. When it does so, the Service's predictions will be entitled to deference." 70 F.4th at 600. NMFS is entitled to such deference here.

### 2.    NMFS' analysis properly incorporated Blondin (2025).

NMFS' model also properly incorporated the Blondin analysis. The Blondin methodology was based on a 2025 study, brand new at the time the BiOp was being prepared. NMFS used this new methodology to incorporate more factors, such as a whale's potential ability to avoid a strike, into its evaluation than the co-occurrence method alone. This new methodology provided a framework for incorporating more factors than NMFS could consider relying on the co-occurrence method alone, such as a whale's ability to avoid a vessel strike. NMFS acknowledged that its analysis using the Blondin methodology was preliminary, there was no way to validate the absolute estimates of the model, and further species-specific information would need to be developed in future model runs. AR 381-82. Thus, NMFS acknowledged the importance of addressing cutting-edge science while also explaining the shortcomings of such a method when applied to Rice's whales.

Plaintiffs challenge this analysis. But, as an initial matter, at least one Plaintiff, Chevron U.S.A., Inc., specifically pointed NMFS to the Blondin approach when it was given an opportunity to submit information as an Applicant. AR 2473. Plaintiffs cannot sustain claims that the Blondin analysis was "unrealistic, pessimistic, and unsupported" when the Blondin methodology was incorporated to address Plaintiff's comments. *See* Pls.' Reply at 14.

Plaintiffs also argue that the Blondin analysis was a preordained approach designed to reach "at least" one vessel strike (and therefore a jeopardy determination). *Id.* at 13-14. One run of the Blondin model predicted that program vessels would strike 0.78 Rice's whales over a forty-five-year period, and NMFS rounded that number up to one vessel strike. Plaintiffs argue

NMFS rounded that number up to "guarantee[]" a jeopardy finding. This argument is squarely at odds with Plaintiffs' argument, addressed above, that Federal Defendants have offered a *post-hoc* explanation that a single, fatal vessel strike could lead to jeopardy. Of course, 0.78 does "round up" to one, and Plaintiffs point to no reason why this rounding was unreasonable. Nor do Plaintiffs support their rote speculation that model inputs were designed to get to a specific result.[3] The Court should not indulge Plaintiffs' unsupported speculation that NMFS incorporated the Blondin analysis simply to reach a preordained result. *See id*. The agency considered all the outcomes of the scientific models, adopted the midpoint of those projections (not the nadir, or the most pessimistic outcome). The best available science supports a conclusion of six lethal vessel strikes, not one.

3. **NMFS considered the best available scientific information about the distribution of the Rice's whale in the western Gulf of America**.

Describing the distribution of the Rice's whale, NMFS explained that recent vessel and aerial surveys from 2023 and 2024 have added to scientific understanding of the Rice's whale's distribution. Once thought more confined to the area of the De Soto Canyon, Rice's whales have now been observed (and in some cases photographed) off the coasts of Louisiana and Texas. AR 187. NMFS also explained that acoustic data indicated Rice's whales have been detected in the central and western Gulf of America. *Id.* Because the Rice's whale has recently been sighted and detected in the western Gulf of America, Plaintiffs' argument that a Rice's whale has "never" been observed specifically at Grand Isle is of no moment. *See* Pls.' Reply at 16. Rosel (2021), for

---

[3] Plaintiff similarly argues that NMFS's determination, applying the traditional co-occurrence method, that there was an annual vessel strike risk of 0.87 was also calculated to preordain a "non-zero" number of strikes. Pls.' Reply at 13. That claim entirely sidesteps the agency's science and reasoning in developing the annual vessel strike rate. AR 380; Defs.' Mem. at 25-29.

instance, noted that a female "GOMx Bryde's-like whale"[4] was stranded at SouthWest Pass (near Grand Isle) in 2005, and notes numerous other possible strandings of Rice's whales in Louisiana. AR 84913-15. The literature also notes that Grand Isle is on the edge of the 100-to-400-meter isobath where Rice's whales have been detected. AR 188 (citing Soldevilla 2022).

