# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

STATE OF LOUISIANA ET AL         CASE NO.  2:25-CV-00691

VERSUS                        JUDGE JAMES D. CAIN, JR.

NATIONAL  MARINE FISHERIES        MAGISTRATE JUDGE LEBLANC
SERVICE ET AL

## MEMORANDUM RULING

Before the court are cross-motions for summary judgment filed, respectively, by plaintiffs the State of Louisiana, American Petroleum Institute, and Chevron USA Inc. [doc. 33] and defendants National Marine Fisheries Service ("NMFS") and Howard Lutnick, in his official capacity as Secretary of Commerce [doc. 34]. Both motions are opposed. Docs. 34, 35. Also before the court is a Motion to Complete or Supplement the Administrative Record [doc. 37], filed by plaintiffs with opposition [doc. 47] from defendants.

## I.
### BACKGROUND

#### A. Statutory Background

The Department of the Interior must comply with federal environmental laws in its oversight of offshore leasing. Section 7(a)(2) of the Endangered Species Act ("ESA") provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued

existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2). If the proposed action may affect a listed species, the agency must formally consult with either the National Marine Fisheries Service ("NMFS") or the Fish and Wildlife Service ("FWS"), depending on whether the species is marine or terrestrial. *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F.Supp.3d 147, 151 (D.D.C. 2014); *see* 50 C.F.R. §§ 402.01(b), 402.14(a).

NMFS, as applies here, then prepares a biological opinion using "the best scientific and commercial data available" to evaluate the proposed action's impact on the species. 16 U.S.C. § 1536(a)–(b); 50 C.F.R. § 402.12. Here it considers whether the proposed action is likely to violate the ESA by jeopardizing the continued existence of a listed species or resulting in the destruction or adverse modification of a critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(h)(1)(iv). If NMFS concludes that such a violation is likely and issues a "jeopardy" opinion, it must provide "reasonable and prudent alternatives" ("RPAs"). 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(1)(iv), (h)(2). RPAs are defined under the regulations as:

alternative actions identified during formal consultation [1] that can be implemented in a manner consistent with the intended purpose of the action, [2] that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, [3] that is economically and technologically feasible, and [4] that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.02. Following the issuance of a "jeopardy" opinion, Interior must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 653 (2007).

### B. Factual Background

This suit arises from the "Biological and Conference Opinion on the Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement's Oil and Gas Program Activities in the Gulf of America" (the "2025 BiOp") issued by NMFS on May 20, 2025, pursuant to Section 7 of the ESA. The 2025 BiOp evaluates the impact of activities regulated by the Bureau of Ocean Energy Management ("BOEM") and Bureau of Safety and Environmental Engineering on threatened and endangered species in the Gulf of America. Doc. 1, ¶ 1; *see* AR 001–701. The 2025 BiOp was published after an August 2024 ruling by the United States District Court for the District of Maryland in *Sierra Club v. National Marine Fisheries Service* ("Sierra Club I"), No. 8:20-cv-3060 (D. Md. Aug. 19, 2024), in which the Sierra Club and other environmental groups challenged various elements of NMFS's 2020 BiOp. The court ordered that the 2020 BiOp be vacated as of May 21, 2025, and NMFS issued the 2025 BiOp to take its place. *Id.* at docs. 204, 205, 220; AR 027.

The District of Maryland had concluded that the 2020 BiOp[1] violated the ESA and the Administrative Procedures Act ("APA") in the following respects:

> First, the BiOp underestimated the risk and harms of oil spills to protected species. Second, the jeopardy analysis for two listed species, the Rice's whale and the Gulf sturgeon, assumed these species' populations remained as large as they were before the catastrophic Deepwater Horizon oil spill ("DWH"), even though the record evidence and NMFS's own findings indicate that DWH significantly diminished their populations. Third, the [Reasonable and Prudent Alternatives] addressed only a couple of stressors that were likely to jeopardize Rice's whale, without explaining why addressing only those two problems was good enough or even explaining how the measures it proposed would prevent the jeopardy those two stressors would cause. Fourth, the ITS failed to recognize oil spill as incidental take and adopted an irrational surrogate for determining how many listed species would be taken by vessel strikes.