In its co-occurrence grid model to determine the vessel strike risk to the Rice's whale, NMFS used Rice's whale density estimates from Garrison et al. (2024), a peer reviewed publication which NMFS expressly found contained the "best available density estimates" for the Rice's whale. AR 311. Plaintiffs identify no other density estimates and point to no better data. Instead, Plaintiffs argue that NMFS' model improperly relied on Garrison 2024 for species density data in the western Gulf of America. Plaintiffs raise this argument—and for that matter, any argument about NMFS reliance on Garrison 2024 and any attack on NMFS's species density estimate—for the first time in its reply brief, and therefore that argument is abandoned. *See* Pls.' Reply at 17-18; ECF No. 33-1; *United States v. Bowen*, 818 F.3d 179, 192 n.8 (5th Cir. 2016) (per curiam) ("[A]ny issue not raised in [a litigant's] opening brief is forfeited.").

Plaintiffs also misapprehend Garrison 2024 in arguing that Garrison's density estimates were only "habitat suitability maps." Pls.' Reply at 17.[5] Garrison modeled animal density using real-world whale sightings survey data ranging from the waters off the coast of Florida to Texas. Garrison used animal density data to examine relationships between animal density and bathymetric and oceanic features and to create a density surface model. AR 38840. Garrison's data set included a sighting of a Rice's whale in Texas in 2017, and Garrison explained that the

---

[4] Based on additional taxonomic research, the ESA-listed population of Gulf of Mexico Bryde's whale was renamed Rice's whale. See 86 Fed. Reg. 47,022 (Aug. 23, 2021).

[5] Plaintiffs appear to cite only to the "literature cited" section of Garrison, *see* Pls.' Reply at 17 (citing AR 38851-52), so it is difficult to determine the exact basis for Plaintiffs' argument. Garrison does not discuss "habitat-suitability maps." AR 38837-54.

model's predictions for western and central Gulf of America were supported by data on whale strandings from 1954 to 2012, as well as other literature. AR 38849. So, like many models, Garrison's model included real data points alongside consideration of other variables. The portion of the Gulf for which Garrison did not use real whale-sighting data was the southern Gulf of America (*i.e.*, off the coast of Mexico). For those waters, Garrison indicated the model could be used to extrapolate predictions about suitable habitat. *See* AR 38837, 38850. As NMFS observed, Rice's whale vocalizations were detected in the waters off the Mexican coast, "validat[ing] habitat predictions from Garrison et al. (2024)." AR 187. And, as noted above, NMFS also pointed to sightings of Rice's whales in Texas and Louisiana in recent years, which is consistent with Garrison's density modeling.

### 4. NMFS' carcass recovery rate assumption for the Rice's whale is a rational estimate based on the best available science.

In its model, NMFS used a five percent carcass recovery rate to estimate unobserved vessel strikes of Rice's whales based on its scientific judgment and the best available information. NMFS "sought information on carcass recovery rates," but that information was not available in the literature. AR 380. Not having species-specific information, NMFS used an approach from a 2017 publication by Rockwood, which used carcass recovery rates for other whale species as a proxy to model recovery rates for three species of baleen whales, specifically blue, humpback, and fin whales. AR 380, 84748. Rockwood observed that recovery estimates for other cetacean species included seventeen percent for right whales, less than five percent for gray whales, 6.5 percent for killer whales, and 3.4 percent for sperm whales. AR 84748. Rockwood also noted that the right whale is an outlier because it is the most buoyant whale species. *Id.* Right whales live in colder water and have more blubber. Thus, Rockwood used five percent as a best estimate for baleen whales, with seventeen percent to produce minimum estimates for vessel

13

strikes. *Id*. Similar to Rockwood, NMFS used a five percent best estimate for the carcass recovery rate for the Rice's whale. NMFS declined to use seventeen percent to produce minimum estimates for Rice's whales because Rice's whales live in warmer waters and have less blubber than a cold-weather right whale (and are therefore more likely to sink than a right whale and, thus be undiscovered). AR 380.

Plaintiffs argue that NMFS should not have used a carcass recovery rate to model the vessel strike risk because the rate could not be determined with absolute certainty. Pls.' Reply at 18-19. But neither the ESA nor APA require certainty in the science before an agency may act. *Texas v. EPA*, 137 F.4th at 369. Instead, when an agency makes scientific predictions and uses models to address complex scientific issues, "a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co.*, 462 U.S. at 103. NMFS' assumption of a five percent carcass rate is well-explained, rational, and based on the approach used in peer-reviewed literature, and therefore entitled to deference.