*Sierra Club I*, No. 8:20-cv-3060 at doc. 204, pp. 11–12 (D. Md. Aug. 19, 2024).

The resulting 2025 BiOp contained a new oil spill risk analysis along with an updated jeopardy analysis for all species with the most recent, post-Deepwater Horizon abundance numbers available. AR 499, 569, 588. After again arriving at a jeopardy conclusion for Rice's whale, NMFS recommended an RPA to BOEM and BSEE for protection of the whale during oil and gas operations in the Gulf of America. The RPA proposed additional measures from those recommended under the 2020 BiOp, targeted at the development and use of technology on oil and gas related vessels to monitor the presence of Rice's whale and help avoid strikes. AR 598–605.

---

[1] In late 2022, BOEM and BSEE had sent a letter to NMFS requesting the reinitiation of consultation on federally regulated oil and gas activities in the Gulf of America with the intent to update oil spill risk analysis and reexamine additional concerns raised by the District of Maryland litigation. AR 028. The letter triggered a technical assistance period during which NMFS provided guidance to the Bureaus for the preparation of a focused biological assessment. *Id.* Accordingly, this process was ongoing by the time the District of Maryland issued its ruling.

Within hours of NMFS issuing the 2025 BiOp, two separate lawsuits were filed to challenge the opinion. In the District of Maryland, the same environmental groups whose suit had given rise to the new BiOp filed a new suit alleging that NMFS was overly conservative in its assumptions.[2] *See Sierra Club v. Nat'l Marine Fisheries Svc.* ("Sierra Club II"), No. 8:25-cv-1627, doc. 1 (D. Md.). Meanwhile, plaintiffs in this suit assert that NMFS was not conservative enough and "brushed aside the available data . . . that concluded that the risk of a Program vessel striking a Rice's whale was so unlikely as to be discountable" before recommending additional burdensome measures on oil and gas operators. Doc. 33, att. 1, pp. 7–8. Accordingly, they seek declaratory and injunctive relief under the APA on the grounds that the 2025 BiOp and incidental take statement are arbitrary and capricious. The matter is now before the undersigned on cross-motions for summary judgment, based on an administrative record filed with the court. Docs. 33, 34. Plaintiffs also move to supplement the record in order to introduce comments provided by BSEE and BOEM in March 2025 to the draft version of the 2025 BiOp. Doc. 37. Defendants oppose the motion. Doc. 47.

## II.
## LAW & APPLICATION

### A. Motion to Supplement

Defendants first oppose the motion on the grounds that plaintiffs have not shown an adequate basis for modifying the court's scheduling order. On July 14, 2025, the same day

---

[2] Plaintiffs in this matter have intervened as defendants in *Sierra II* and filed a motion to transfer the case to this court. *Sierra II*, No. 8:25-cv-1627, at doc. 44 (D. Md.). The motion is still pending, opposed by the environmental group plaintiffs and unopposed by the federal defendants. *Id.* at docs. 57, 58.

defendants filed their answer and lodged the administrative record, the parties filed a joint stipulation as to the briefing schedule for this matter. Doc. 24. The court adopted same via order issued two days later. *Id.* at doc. 27. Under that schedule, the deadline for amendment of pleadings and any motions regarding the sufficiency of the administrative record was set for August 4, 2025. Doc. 27. But plaintiffs did not file the instant Motion to Complete or Supplement the Administrative Record [doc. 37] until October 6, when briefing on the parties' cross-motions for summary judgment was already well underway.[3]

Plaintiffs argue that their delay in filing this motion is a direct result of defendants' own delay. They note that they first requested inclusion of the bureau comments during the parties' meet-and-confer session on July 22, 2025, but defendants did not provide a response until August 4—the deadline for plaintiffs to file a motion regarding sufficiency of the record. Doc. 37, att. 3, ¶¶ 5–7. Accordingly, plaintiffs responded that day via email:

> Given the timing of your response to our request to include the [Bureau Comments] on the day the motion to complete the record is due, we will not be filing a motion on the record today, and will be proceeding to file our motion for summary judgment on August 11. API reserves all rights to later ask the court for leave to supplement or complete the record to include this document if necessary or appropriate to respond to arguments made in the Government's responsive briefing.