Plaintiffs also argue that the Rockwood 2017 value for right whales is out of date and that the current recovery rate for the right whale is thirty-seven percent, citing in part extra record evidence. Pls.' Reply at 19. Plaintiffs' citation to extra-record evidence, which it has not even attempted to introduce into the record should be disregarded. *See supra* at 6 n.2. Even if that information were properly before the Court, the carcass recovery rate for right whales is irrelevant because, as NMFS explained, it is the most buoyant whale species and a clear outlier from the many other whale species considered in Rockwood 2017. AR 380, AR 84748. Plaintiffs therefore point to no "better" data that the agency should have considered. *See Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021) ("'best scientific and commercial data'" does not mean the data a party would have preferred"); *see also San Luis & Delta-Mendota*

*Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014).

Plaintiffs also argue that it is inconsistent for NMFS to consider behavioral similarities between North Atlantic right whales and Rice's whales (as NMFS did in incorporating the Blondin analysis), but not to apply the carcass recovery rate for the right whale to the Rice's whale. Pls.' Reply at 20. Both whale species are baleen whales that may have similar behaviors, but, even so, NMFS caveated the Blondin analysis as preliminary and noted that individual data about the Rice's whale such as refined swim speed estimates should be obtained in future analysis using the Blondin approach. AR 382. Moreover, NMFS explained that the right whale's recovery rate is simply not a proxy for the Rice's whale because the two species have very different buoyancy. AR 380.[6]

### 5.      NMFS explained its disagreement with the Bureau's findings.

As explained in Federal Defendants' opening brief, during a consultation, NMFS may adopt all or part of the Bureaus' biological assessment, but it must also use the best available scientific and commercial information and apply its own best judgment to render an independent determination when developing its biological opinion. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(h)(3); *see also Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 107-10 (D.D.C. 2014) (the Services must make an independent determination in the Section 7 consultation process). During the consultation, NMFS disagreed with the action agencies' analysis, and, in some cases, NMFS identified new scientific material and new data that reflected its independent assessment of the proposed action and its effects on species. Those

---

[6] Plaintiffs argue that Federal Defendants' explanation in their brief, Defs.' Mem. at 32-33, that a five percent carcass rate is not statistically impossible simply because it "seems" high to Plaintiffs is a *post-hoc* rationalization. Not so. Federal Defendants argued that Plaintiffs cannot rely on Plaintiffs' supposition that the carcass recovery rate for the Rice's whale "seems" high and is therefore impossible where the record documents numerous Rice's whale strandings over the past three decades, and where the assumed carcass recovery rate is not, based on simple math, "impossible." Defs.' Mem. at 32-33.

disagreements are reflected in the BiOp.

Plaintiffs misrepresent the meaning of NMFS' ESA regulations on this point. They argue that, essentially, NMFS must agree with every statement made in the Biological Assessment under § 402.12(j), which states that NMFS must "respond in writing within 30 days as to whether or not [NMFS] concurs with the findings of the biological assessment." But this is not the "findings" with which NMFS is agreeing. Those findings are described in § 402.12(a), which explains that a biological assessment asks the action agency to determine whether a "species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation . . . is necessary." Here, NMFS agreed that this action will "adversely affect" the Rice's whale, among numerous other species. Plaintiffs' extraordinary interpretation of NMFS's own regulations would essentially render the biological assessment the biological opinion. There would be no need for consultation at all, if Plaintiffs view was correct.

In a consultation, NMFS is not required to flag every instance of disagreement with the action agencies. Plaintiffs cite no case law in support of their argument to the contrary. Instead, Plaintiffs cite a D.C. Circuit case involving the Federal Energy Regulatory Commission's ("FERC") decision to reject an energy company's agreement with another energy company to provide electric power. That case stands for the wholly inapt principle that, under D.C. Circuit law, FERC should meaningfully respond to objections raised by a party during a commission proceeding. *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005). Plaintiffs cite no law giving a third-party the right to sue, in an ESA Section 7 case, over the party's perception that the consulting agency did not specifically address every point of disagreement with the action agency. Nor could they, as the ESA does not provide for public participation and comment in Section 7 consultations, *see* 16 U.S.C. § 1536, and the ESA itself

16

only mandates that NMFS provide a "summary of the information on which the opinion is based" 16 U.S.C. § 1536(b)(3).