*Id.* at ¶ 8 (alterations in original). Plaintiffs maintain that defendants' assertion in their summary judgment response, that a vessel strike of a whale was similar to hitting a big

---

[3] The following day, the government filed a Motion to Stay Further Case Management Deadlines [doc. 39] due to the lapse in appropriations under the 2025 government shutdown. The court granted the motion and briefing resumed, based on deadlines set forth in that motion and a subsequent joint motion for extension, after funding to the federal government was restored. *See* docs. 39, 43.

wave and might go unnoticed by a ship's crew, is directly undermined by the bureau comments and necessitates that they be included in the record. *See* doc. 35, p. 21.

In response, defendants maintain that plaintiffs "had ample opportunity to prepare a motion in advance of Defendants' final position on their request" and observe that plaintiffs managed to file their complaint just hours after the challenged biological opinion was published online. Doc. 47, p. 9. Defendants also note that, under the parties' joint briefing schedule, any challenge to the sufficiency of the administrative record would result in a revised schedule for merits briefing. *See* doc. 27, p. 1 n. 1. Accordingly, they maintain that plaintiffs should not be allowed to disrupt summary judgment with an eleventh-hour challenge to the administrative record, based on a unilateral reservation of rights.

Upon review of the parties' respective positions, the court finds that good cause exists to excuse the late filing of this motion and that no disruption to the summary judgment briefing is needed. It was unreasonable for defendants to wait until the August 4 deadline to inform plaintiffs of their opposition. Further, there is no record of defendants opposing plaintiffs' reservation of rights. Finally, plaintiffs did not rely on the bureau comments in their own motion for summary judgment and have instead only raised them to refute arguments made by the defense. Defendants are not prejudiced and can address the comments in their reply.[4] Accordingly, the delay is excusable and the court turns to the merits of the motion.

---

[4] Defendants also argue that plaintiffs have waived any arguments relating to the bureau comments by not raising them in their motion for summary judgment. As noted supra, plaintiffs made a limited reservation of rights to which defendants offered no objection. Additionally, plaintiffs only cite the bureau comments to refute specific factual assertions made in defendants' own motion for summary judgment. Defendants may address these in their reply, which they have had ample time to craft thanks to the briefing delays since the 2025 government shutdown.

Under the APA, a court must "hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of the law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A), (C). The court's review is confined to "the whole record or those parts of it cited by a party." *Id.* at § 706; *see also Indep. Turtle Farmers of La., Inc. v. United States*, 703 F.Supp.2d 604, 610 (W.D. La. 2010) (quoting *Louisiana ex rel. Guste v. Verity*, 853 F.3d 322, 327 n. 8 (5th Cir. 1988)) ("Agency action is to be upheld, if at all, on the basis of the record before the agency at the time it made its decision."). This principle is known as the record rule and prevents the reviewing court from conducting a *de novo* trial. *Indep. Turtle Farmers of La., Inc.*, 703 F.Supp.2d at 610. But a complete administrative record must "include all materials that might have influenced the agency's decision, and not merely those on which the agency relied in its final decision." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 2019 WL 13159731, at *2 (M.D. La. May 14, 2019) (internal quotations omitted). The Fifth Circuit has allowed supplementation of the administrative record when: "(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, . . . (2) the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors, or (3) the agency failed to explain administrative action so as to frustrate judicial review." *Texas v. U.S. Dep't of Homeland Sec.*, 2023 WL 2842760, at *1 (S.D. Tex. Apr. 7, 2023) (quoting *Medina Cnty. Envir. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010)). "Supplementation, therefore, accords with the record rule and does not pose the

same difficulties as consideration of evidence not considered by the agency, which presents a more challenging legal question." *La Union del Pueblo Entero v. FEMA*, 141 F.Supp.3d 681, 694 (S.D. Tex. 2015) (cleaned up).

Plaintiffs first argue that the bureau comments were improperly withheld from the administrative record under the deliberative process privilege. This privilege applies to certain documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). In response, defendants admit that they are not invoking the deliberate process privilege but note that under the same principles, pre-decisional, deliberative documents are not part of the administrative record in the first place. *Accord Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019).