### 6.    NMFS considered the Applicants' comments.

In their opening brief, Plaintiffs argued "NMFS Failed to Consider and Address Applicant[s'] Expert Opinion." They argued at length that NMFS improperly rejected the report Plaintiffs submitted many weeks after the deadline to submit comments on the draft BiOp, and just a week before the BiOp was due to be finalized. As explained in Defendants' opening brief, NMFS was not required to consider that untimely opinion. *Healthy Gulf v. U.S. Army Corps of Eng'rs*, 81 F.4th 510, 522 (5th Cir. 2023); *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 174-75 (5th Cir. 2012). Now, on reply, Plaintiffs pivot, raising new arguments that NMFS failed to address its comments that (1) the population density estimates from Garrison 2024 were "habitat suitability maps"; (2) there were no detections of the Rice's whale at Grande Isle; and (3) the five percent carcass recovery rate was overly conservative. Each of those arguments is flawed, and each is addressed above and in the BiOp.

## II.    The RPA is rational.

Under the ESA, if NMFS determines that a federal action is likely to jeopardize an ESA-listed species' continued existence, it will suggest RPAs, if any, to avoid the likelihood of jeopardy. 16 U.S.C. § 1536(b)(3)(A). Here, NMFS determined that the oil and gas program—specifically, the risk of vessel strikes—was likely to jeopardize the continued existence of the Rice's whale. AR 571. Having reached a "jeopardy" conclusion, NMFS proposed a multi-pronged RPA to allow the program to proceed in compliance with ESA Section 7(a)(2). The RPA was designed to reduce the risk of vessel strikes by implementing strike avoidance and monitoring requirements with the use of technology. AR 600-05.

The RPA is a suggestion and recommendation to the action agency "that would allow the action to proceed in compliance with section 7(a)(2)" of the ESA. AR 598. In their opening brief, Federal Defendants pointed out that Plaintiffs' claim that they have been injured by the RPA seems speculative at this juncture, before the RPA has been accepted by the Bureaus. Plaintiffs argue they can challenge the RPA now because they have standing to challenge the BiOp. This misses the point. Plaintiffs filed their lawsuit mere hours after the BiOp was made public, without giving the Bureaus an opportunity to determine whether or how they will accept or implement the RPA. In any event, the RPA is rational and should be upheld for the reasons explained in Defendants' opening brief. Defs.' Mem. at 40-41.

## III. NMFS applied the correct legal standard when estimating anticipated take levels in its ITS.

Plaintiffs' challenge to NMFS' ITS rests on a fundamentally flawed premise: that NMFS was prohibited from relying on the MMPA's harassment framework as a basis for estimating take under the ESA. But the statutory text, NMFS' longstanding practice, and the relevant line of authority confirm that NMFS acted exactly as Congress intended when it used MMPA Level B harassment estimates as proxies for ESA harassment to quantify incidental take of marine mammals. Plaintiffs' argument on this score fails for at least three independent reasons.

### A. Plaintiffs' theory collapses under the statutory structure Congress created expressly tying ESA marine mammal take to the MMPA.

Plaintiffs' harassment theory fails because it ultimately cannot be squared with the statutory structure Congress enacted. Congress addressed how incidental take of marine mammals must be treated under ESA Section 7 and did so in two provisions: 16 U.S.C. §§ 1543 and 1536(b)(4)(C). The former establishes that the ESA must yield to any more restrictive conflicting provisions of the MMPA. Meanwhile, the latter then directs that NMFS may exempt

18

incidental take of marine mammals under the ESA only to the extent that such take has been separately authorized under the MMPA. These two provisions work in tandem, ensuring that the MMPA—the more stringent statute—sets the parameters for what take may be exempted in an ESA biological opinion for marine mammals.