An agency "enjoys a presumption that it properly designated the administrative record" and a party challenging the completeness "bears the burden of identifying reasonable, non-speculative grounds for its belief that the documents were considered by the agency and not included in the administrative record." *Oceana, Inc. v. Locke*, 634 F.Supp.2d 49, 53–54 (D.D.C. 2009) (cleaned up), *rev'd on other grounds*, 670 F.3d 1238 (D.C. Cir. 2011)). But "[a]n agency cannot unilaterally determine what constitutes the administrative record, and its designation . . . is entitled to a presumption of administrative regularity only." *La Union del Pueblo Entero*, 141 F.Supp.2d at 693 (internal quotations omitted). Here, plaintiffs have identified sufficient grounds to overcome the agency's presumption.

Plaintiffs note that federal regulations under the Endangered Species Act require that NMFS discuss "the basis for any finding in the biological opinion" with the action agency, i.e. the Bureaus, during formal consultation. 50 C.F.R. § 402.14(g)(5). The 2025 BiOp states that NMFS "met with the Bureaus and applicants to discuss comments on the draft opinion." AR 030. Defendants' response brief also states that NMFS thoroughly considered "comments from BOEM," though the administrative record contains no separate entry for these comments. Doc. 47, p. 18. Defendants now fault industry plaintiffs for not incorporating the agencies' concerns into their own comments. They deny that the specific document in which the Bureau Comments are presented was ever submitted to NMFS. But they do not deny that it contains the substance of the bureaus' concerns, and that these concerns were presented to NMFS during its required consultation.

"The complete administrative record consists of all documents and materials directly **or indirectly** considered by the agency and includes evidence contrary to the agency's position." *City of Dallas, Tex. v. Hall*, 2007 WL 3257188, at *4 (N.D. Tex. Oct. 29, 2007) (citing *Bar MK Ranches v. Yeutter*, 994 F.2d 735, 739 (10th Cir. 1993)) (emphasis added). Based on plaintiffs' showing, it is evident that the Bureau Comments were at least indirectly considered by NMFS as part of its formal consultation. And given the inconsistencies between these comments and NMFS's findings in the BiOp, infra, the court must review those comments as the best evidence of the bureaus' positions during that consultation under arbitrary and capricious review. Accordingly, the Motion to Supplement will be granted.

## B. Motions for Summary Judgment

### 1. Legal Standard

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

### 2. Application

The APA requires that a court "hold unlawful and set aside" an agency action if it is found to be "arbitrary, capricious, [or] an abuse of discretion[.]" 5 U.S.C. § 706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The court "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (internal quotations omitted). Put another way, the reviewing court must ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423. In reviewing an agency's action, the court may only consider the reasoning articulated by the agency itself and may not credit post hoc rationalizations. *Wages and White Lion Investments, LLC v. USDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 53 (1983)).

In line with some of the concerns raised by environmental groups in the District of Maryland suit, the 2025 BiOp reevaluates the danger posed to Rice's whale by stressors associated with offshore oil and gas production. The 2025 BiOp thus reflects greater concerns about these stressors than the 2020 BiOp, with more associated recommended restrictions for oil and gas producers under the RPA. Plaintiffs assert that NMFS's jeopardy analysis and incidental take statement are flawed to the extent that they are arbitrary, capricious, and contrary to law, and that the resulting RPAs and RPMs violate the ESA to the extent that they rest on these flawed findings. Defendants maintain that NMFS's

jeopardy analysis, incidental take statements, and resulting RPAs and RPMs are rational and compliant with the ESA. Doc. 34, att. 1.

### a. Jeopardy analysis

Plaintiffs allege the following flaws in the NMFS's jeopardy analysis as to Rice's whale: (1) the projection of vessel strikes does not use the best available data and the "vessel strike risk percentages" are unsupported by real-world data; (2) NMFS used an improper methodology to predict vessel strikes; (3) NMFS failed to consider and address the bureaus' contrary findings and opinions; (4) NMFS failed to consider and address applicant expert opinion; (5) the five percent carcass recovery rate used by NMFS is "an unlawfully pessimistic assumption." Doc. 33, att. 1.