Plaintiffs' theory, however, would artificially divorce the connected statutory schemes (and terms) without any statutory basis to do so. By insisting that ESA "harassment" is necessarily narrower than MMPA harassment, Plaintiffs would create a statutory scheme in which a marine mammal take authorized under the MMPA would often not qualify as ESA harassment and therefore could not be exempted in an ESA biological opinion—rendering Section 7(b)(4)(C) meaningless. Courts consistently refuse to adopt statutory interpretations that nullify express provisions or render Congressional direction meaningless. *Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons [is] that 'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'"). The only interpretation of these two statutes that gives effect to both the ESA and MMPA, and preserves the harmony Congress intended, is NMFS' using the MMPA's framework—including its Level B behavioral disturbance—as the logical baseline for estimating and exempting incidental take for marine mammals under ESA Section 7.

### B. Plaintiffs' attempt to sever ESA harassment from MMPA Level B harassment ignores long-recognized overlap between significant behavioral disturbance and injury.

Plaintiffs assert that Level B harassment can never qualify as ESA harassment because Level B does not require a "potential to injure." *See, e.g.*, Pls.' Reply at 25-26. But that misstates both the MMPA and ESA. The MMPA defines Level B harassment to include acts that have the "potential to disturb" by causing disruption of behavioral patterns such as migration, breathing,

nursing, breeding, feeding, or sheltering. 16 U.S.C. § 1362(18)(A)(ii). These disturbances can impose significant energetic, reproductive, or survival costs on individuals and populations even absent immediate physical injury. NMFS' longstanding scientific and policy guidance explains that such significant disruption of behavioral patterns can reasonably be expected "to create or increase the risk of injury" because chronic or severe behavioral disturbance impairs vital functions and can ultimately compromise fitness. NMFS Procedure 02-110-19 at 3. NMFS' policy guidance goes on to state explicitly that disrupting behavior can be enough to establish a likely injury. *Id*. ("[A]n analysis that indicates a likelihood of a significant disruption in behavior patterns establish the 'likelihood of injury.' A separate analysis of 'likelihood of injury' is not needed[.]"). Meanwhile, the U.S. Fish and Wildlife Service's ESA implementing regulations defines "harass" as an intentional or negligent act that creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering. 50 C.F.R. § 17.3.[7] Both standards plainly focus on the *likelihood of behavioral disruption* rather than the certainty of physical harm.

Plaintiffs, for their part, do not grapple with this scientific reality and instead propose a regime in which thousands of predicted behavior-disturbance events affecting endangered whales would be treated as legally irrelevant because those exposures allegedly do not result in immediate physical injury. That view is not only inconsistent with the scientific consensus about the cumulative and energetic impacts of chronic disturbance, but it would also severely under-protect marine mammals by erasing an entire category of take recognized by both Congress and the courts. For instance, the Ninth Circuit in *Natural Resources Defense Council v. Pritzker*

---

[7] As explained in Defendants' opening brief, NMFS adopted similar language in its "Guidance on the Endangered Species Act Term 'Harass.'" NMFS Procedure 02-110-19 at 2.

accepted NMFS' use of acoustic thresholds and behavioral-response modeling to quantify non-injury harassment from sonar, expressly acknowledging that the resulting behavioral disruptions can "force marine mammals to make trade-offs like delaying migration, delaying reproduction, reducing growth, or migrating with reduced energy reserves." 828 F.3d 1125, 1131 (9th Cir. 2016). The fact that neither party in *Pritzker* chose to appeal the specific ESA claims at issue in the case is irrelevant when the Court expressly acknowledged the likelihood of disruption to the very behavioral patterns identified in NMFS' interpretation of harassment under the ESA. *Compare id*. *with* NMFS Procedure 02-110-19 at 2.

Plaintiffs, meanwhile, rely on a recent district court case claiming that it "approved an ITS in a [U.S. Fish and Wildlife Service] BiOp that expressly *excluded* MMPA Level B harassment[.]" Pls.' Reply at 28 (citing *Sovereign Inupiat for a Living Arctic v. BLM*, 701 F. Supp. 3d 862, 908 (D. Alaska 2023)) (emphasis in original). This framing is misleading. Plaintiffs here merely quote a passage where the court cites language directly from the challenged BiOp in the case. The court did not hold that MMPA Level B harassment could not amount to ESA harassment and the plaintiffs in that case did not make this argument in briefing, nor did the court consider the question. Even if those plaintiffs had raised a similar argument, the challenged BiOp was issued by the U.S. Fish and Wildlife Service—not NMFS. As a result, the Alaska District Court was not analyzing NMFS' policy that explains the substantial overlap between MMPA Level B harassment and ESA harassment.