As noted *supra*, § 7(a)(2) of the ESA requires formal consultation between NMFS and the Department of the Interior regarding offshore leasing activities that may impact a listed marine species. NMFS then prepares a biological opinion based on "the best scientific and commercial data available" to "insure that any action authorized, funded, or carried out by [Interior] is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ." 16 U.S.C. § 1536(a)(2). "A key term limiting this duty is 'likely'" and a reviewing court must give the term "its 'ordinary, contemporary, common meaning.'" *Maine Lobstermen's Assoc. v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 595 (D.C. Cir. 2023) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433–34 (2019)). At the time it was added to the ESA, "likely" was defined as "[i]n all probability" and has been read by NMFS as meaning "more likely than not." *Id.* (internal quotations omitted; alterations in original). Accordingly, the statute is not

focused on "worst-case scenarios." *Id.* at 599. Instead, it "requires [NMFS] to use the best available scientific data" rather than "the most pessimistic." *Id.*

According to the bureaus' biological assessment, published in December 2024 as part of the formal consultation between Interior and NMFS, only two Rice's whales have shown evidence of vessel strikes to date—one from a carcass carried into Tampa Bay on the bow of a cargo ship in 2009 and another from a whale spotted in 2019 with a spinal deformation consistent with a vessel strike.[5] AR 2061; *see* AR 1198. Neither of these strikes was attributed to federal oil- and gas-related activities and only one was fatal. *Id.* The bureaus concluded:

> Due to the relatively low abundance of vessel routes originating from the eastern GOM; relatively low percentage of vessel traffic attributed to the Bureaus' oil and gas program activities within the GOM; lack of previous vessel strikes attributed to oil- and gas-related activities; and that all of the larger vessel types (LOA >80 meters) BOEM identified as conducting oil and gas activities on the OCS are expected to be typically operating either below or at the lower range of speeds noted to result in the majority of large whale ship strikes, as well as the proven effectiveness of existing protocols, we find the potential for vessel strikes to whales is unlikely to occur and, therefore, discountable. . . . Further, given the low level of program-related traffic through the Core Distribution Area and low level of program-related activities within the Core Distribution Area along with the aforementioned mitigations, the Bureaus find accidental vessel strikes "*may effect – are not likely to adversely effect*" (NLAA) Rice's whales. The Bureaus also find accidental vessel strikes "*may effect – are not likely to adversely effect*" (NLAA) the proposed Rice's whale critical habitat.

AR 2065.

---

[5] In the final BiOp, NMFS reported evidence of another vessel strike from a Rice's whale stranded in the Everglades in 2019. AR 370. The agency conceded that the whale appeared to have died from ingesting a piece of plastic, but noted that "experts at the Smithsonian report evidence of a ship strike to the specimen found in a healed break in its scapula and one of its ribs." *Id.*

In the draft biological opinion ("draft biOp"), issued just a few months later, NMFS rejected this analysis. Instead, relying on an "unpublished report from a protected species observer on a seismic vessel," it noted that many vessel strikes can go either unnoticed or unreported. AR 1197. NMFS also acknowledged the existing protocols for avoiding vessel strikes, but stated that it could not evaluate the efficacy of these measures. Due to a lack of data on compliance, it maintained, "a lack of reported or observed vessel strikes of whales by Oil and Gas-related vessels cannot be interpreted to mean that no strikes have occurred." AR 1200.

With scant data on past strikes, NMFS then resorted to modeling based on a series of pessimistic assumptions to predict future vessel strikes against Rice's whales. AR 1201. As to density, it admitted that "Rice's whale abundance estimations were determined differently because they are observed primarily in the northeastern GOM in a relatively small area close to the 200m isobath." AR 1138–39. It also admitted that "[t]he current best available abundance estimate for the Rice's whale is 51 animals, with a confidence interval of 20 to 130 whales and a minimum population estimate of 34." AR 1416 (citations omitted). Only seven Rice's whale carcasses have been recovered in the preceding 23 years, and only one of these bore evidence of a lethal vessel strike (the cargo incident described above). AR 1214, 84913–16. NMFS nevertheless applied a 5 percent carcass recovery rate to that single vessel strike fatality to conclude that 19 additional Rice's whales were killed by vessel strikes during the same 23-year period, for an estimated annual rate of .87 lethal Rice's whale vessel strikes. AR 1214. To estimate the proportion of this annual rate associated with oil and gas vessel traffic, "and given the critically