### C.    Plaintiffs' harassment argument is irrelevant to NMFS' jeopardy determination and does not undermine the BiOp.

Even indulging Plaintiffs' misinterpretation of the ESA harassment standard, their challenge to the ITS cannot undermine the BiOp's jeopardy determination because the alleged error has nothing to do with NMFS' core conclusions. NMFS' finding that the oil and gas

program is likely to jeopardize Rice's whales was based entirely on the risk of lethal vessel strikes—not on acoustic harassment or behavioral disturbance. Indeed, the BiOp expressly states that the jeopardy risk accrues from the anticipated frequency and lethality of vessel-strike interactions, which NMFS determined would threaten the survival and recovery of an already extremely small population. AR 598 ("The RPA described below reduces or avoids the primary threat to Rice's whales in our analysis, the risk of injurious and lethal vessel strike interaction. The impacts of other stressors that are part of the proposed action are more limited in space and time, diffuse, or not likely to result in adverse effects to Rice's whale."). Harassment was not determined to be the proximate cause of injury, and Plaintiffs do not contend otherwise.

Nor did harassment estimates drive the Reasonable and Prudent Alternative or the associated protective measures designed to avoid jeopardy. As Defendants previously explained, the only reasonable and prudent measure, a component of the incidental take statement unrelated to the jeopardy analysis, that could conceivably bear any connection to the MMPA Level B harassment of which Plaintiffs complain—requiring use of the quietest technically feasible seismic equipment—address adverse impacts to sea turtles, as well as whales covered under the MMPA. AR 618-19. Accordingly, the RPM has independent significance apart from the take estimates for harassment. Plaintiffs' speculation that NMFS might have imposed a different RPA had it applied Plaintiffs' preferred definition of harassment is precisely the type of conjecture that does not satisfy the APA's arbitrary and capricious standard. Because Plaintiffs cannot connect their harassment argument to any defect in NMFS' jeopardy analysis or the chosen mitigation measures, their challenge to the ITS fails on its own terms.

## IV.    RPM #1 complies with the ESA and NMFS' statutory authority.

Under Section 7(b)(4), when NMFS concludes that incidental take is reasonably certain

to occur, it must include an incidental take statement that specifies measures to minimize the impact of that take. 16 U.S.C. § 1536(b)(4)(C)(ii). RPM #1—requiring seismic surveys to use the "quietest configuration of equipment necessary to conduct geophysical surveys"—does exactly what the ESA requires: it minimizes the impacts of take that NMFS reasonably concluded are likely to result from these surveys across the Gulf. AR 619; *see also Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 120 F. Supp. 2d 1005, 1022 (M.D. Fla. 2000) (finding that the consulting agency "is entitled to deference" when identifying mitigation measures "due to its biological expertise.").

NMFS documented the anticipated impacts from these surveys at length in the 2025 BiOp. *See, e.g.*, AR 401-479 (providing seventy-eight pages of analysis on how sound will affect listed species). The impacts and the anticipated take support the agency's judgment that some reasonable means of minimizing the effects are "necessary or appropriate." 16 U.S.C. § 1536(b)(4)(C)(ii). And the "quietest configuration" approach applied through RPM #1 is, in NMFS' considered judgment, necessary to help minimize the impacts of these and other takings expected in the ITS. *Loggerhead Turtle*, 120 F. Supp. 2d at 1022 ("[T]he choice of minimization and mitigation measures lies within the [agency's] discretion."); *see also Ctr. for Marine Conservation v. Brown*, 917 F. Supp. 1128, 1150 (S.D. Tex. 1996). Plaintiffs mischaracterize the RPM as violating the "minor change" rule and assert that it "necessarily requires changing the basic 'design, location, scope, duration, or timing of' planned surveys." Pls.' Reply at 29. But NMFS could not have been more clear that this RPM allows regulated parties to operate in a way that accommodates their specific survey needs without compromising data acquisition. *See* AR 619 (describing the relevant Terms and Conditions for RPM #1). These accommodations are not "empty promises" as Plaintiffs assert, Pls.' Reply at 29, but thoughtful adjustments that were

made in response to industry concerns.