endangered status of Rice's whales," it multiplied the annual rate by the higher end estimate (i.e., 21 percent compared to 17 percent) of the proportion of vessel strike risk to Rice's whales due to oil and gas-related vessel traffic, yielding an estimate of .18 lethal Rice's whale strikes per year from oil and gas program-related vessel traffic and approximately nine (in reality, 8.22 "rounded up") Rice's whales projected to be killed or seriously injured in this manner over the next 45 years. AR 1214.

API responded with written comments, providing a report by Heidi King ("King report") that identified certain flaws in NMFS's analysis. AR 2508–16. Dr. King criticized the probability assertions made by NMFS, given the admitted uncertainties "in nearly all the data and methods used and the assumed future conditions[.]" AR 2509. She further criticized most of the assumptions as overly pessimistic or far-fetched, particularly the carcass recovery rate:

> A simple example of model validation is to consider whether the model and parameters generate plausible or improbable outcomes. For example, data available in the draft BiOp show that applying the 5% carcass recovery rate to the Rice's whale is not defensible as it would produce implausible results. The draft BiOp uses the 5% recovery rate and the one cargo vessel strike between 2002 and 2024 to conclude that there were 20 lethal vessel strikes of Rice's whales during that time period (1/0.05 = 20). But consider the fact that during that same time frame, there were a total of seven Rice's whale strandings with carcass recoveries (only one of which was the vessel strike) in the Gulf. Applying the same 5% recovery rate to the seven Rice's whale carcasses found from 2002 to 2024 yields a total mortality of 140 whales (7/0.05 = 140) during that time period. This seems highly implausible and likely impossible given the small population estimated for the species: The draft BiOp estimates the entire population of Rice's whales from 1992 to 2009 to be 44 whales and estimates the current population at 51 whales. It therefore seems impossible or at least inconsistent that 140 whales died between 2002 and 2024. The highly uncertain model produces output that contradicts population estimates. The 5% carcass recovery rate for Rice's whales is therefore not plausible.

AR 2513. Additionally, she noted that this rate "was calculated using numerous assumptions for other species in other locations" and that other researchers attempting to develop carcass recovery rates for Gulf species had been unable to do so "due to uncertainties in their abundance and/or population structure." AR 2514.

NMFS did not address these criticisms in issuing the final BiOp. Instead, it increased the risk of program vessel strikes from the "high end" 21 percent used in the draft BiOp to 27 percent. AR 379–80. In so doing, it continued to assume that the existing RPAs enacted through the 2020 BiOp were ineffective—ignoring the Bureaus' observation that the "absence of a report could also indicate complete compliance and effectiveness" of existing mitigation measures. Doc. 37, att. 2, p. 382.

NMFS also incorporated new data on the probability of whale avoidance to its vessel strike risk analysis, borrowing from a recent study by Blondin et al. on the behavior of North Atlantic right whales. AR 381. NMFS admitted, however, that "little is known about the active avoidance of oncoming vessels by Rice's whales" and so ran its model averaging estimates of vessel avoidance. AR 382–83. From this calculation it estimated that only six Rice's whales, as opposed to the nine proposed in the draft BiOp, would be killed or seriously injured by oil and gas vessels in the next 45 years. AR 383. Without explanation, NMFS used the estimate of nine lethal or serious injury vessel strikes in its jeopardy analysis rather than the six calculated based on the new inputs. AR 571. It subsequently admitted the error but did not revise the jeopardy conclusion or the associated multi-phased RPAs. Doc. 34, p. 28 n. 9. Instead, NMFS has concluded that due to the population size

and status of Rice's whale, "**any** effects that may reduce the fitness of individual [whales] or result in mortality will affect the population" and that "[t]he death of one female . . . would affect vital rates because calf production would decline, and would constitute the loss of approximately 4% of the breeding population." AR 571 (emphasis added).