## V.    Remedy

Plaintiffs' critiques over a thorough 700-page BiOp do not undermine the reasonableness of NMFS' analysis. Without more, Plaintiffs are entitled to no relief. But if the Court does find a violation, the parties "agree that the appropriate remedy is remand without vacatur." Pls.' Reply at 30. Defendants do not agree, however, that it would be appropriate for the Court to issue any remedy order without separate briefing on the issue, specifically tailored to the Court's merits ruling.

The issues in this case are complex, and the potential consequences of any remedy order could be far reaching—for regulated parties, regulating agencies, and listed species alike.[8] That Plaintiffs do not call for vacatur of the 2025 BiOp does not change this fact. The Court ought to be assured that it is fully informed of these potential consequences in light of the Court's decision before it issues any final remedy. *See Milliken v. Bradley*, 418 U.S. 717, 744 (1974) ("The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation."); *see also M.D. by Stukenberg v. Abbot*, 907 F.3d 237, 271-72 (5th Cir. 2018).

Plaintiffs dismiss Defendants' request in a single sentence claiming it to be an

---

[8] For this reason, in the event of remand, the Court should not dictate to the agency "the methods, procedures and *time dimension* of the needed inquiry[.]" *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) (per curiam) (emphasis added). Artificial deadlines and timetables can constrain an agency's ability to conduct a proper, thorough analysis. *See, e.g.*, *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 606 ("We wonder whether anyone was ultimately well-served by the imposition of tight deadlines in a matter of such consequence. Deadlines become a substantive constraint on what an agency can reasonably do."); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 189 n.12 (D.C. Cir. 2017) (declining to retain jurisdiction and oversee deadlines). To the extent the Court does order a deadline for any remand, Defendants cannot at this time reasonably estimate how long NMFS will need as the appropriate scope of remand will turn on the precise nature of any deficiencies that the Court identifies. By contrast, Plaintiffs' request that the Court impose a twelve-month deadline for completion of any remand is, by its nature, arbitrary.

"unnecessary waste of time." *Id*. Not only is their position entirely undeveloped, but it contradicts the position they took as Defendant-Intervenors in the parallel proceedings in the District of Maryland. *See Sierra Club et al. v. NMFS*, No. 8:25-cv-1627-DLB, ECF No. 43 at 3 (describing API and Chevron's position that "briefing on appropriate remedy should be deferred until after the Court rules on the merits."). As Defendants argued in their opening brief, Plaintiffs should have no objection to proceeding similarly here.

<u>**CONCLUSION**</u>

NMFS' 2025 BiOp represents the agency's most comprehensive and up-to-date evaluation of how offshore oil and gas activities across the Gulf of America are likely to affect ESA-listed species. Guided by prior consultations and explicit judicial direction, NMFS exercised its expert scientific judgment, based on the best scientific and commercial information available, that vessel traffic associated with the oil and gas program is likely to jeopardize the continued existence of the endangered Rice's whale, and it fully explained the basis for that conclusion. NMFS likewise crafted an ITS that reasonably accounted for anticipated take by harmonizing the ESA and MMPA as Congress intended, ensuring that the full scope of likely impacts was lawfully addressed. Plaintiffs' challenge ultimately amounts to little more than disagreement with NMFS' expert judgments, inviting the Court to instead credit industry's preferred assumptions. The APA, however, does not authorize courts to second-guess an agency's expert judgment, or to substitute Plaintiffs' preferred science for NMFS' reasoned conclusions. Because Plaintiffs have failed to show that any aspect of the 2025 BiOp is arbitrary, capricious, or otherwise contrary to law, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion in full.

Dated: December 17, 2025                    ADAM R.F. GUSTAFSON,

Principal Deputy Assistant Attorney General
MEREDITH L. FLAX, Deputy Section Chief
MICHAEL R. EITEL, Acting Assistant Section Chief

*/s/ Davis A. Backer*
DAVIS A. BACKER, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, North Terrace, Suite 600
Denver, Colorado 80202
Tel: (202) 305-5469
Fax: (202) 305-0275
Email: davis.backer@usdoj.gov

SARA M. WARREN, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Benjamin Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 598-5785
Fax: (202) 305-0275
Email: sara.warren@usdoj.gov

*Attorneys for Defendants*