The government defends the conclusions reached by NMFS, noting recent studies on the distribution of Rice's whale and the necessity of modeling vessel strike risks due to the absence of concrete data. It also responds to Dr. King's criticisms, maintaining that the carcass recovery rate was the "best available" and based on reasonable extrapolations from the recovery rates of other whale species.[6] Applying this rate to the 22 carcasses recovered over the last 67 years yields a total 440 Rice's whale deaths over that period (or 6.5 per year) from all causes, which defendants maintain is a reasonable rate based on the current estimated Rice's whale population. Doc. 34, pp. 32–33. But if this annual mortality rate is used, then 292.5 Rice's whale deaths would occur over the next 45 years and the six program vessel strike fatalities estimated for that period would only account for two percent of all Rice's whale deaths.

As plaintiffs note, NMFS's estimates rest on a series of worst-case scenario assumptions: that Rice's whale is abundantly present in the western Gulf, where it is seldom seen; that vessel strikes usually go unnoticed and even when they are noticed they are not reported; that the RPAs enacted under the 2020 BiOp are inadequate to avert vessel

---

[6] Plaintiffs point out that extrapolations were made from other whale species based on their blubber, but maintain that blubber has no role in carcass recovery rates and note that NMFS cites no studies discussing blubber content of Rice's whales or their tendency to float post-mortem. Doc. 36, p. 20. They also note that NMFS failed to account for the effects of the Gulf's currents and warmer waters in these extrapolations.

strikes; and that the vast majority of carcasses are never recovered. These assumptions are then used to support a jeopardy finding based on an impossibly low threshold—namely, that any incidental contact with a Rice's whale, which may or may not be present in the areas where oil and gas exploration are currently occurring and may or may not actively avoid contact with program vessels, threatens the entire species.

When faced with uncertainty, an agency should "make a scientifically defensible decision without resort to a presumption in favor of the species." *Maine Lobstermen's Ass'n*, 70 F.4th at 600. "The obvious purpose of the requirement that each agency 'use the best scientific and commercial data available' is to ensure that the ESA not be implemented haphazardly, on the basis of speculation and surmise." *Bennett v. Spear*, 520 U.S. 154, 176 (1997). That is the opposite of what NMFS has done here. At every turn, it reached for confirmation of jeopardy and the inefficacy of current measures by requiring proof of a negative or attempting to extrapolate from studies concerning different species in different habitats. It then provided an extra layer of insulation by opining that **any** risk of harm to any Rice's whale from an oil and gas exploration vessel could jeopardize the survival of the entire species. NMFS's analysis appears as means in search of an end: justifying additional restrictions on offshore drilling in order to achieve a settlement with environmental group plaintiffs in the District of Maryland litigation. This is an abdication of the agency's statutory mandate, as recently articulated in *Maine Lobstermen*. Accordingly, plaintiffs have shown that the jeopardy determination and resulting RPAs violate the ESA and APA. They are therefore entitled to summary judgment in this respect.

**b. Incidental take statements**

With its BiOp NMFS produced an incidental take statement ("ITS") specifying "the impact of [] incidental taking on the species" along with "those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact[.]" 16 U.S.C. § 1536(b)(4)(i)–(ii). Incidental take covered by an ITS is exempt from liability under § 9 of the ESA, provided measures are implemented to minimize the take of listed species. *Id.* at § 1536(o)(2). In the case of marine mammals, however, such take is only exempted to the extent that it is separately authorized under the Marine Mammal Protection Act ("MMPA"), § 101(a)(5). *Id.* at 1536(b)(4); *see* 16 U.S.C. § 1371(a)(5).

Plaintiffs challenge the ITS issued with the 2025 BiOp for its reliance on the definition of harassment under the MMPA, rather than the narrower definition under the ESA. Under the ESA, harassment is defined as an act "which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns . . . ." 50 C.F.R. § 17.3. Meanwhile, the MMPA's "Level B harassment" includes any act with "the potential to disturb," as opposed to injure, "a marine mammal." AR 039. Relying on the latter definition, NMFS estimated dozens of annual incidents of "[h]arassment from seismic survey sound exposure" to Rice's whale and thousands more to the endangered sperm whale. AR 614.

Plaintiffs also challenge the associated Reasonable and Prudent Measures ("RPMs") made with the 2025 BiOp's ITS, regardless of whether the correct standard for "harassment" was applied. The court agrees that RPMs #1 and 4 exceed the scope of ESA's authority and therefore finds it unnecessary to decide whether the correct harassment

standard was used. Namely, RPM #1 requires regulated parties to use the "quietest configuration of equipment necessary to conduct geophysical surveys."[7] AR 618–19. But the NMFS's authority on an ITS is limited; its RPMs "may involve only minor changes" and may not include "measures . . . [that] alter the basic design, location, scope, duration, or timing of the action[.]" 50 C.F.R. § 402.14(i)(2). The restrictions on equipment configuration may alter the basic design of a survey, even if the end results are achieved. Accordingly, this RPM is outside the scope of NMFS's regulatory authority.

RPM #4 states:

> BOEM, in conjunction with BSEE, shall compile, summarize, and include in their annual program report information regarding the effectiveness of PDCs and other required measures to control unauthorized releases of trash, debris, or oil associated with Oil and Gas Program activities to NMFS, including investigation reports or other information, as available.

AR 619. As defendants note, this RPM is addressed to the action agencies and is not a direct imposition on the regulated parties. But the unauthorized release of marine debris does not constitute an "incidental take" under NMFS regulations because it is not part of "carrying out an otherwise lawful activity." 50 C.F.R. § 402.02. Additionally, NMFS explained in the 2025 BiOp that it was not including the illegal release of marine debris in

---

[7] Defendants point out that the RPM includes certain hedging language:

> BOEM, in conjunction with BSEE, shall require that industry *consider* all configurations of equipment available for the type of survey being conducted *without compromising data acquisition*. The selected configuration should produce the lowest sound source levels (rms and/or peak to peak) over frequencies audible to the aforementioned ESA-listed species, *while still accomplishing the goals of the survey*.

AR 619 (emphasis added). But the measure is still expressed as a requirement, which would alter the design of the survey by placing restrictions on the equipment used. Notably, NMFS ignored API's suggestion for more permissive language requiring only that BOEM and BSEE "encourage permittees to consider sound source levels produced by available equipment" and "consider . . . configurations that produce the lowest sound source levels (rms and/or peak to peak) while still accomplishing the purpose and goals of the survey." *See* AR 2519.

the ITS for this reason. AR 587. Because the oil and gas lessees are the regulated parties who must implement marine debris collection protocols and provide the bureaus with the required data, they have standing to challenge the measure. And because the measure is not rationally targeted toward the reduction of incidental takes, it exceeds the scope of NMFS's authority. Accordingly, the ITS is contrary to law and plaintiffs are also entitled to summary judgment on this issue.

### 3. Remedy

As remedy, plaintiffs request a declaration that NMFS violated the APA and ESA as well as remand to the agency without vacatur, and a deadline of 12 months to correct the identified errors. They note that this type of relief is commonly granted in cases involving biological opinions, in order to avoid disruptive consequences to regulated parties. *See, e.g.*, *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021); *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 925 (9th Cir. 2008). The court may also retain jurisdiction until the federal agency has complied with its legal obligations, and has the authority to compel regular progress reports in the meantime. *Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001). Defendants acknowledge that the proper remedy is remand without vacatur. But they maintain that the remedy must be tailored to address the specific deficiencies identified by the court. Accordingly, they request that the court allow an opportunity for briefing on the proper remedy if it finds that the 2025 BiOp or ITS is deficient in any respect. The court agrees that supplemental briefing is required to address the proper timeline as well as how to minimize disruption

for regulated parties in the interim. Briefing deadlines will therefore be set with this judgment before any remedy is selected.

## III.
### CONCLUSION

For the reasons stated above, the Motion to Complete or Supplement the Administrative Record [doc. 37] and Motion for Summary Judgment [doc. 33] filed by plaintiffs will be **GRANTED** and the Cross-Motion for Summary Judgment [doc. 34] filed by defendants will be **DENIED**. Plaintiffs are given **14 days** from this ruling to file a brief addressing the remedy issues described above and defendants will have an additional **14 days** to file a response. A separate ruling will issue then issue on the appropriate remedies.

**THUS DONE AND SIGNED** in Chambers on the 23rd day of January, 2026.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**